SUPERIOR COURT OF CALIFORNIA
ALAMEDA COUNTY

| | | |
|---|---|---|
| JACK LaSALLE and DIANNE LaSALLE, | ) | |
| Plaintiff(s), | ) | |
| vs. | ) | 22CV018567 |
| AMERICAN INTERNATIONAL INDUSTRIES, et al., | ) | |
| Defendant(s). | ) | |

Video Recorded Deposition Upon Oral Examination of
JACK LaSALLE
Volume 1

10:35 a.m.
November 17, 2022
1100 North Sullivan Road, Suite 3218
Spokane, Washington

REPORTED BY: Mindi L. Pettit, RPR, WA CCR #2519, ID CSR #1141

# A P P E A R A N C E S

For the Plaintiff:

MARTIN P. NEIRA, ESQ.
Kazan, McClain, Satterley & Greenwood
55 Harrison Street, Suite 400
Oakland, California 94607
(510) 302-1000
mneira@kazanlaw.com

For the Defendant American International Industries:
(Present via Virtual Zoom)

ROBERT THACKSTON, ESQ.
Lathrop GPM LLP
2101 Cedar Springs Road, Suite 1400
Dallas, Texas 75201
(469) 983-6023
robert.thackston@lathropgpm.com

For the Defendant Chattem, Inc.:
(Present via Virtual Zoom)

THEODORE C. YARBROUGH, ESQ.
Gordon Rees Scully Mansukhani LLP
101 West Broadway, Suite 2000
San Diego, California 92101
(619) 544-7227
tyarbrough@grsm.com

For the Defendant Whittaker, Clark & Daniels, Inc.:
(Present via Virtual Zoom)

JAMES V. WEIXEL, ESQ.
Demler, Armstrong & Rowland, LLP
1990 North California Boulevard, Eighth Floor
Walnut Creek, California 94596
(415) 949-1900
jvw@darlaw.com

A P P E A R A N C E S (Continued)

For the Defendants Bayer Consumer Care Holdings LLC and Scholl's Wellness Co., LLC:
(Present via Virtual Zoom)

KYLE CASAZZA, ESQ.
Proskauer
2029 Century Park East, Suite 2400
Los Angeles, California 90067
(310) 284-5677
kcasazza@proskauer.com

For the Defendants Pfizer Inc., Barrett Minerals Inc., Specialty Minerals Inc.:
(Present via Virtual Zoom)

FERLIN P. RUIZ, ESQ.
Tucker Ellis LLP
201 Mission Street, Suite 2310
San Francisco, California 94105
(415) 617-2222
ferlin.ruiz@tuckerellis.com

For the Defendant Merck & Co., Inc.:
(Present via Virtual Zoom)
VANTHARA MEAK, ESQ.
Ridley Master
1900 O'Farrell Street, Suite 280
San Mateo, California 94403
(650) 365-7715
vmeak@hrmrlaw.com

For the Defendant Brenntag Specialties, LLC:
(Present via Virtual Zoom)

MICHAEL C. SCANLON, JR., ESQ.
Murrin & Associates LLC
3685 Mount Diablo Boulevard, Suite 353
Lafayette, California 94549
(925) 284-5770
michael.scanlon@murrinlaw.net

A P P E A R A N C E S (Continued)

For the Defendant Safeway, Inc.:
(Present via Virtual Zoom)
JOEL R. MEYER, ESQ.
Barnes & Thornburg LLP
2029 Century Park East, Suite 300
Los Angeles, California 90067
(310) 284-3772
joel.meyer@btlaw.com

Also Present: Robert Guier, Veritext
(Present via Virtual Zoom)
Hannah Silverman

# I N D E X


| EXAMINATION BY: | PAGE(S) |
|---|---|
| MR. NEIRA | 10 |

| EXHIBITS FOR IDENTIFICATION | | PAGE |
|---|---|---|
| Exhibit 1 | Photocopy of photograph | 8 |
| Exhibit 2 | Photocopy of photograph | 8 |
| Exhibit 3 | Photocopy of photograph | 8 |
| Exhibit 4 | Photocopy of photograph | 8 |
| Exhibit 5 | Photocopy of photograph | 8 |
| Exhibit 6 | Photocopy of photograph | 8 |
| Exhibit 7 | Photocopy of photograph | 8 |
| Exhibit 8 | Photocopy of photograph | 8 |
| Exhibit 9 | Photocopy of photograph | 8 |
| Exhibit 10 | Photocopy of photograph | 8 |
| Exhibit 11 | Photocopy of photograph | 8 |
| Exhibit 12 | Photocopy of photograph | 8 |
| Exhibit 13 | Photocopy of photograph | 8 |
| Exhibit 14 | Photocopy of photograph | 8 |
| Exhibit 15 | Photocopy of photograph | 8 |

| | | |
|---|---|---|
| Exhibit 16 | Photocopy of photograph | 8 |
| Exhibit 17 | Photocopy of photograph | 8 |
| Exhibit 18 | Photocopy of photograph | 8 |
| Exhibit 19 | Photocopy of photograph | 8 |
| Exhibit 20 | Photocopy of photograph | 8 |
| Exhibit 21 | Photocopy of photograph | 8 |
| Exhibit 22 | Photocopy of photograph | 8 |
| Exhibit 23 | Photocopy of photograph | 8 |
| Exhibit 24 | Photocopy of photograph | 8 |
| Exhibit 25 | Photocopy of photograph and video | 8 |
| Exhibit 26 | Photocopy of photograph and video | 8 |
| Exhibit 27 | Photocopy of photograph | 8 |
| Exhibit 28 | Photocopies of photographs | 8 |
| Exhibit 29 | Photocopies of photographs | 8 |
| Exhibit 30 | Photocopies of advertisements | 8 |
| Exhibit 31 | Photocopies of advertisements | 8 |
| Exhibit 32 | Photocopies of advertisements | 8 |
| Exhibit 33 | Photocopies of advertisements | 8 |
| Exhibit 34 | Photocopies of advertisements | 8 |
| Exhibit 35 | This Exhibit was Intentionally Left Blank | 8 |
| Exhibit 36 | Photocopy of photograph | 8 |
| Exhibit 37 | Photocopy of photograph | 8 |
| Exhibit 38 | Photocopy of photograph | 8 |
| Exhibit 39 | Photocopy of photograph | 8 |

| | | |
|---|---|---|
| Exhibit 40 | Photocopy of photograph | 8 |
| Exhibit 41 | Photocopy of photograph | 8 |
| Exhibit 42 | Photocopy of photograph | 8 |
| Exhibit 43 | Photocopy of photograph | 8 |
| Exhibit A | Notice of Deposition of Plaintiff Jack LaSalle | 8 |
| Exhibit B | Letter to Ms. Huth from Mr. Rivamonte, 11-14-22 | 8 |
| Exhibit C | Letter to All Defense Counsel from Ms. Kundidzora, 11-14-22 | 8 |
| Exhibit D | Declaration of Barry R. Horn, M.D. in Support of Plaintiffs' Motion for Trial Preference | 8 |
| Exhibit 44 | Defendant American International Industries' Objection to Plaintiffs' Notice of Deposition of Plaintiff Jack Lasalle | 100 |

Spokane, Washington; November 17, 2022
10:35 a.m.
--oOo--

(Deposition Exhibits 1 through 43 and A through D were marked for identification.)

THE VIDEOGRAPHER: And we are on the record at 10:35 on November 17th, 2022. Audio and video recording will continue to take place unless all parties agree to go off the record.

This is Media Unit 1 of the video recorded deposition of Jack LaSalle, taken by counsel for plaintiff in the matter of Jack LaSalle and Dianne LaSalle, plaintiffs, versus American International Industries, et al., defendants. It's filed in the Superior Court of the State of California, County of Alameda, Case No. 22CV018567.

We are at the Mirabeau Park Hotel and Convention Center, 1100 North Sullivan Road, Spokane Valley, Washington 99037. My name is Robert Guier representing Veritext Legal Solutions, and I'm the videographer. The court reporter is Mindi Pettit, also with Veritext Legal Solutions. And I guess counsel will be represented on the stenographic record.

And will the court reporter please swear the

witness.

(Witness sworn.)

MR. NEIRA: All right. Good morning, everybody. Before we start the examination today, I would like to premark some exhibits. Exhibit A will be plaintiff's notice of deposition of plaintiff Jack LaSalle. Exhibit B will be plaintiff's November 14th meet and confer letter with the proposed stipulation regarding the conduct of this deposition. Exhibit C will be plaintiff's November 14th letter with the deposition information.

And Exhibit D will be Dr. Horn's October 14th -- October 24th declaration in support of plaintiff's motion for preference. In accordance with this declaration, defendants' time on cross-examination will be limited under Code of Civil Procedure Section 2025.295.

I'd also like to put on the record a stipulation that we've entered with counsel that an objection for one defendant is an objection for all. And then finally if counsel could please email their appearances to Ms. Pettit, our court reporter -- her email address is in the chat.

JACK LaSALLE,

sworn as a witness by the Certified Court Reporter,

testified as follows:

EXAMINATION

BY MR. NEIRA:

Q. Good morning, Jack.
A. Good morning.
Q. You know me?
A. Yes.
Q. I'm Martin Neira, your attorney.
A. Yes.
Q. The attorneys representing the corporations in this lawsuit are appearing today via Zoom. And we're here today for your deposition. And the way this goes is I will ask you questions first and then the attorneys for the corporation will get to ask you questions next.
A. Okay.
Q. Can we go ahead and proceed today?
A. Yes.

DEFENSE COUNSEL: Could we -- can we just make sure we have on the record the agreement that participating in the deposition, that we're not waiving any objections including to the form or jurisdiction. This is Robert Thackston for AII. We've -- we've filed objections to the deposition, and we will attach those as well, but I just want to make sure we --

THE REPORTER: You know what? I can barely hear him.

(Discussion off the written record.)

THE REPORTER: You might have to repeat that, Robert. Thanks. Just wait a sec.

DEFENSE COUNSEL: Okay.

(Discussion off the written record.)

THE REPORTER: Okay. Try again, Robert.

DEFENSE COUNSEL: Yeah, this is Robert Thackston for AII. Can you hear me okay?

THE REPORTER: Yeah. Go ahead.

DEFENSE COUNSEL: Okay. Mr. LaSalle and Counsel, I apologize for interrupting. I just want to say that participation in the deposition is not waiving any of our rights including to object to the appropriateness of the form. And we will attach the objections that we filed as an exhibit to the deposition after -- at some point. Thank you for allowing me to interject.

MR. NEIRA: Thank you, Counsel.

Q. (By Mr. Neira) So, Jack, today I will ask you questions about at least three topics. One is your background, your family, and your life. Is that something that you're prepared to talk about today?

A. Yes.

Q. Then I'm going to ask you about your work history and your use of talc products, both at work and for your own personal use. Are you prepared to talk about that too?

A. Yes.

Q. And finally I'll ask you some questions about your medical situation. Is that -- is that something that -- that you're prepared to talk about?

A. Yes.

Q. Okay. Great. Thank you. I'll ask you some overview questions on each topic first, and then we'll dive into each topic together.

A. Okay.

Q. So, while we talking, you're on camera, and the camera is recording. And as you know, all the other attorneys are appearing via Zoom. So I know it's a bit unnatural, but just pretend you're on TV and don't look at me, but look at the camera instead.

A. Okay.

Q. Okay. I know it's going to be a bit unnatural, but that's the way we have to do it. So, if you could do that, I would appreciate it. Okay?

A. Okay.

Q. All right. So, to get us started here, can you please state your full name for the record.

A. Jack Marquis LaSalle.
Q. And how do you spell Marquis?
A. M-a-r-q-u-i-s.
Q. And what is your date of birth?
A. 5-21-47.
Q. So that makes you 75 years old today?
A. Yes.
Q. And where do you live?
A. 1716 South Burns Road, Spokane Valley, Washington.
Q. How long have you been in the Spokane area for?
A. All my life.
Q. Have you recently been diagnosed with cancer?
A. Yes.
Q. And what type of cancer do you have?
A. I have mesothelioma.
Q. When were you diagnosed with this disease?
A. In June -- about June 3rd, I believe was the first diagnosis. Can everybody hear me?
Q. Yes. June 3rd of 2022?
A. Yes.
Q. So that was about five months ago?
A. Yes.
Q. And since then, have you been receiving

treatment for your mesothelioma?
A. Yes, I've been getting chemo.
Q. Okay. Were you working before you were diagnosed with mesothelioma?
A. Yes.
Q. What was your job?
A. I'm a barber.
Q. And when did you last work?
A. In February -- late February.
Q. Of 2021?
A. Of this year.
Q. Okay. 2022?
A. Yeah.
Q. Okay. And why did you have to stop working?
A. Well, I was in pain from the mesothelioma that came on kind of sudden. And -- well, they didn't know what it was, but eventually I found it was mesothelioma. I had three physicians diagnose it.
Q. And so the symptoms that eventually led to your diagnosis of mesothelioma is what kept you from working?
A. Yes.
Q. Okay. And I assume you've not been able to return to work --
A. No.

Q. -- since the symptoms appeared.
A. No.
Q. Okay. How long were you a barber for before you had to stop working?
A. About 52 years.
Q. And did you like your job?
A. I loved it.
Q. During the course of your 52-year career as a barber, did you use any talc products?
A. Yes.
Q. And what brand of talc products did you use for your work as a barber?
A. Clubman.
Q. Did you use any other brand?
A. No. Only in special -- if we were out of Clubman, I would grab some Johnson & Johnson.
Q. The baby powder?
A. Yeah, that was just to fill a gap.
Q. Okay. So almost exclusively Clubman Talc?
A. Yes.
Q. And if you didn't have it, Johnson & Johnson baby powder?
A. Yes, sir.
Q. Okay. And what about for your own personal use? Did you ever use talc products?

A. No. Oh, I -- I'm sorry, I did. I used foot powder.

Q. Okay. And what brands of foot powder did you use?

DEFENSE COUNSEL: Objection, overbroad, vague, ambiguous, calls for speculation.

A. Oh, I used Johnson -- not Johnson & Johnson.

Q. (By Mr. Neira) It's okay. You can -- you can take a moment.

A. Used -- oh, gosh. I need time to bring it back up. My memory isn't too good anymore, so could we go to another -- the next . . .

Q. Okay.

A. I'll get back to you on that one.

Q. Okay. So we'll go over some photographs, and I'll ask you some more questions about your work history and your use of talc products in just a moment. Right now, I'd ask -- I'd like to ask you some questions about you, your life, and your background. Is that okay with you?

A. Sure.

Q. Okay. So where did you grow up?

A. In Spokane.

Q. Did you move out of Spokane in about the 1960s?

questions about your -- your family -- your parents and your siblings. What is your mother's name?

A. Joann Cody.

Q. Is she still alive?

A. No.

Q. Do you know what your mom did for a living?

A. She was a nurse assistant and a -- oh -- she did a lot of school. She was a -- a college student for a couple of years. And she was a waitress. She was, like I said, a -- a nurse assistant.

Q. Okay. And how old -- how old was she when she passed?

A. 84.

Q. Do you know what led to her passing?

A. Yeah, she had really bad COPD. Her lungs were shot.

Q. Did she smoke cigarettes?

A. Yes.

Q. What is your father's name?

A. Donald LaSalle.

Q. Is he still alive?

A. No.

Q. What did your father do for a living?

A. He was a barber.

Q. Okay. And to your knowledge, did your -- did

your father ever use talc product for his work as a barber?

A. Oh, yes.

Q. Do you know what brand of talc powder your dad used?

A. Clubman.

Q. And how do you know it was Clubman?

A. Because Clubman was the first thing that I saw in his barbershop -- him using. I spent a lot of time up there.

Q. Could you see anything in the air when your father was using Clubman around you?

A. Oh, yes.

DEFENSE COUNSEL: Objection, vague, speculation.

Q. (By Mr. Neira) What could you see in the air?

A. I could see a -- a -- a mist of powder.

Q. Do you know what led to your dad's passing?

A. Yeah, his lungs were shot.

Q. Did he smoke cigarettes?

A. Yes.

Q. Okay. Do you have any siblings?

A. Pardon?

Q. Do you have any siblings? Brothers --

A. One's left. I had three other siblings, but

A. Yes.

DEFENSE COUNSEL: Objection.

DEFENSE COUNSEL: Objection, leading colloquy.

Q. (By Mr. Neira) So you mentioned earlier that you used Clubman Talc during your career as a barber and that you also occasionally used Johnson & Johnson baby powder?

A. Yes.

Q. So I'm going to ask you some questions about that.

DEFENSE COUNSEL: Objection, leading.

Q. (By Mr. Neira) When did you first use talc for your work as a barber?

A. In barber school.

Q. So that was in 1969?

A. Yes.

Q. And did you get on-the-job training at Dan's Barber School?

A. Dan's Barber School?

Q. Yeah.

A. Yeah, we had -- it was actually on-the-job training. We had people that came in to get cheap haircuts so the students would have something to learn from.

Q. So was Dan -- Dan's Barber School one of those schools where you had classes in the morning and then practical training in the afternoon?

A. Yes.

Q. And were you the only student practicing in the afternoon, or did you have other barbers around you?

A. Oh, no, we -- we had at least six --

Q. And --

A. -- students.

Q. And did you use talc on every single client at Dan's Barber School?

A. That was part of the routine --

DEFENSE COUNSEL: Objection, leading.

A. -- yes. Unless they didn't want it.

Q. (By Mr. Neira) And what did you use talc powder for?

A. For taking off the hair that was moist and then stuck to the skin. It helped to get that off.

Q. So you would use the talc to help with moisture and also to help get rid of the excess hair when you were done cutting hair?

A. Yeah, the --

DEFENSE COUNSEL: Objection, leading.

A. The talc actually took the moisture out of

those haircuttings that you normally couldn't get.
THE REPORTER: You know, I -- I'm having a really hard time hearing when the objections come and then -- if you hear them speak, just pause for a second, 'cause I have to write what everyone is saying, so -- thank you.
THE WITNESS: Sorry.
THE REPORTER: That's okay.
Q. (By Mr. Neira) So can you please describe for me the way in which you applied the talc powder to your clients.
A. Yeah, we --
DEFENSE COUNSEL: Objection, leading.
A. Well, we would take the powder and put it on our brush -- we had a dusting brush. And then we brush it off on the neck and around the ears to get the hair off. And -- and the -- basically that's what we did. It was -- it was a -- a mess.
Q. (By Mr. Neira) And so you mentioned you would put the talc on the brush. Once you had put the talc on the brush, did you tap the brush or kind of shake it around a little bit?
A. Yes. To get the excess off.
Q. So what did you see in the air when you would do that?

A. Talc.

DEFENSE COUNSEL: Objection, leading, assumes facts.

A. I'd see talc.

Q. (By Mr. Neira) And what about when you brush your client's neck with the talc? What did you see in the air?

A. Dust talc.

DEFENSE COUNSEL: Objection, leading, assumes facts.

A. It was talc.

Q. (By Mr. Neira) I want to share my screen again. I want to show you what I've marked as Exhibit 25. Can you see it?

A. Not very well.

Q. Okay. It's right here. You can see it on the screen right in front of you?

A. No, I can't.

Q. You can't see it right here in front of you?

A. That's my brush -- or it would be a brush.

Q. Look at the screen right here in front of you.

A. Yeah. Yeah, that's -- that's how we did it. That's how we did it. We brushed the -- put it on there and then brushed it -- to get it down into the brush -- like that. Shook off the excess.

represent how you applied talc on a client?
A. Yes.
DEFENSE COUNSEL: Objection, form, leading.
Q. (By Mr. Neira) Does it fairly and accurately represent the type of dust that you saw in the air --
A. Yes.
Q. -- when you applied talc on your clients?
A. Yes.
DEFENSE COUNSEL: Objection, leading, form.
Q. (By Mr. Neira) So, when you applied talc as a barber, could you see the dust from the talc on your own hands when you were cutting hair?
A. Yes.
DEFENSE COUNSEL: Leading, form.
Q. (By Mr. Neira) Could you see the dust on the client's neck once you had applied the talc?
A. Yes.
DEFENSE COUNSEL: Objection, leading, form.
Q. (By Mr. Neira) Could you see the dust on the cape that the client was wearing?
A. Yes.
DEFENSE COUNSEL: Objection, leading,

form.
Q. (By Mr. Neira) Could you see the dust on the towels that you would put on your clients' shoulders?
A. Yes.
Q. Could you see it on the clients' neck strips?
A. Yes.
DEFENSE COUNSEL: Objection, leading, form.
Q. (By Mr. Neira) I'm going to show you what I've marked as Exhibit 27. What do you see on this picture?
A. Apply -- application of the talc.
DEFENSE COUNSEL: Objection, leading, form.
Q. (By Mr. Neira) And does Exhibit 27 fairly and accurately represent the type of dust that you saw in the air --
A. Oh, yes.
Q. -- on and around your clients when you applied the talc powder on their neck?
A. Yes.
DEFENSE COUNSEL: Objection, leading form.
DEFENSE COUNSEL: Lack of foundation, assumes facts.

Q. (By Mr. Neira) Thank you. Were you responsible for cleaning up whatever hair you cut around your immediate area?
A. Absolutely.
Q. And did you --
A. Yes.
Q. Did you sweep the floor around your working area to keep it clean?
A. Yes.
DEFENSE COUNSEL: Objection, leading, form, assumes facts.
Q. (By Mr. Neira) Were you responsible for cleaning up your work chair?
A. Yes.
Q. Were you also responsible for cleaning up the capes and the towels that you used with your clients?
A. Yes.
Q. And every time you did any of these things, what could you see in the air?
A. Dust from the talc.
DEFENSE COUNSEL: Objection, form.
MR. NEIRA: Did you get it?
Q. (By Mr. Neira) You could see the dust from the talc?
A. Yes.

DEFENSE COUNSEL: Objection, leading, form.

Q. (By Mr. Neira) You -- you mentioned that when you were at Dan's Barber School, you had at least six other trainees around you?

A. Yes.

Q. Did they also use talc the way you did?

A. Oh, yes.

DEFENSE COUNSEL: Objection, leading, compound, vague, overbroad.

Q. (By Mr. Neira) And what could you see in the air when they used talc?

A. Dust.

DEFENSE COUNSEL: Leading, assumes facts, vague, overbroad, form.

Q. (By Mr. Neira) When you or the other barbers around you applied this talc, could you smell the powder?

A. Oh, yes.

DEFENSE COUNSEL: Objection, leading.

Q. (By Mr. Neira) Did you breathe the talc powder?

A. Yes.

DEFENSE COUNSEL: Leading, calls for an expert opinion, vague, overbroad.

Q. (By Mr. Neira) Did you ever feel irritation from breathing the talc?
A. Yes.
DEFENSE COUNSEL: Same objection.
Q. (By Mr. Neira) What brand of talc did you use during your on-the-job training at Dan's Barber School?
A. Clubman.
Q. So you explained that you used Clubman Talc while training at Dan's Barber School in 1969. We also discussed that you went on to continue with your career as a barber for over 50 -- 52 years and that you worked at half a dozen places. Did you continue to use Clubman Talc for your -- for your work for the rest of your career?
A. Yes.
DEFENSE COUNSEL: Objection, leading -- leading, assumes facts.
Q. (By Mr. Neira) Did you use it every day for the rest of your career as a barber?
A. Yes.
DEFENSE COUNSEL: Objection, leading.
Q. (By Mr. Neira) And every time you used Clubman for over 52 year, did you apply the talc in the same way you just explained you did while you were at Dan's Barber School?

A. Yes, I did.
DEFENSE COUNSEL: Objection, leading.
Q. (By Mr. Neira) And your application of the talc created dust every time in the same way you described it did while you were at Dan's Barber School?
A. Yes.
DEFENSE COUNSEL: Objection, leading.
Q. (By Mr. Neira) And throughout your career, did you also work at barbershops where other barbers used Clubman Talc around you?
A. Yes.
DEFENSE COUNSEL: Objection --
Q. (By Mr. Neira) In the way you described others --
THE REPORTER: Hold on.
DEFENSE COUNSEL: Objection, leading.
Q. (By Mr. Neira) I'm going to -- I'm going to ask that question again. Wait for me to be done and then you answer. Okay? It's okay. Throughout your career, did you also work at barbershops where other barbers used Clubman around you in the way you described others using talc at Dan's Barber School?
A. Yes.
DEFENSE COUNSEL: Compound, assumes facts, form.

Q. (By Mr. Neira) Okay. And did this also create dust you could see around you and that you breathed?

A. Yes.

DEFENSE COUNSEL: Same objection.

Q. (By Mr. Neira) How did you know it was Clubman Talc?

A. It had a label.

Q. What did the label say?

A. Clubman Talc.

Q. And did -- was there anything distinctive about the bottle?

A. Well, they -- they changed it a couple times.

Q. Okay. Did anything remain, you know, constant throughout the different packaging?

A. The product.

Q. Right. But on -- on the packaging, did you -- was there something that was always there?

A. Yes --

DEFENSE COUNSEL: Objection, vague, form, leading.

A. -- there was -- there was a little -- there was a man on there with a little top hat. And it said "Clubman Talc" over again.

Q. (By Mr. Neira) Okay. Do you remember the

color of the bottle?
A. It started out with white. Then -- that's near my first part of my career in school --
Q. Did it change to a different color after that?
A. Yes.
Q. To what color?
A. Yeah, it went to green.
Q. Okay. Do you remember what the -- the bottle was made out of when you first started using it?
A. Yeah, it -- the white one was tin.
Q. Okay. And then what was the green one made out of?
A. The first ones were tin also.
Q. Okay. And then what did it change to?
A. It went to plastic.
Q. Did you notice any change about the cap or the lid throughout your career?
A. Yeah, the first ones were twist lids. And the later ones in the '90s, were flip tops.
Q. Okay. I'm going to show you now a series of pictures that I've marked as Exhibit 28. Take some time and have a look at them.
A. Yeah.
DEFENSE COUNSEL: Counsel, I'm going to ask that you produce the photographs to us now --

only see myself, the court reporter, the videographer, and Mr. LaSalle.

So this is the way it's going to go. You have my representation, Counsel, that I am not showing Mr. LaSalle anything. And every exhibit that I hand out to him is what I show you on the screen. And I'm going to move forward.

DEFENSE COUNSEL: Can you also represent that you have nothing else in front of you? You have no other pictures or written materials in front of you that the witness can see or read?

MR. NEIRA: Absolutely.

Q. (By Mr. Neira) All right. So, Jack, did you have a chance to look at what has been marked as Exhibit 28?
A. Yes.
Q. And do you recognize Exhibit 28?
A. Yes.
Q. What's -- what's Exhibit 28?
A. It's a can of Clubman Talc --
Q. And how --
A. -- an older can of talc.
Q. And -- and you've gone through the -- the multiple pages in Exhibit 28?
A. Yes.

Q. Do -- does Exhibit 28 fairly and accurately represent the types of bottle of Clubman that you used every day throughout your career as a barber?
A. Yes.
DEFENSE COUNSEL: Well, object to -- object to form. And object to compound and leading. Are there -- are there other photographs that are a part of Exhibit 28?
MR. NEIRA: There are multiple photographs as part of Exhibit 28. There are ten different pictures that I showed on the screen. And I also sent that exhibit to you via email.
DEFENSE COUNSEL: Yeah, I -- I got it. I just -- I think for the record, if we could identify that -- you've indicated it was actually -- Exhibit No. -- Exhibit 28 is actually ten different photographs.
MR. NEIRA: All right. Noted for the record.
Q. (By Mr. Neira) So, Jack, why did you use Clubman Talc?
A. It was professional product.
Q. What do you mean by that?
A. Well, it -- what we use were professional grade tools, and everything about it -- I wanted to

keep a professional image in the barbershop.
Q. Was -- was it a brand that you trusted?
A. Oh, yes.
Q. Does the fact that your father also used Clubman Talc have any impact -- did that have any impact on you?
A. Yes, it did.
Q. What about the fact that this was the product that they taught you to use at Dan's Barber School?
A. Well, it was part of the training. It was another step in the training.
Q. Okay. And you mentioned that you also occasionally used Johnson & Johnson baby powder. Why Johnson & Johnson baby powder?
A. Well, it was the handiest one we had.
Q. Okay.
A. You know, we kept it as a -- as a backup. If everybody was out and -- oh, I've got a bottle over -- over here, so they would use it.
Q. And was Johnson & Johnson baby powder a brand that you trusted?
A. Yes.
Q. And why was that?
A. It smelled good.
Q. And how did you know it was Johnson & Johnson

baby powder?
A. It had the label on there. It was white with a blue background -- blue printing on it.
Q. The bottle was white with blue printing on it?
A. Yes.
Q. And what did the printing say?
A. Johnson & Johnson.
Q. So I'm going to show you what I've marked as Exhibit 29. Exhibit 29 contains 21 different pictures. Have a look at them.
A. All familiar.
Q. And what does Exhibit 29 represent?
A. Woops, sorry. Going to ruin your pictures. The bottom of the can -- of the bottle.
Q. Are those pictures of Johnson & Johnson baby powder?
A. All the way through.
Q. And does Exhibit 29 fairly and accurately represent the types of bottles of Johnson & Johnson baby powder that you used throughout your career as a barber?
A. Yes, yes.
Q. Did you buy the Clubman Talc and the Johnson & Johnson baby powder yourself that you used at work?
A. Yes.

Q. Where did you buy these products?
A. We got it from a supplier -- a professional supplier of beauty and barber supply.
Q. So did -- did any salesmen or any -- you know, did any salesmen for Clubman Talc come to the barbershops to try and sell you their products?
A. Well, that's the only -- only kind they had powderwise --
Q. Okay.
A. -- was the Clubman.
Q. And so they came to your barbershop and --
A. Yes.
Q. -- and trying to sell you the product?
A. Yeah, amongst other products.
DEFENSE COUNSEL: Objection -- objection, leading, form.
Q. (By Mr. Neira) Did you ever see any advertisements about these products?
A. I'm sorry. The question?
Q. Did you ever see any advertisements about these products?
A. Oh, just in magazines, yes.
Q. Okay. And I'm going to share my screen again and show you Exhibit 30, which is just two pages. What do you see on Exhibit 30?

A. I see advertisement.
Q. And does Exhibit 30 fairly and accurately represent print ads that you recall about Clubman Talc?
A. Yes.
DEFENSE COUNSEL: Leading, form.
A. Yes.
Q. (By Mr. Neira) And I want to show you what I've marked as Exhibit 31. Exhibit 31 is three pages.
A. Yes, I've seen these.
Q. What is Exhibit 31?
A. It's advertisement.
Q. For what brand?
A. For Johnson & Johnson baby powder.
Q. Does Exhibit 31 fairly and accurately -- accurately represent print ads you recall about Johnson & Johnson baby powder?
A. Yeah. Yes, it does.
Q. Jack, did you -- did you think that the white dust that you saw and breathed from your use of Clubman and J&J talc powder during your 52-year career as a barber was safe?
A. I did, yes.
DEFENSE COUNSEL: Objection, leading, assumes facts, form.
Q. (By Mr. Neira) Did you know or expect that

Clubman Talc or Johnson & Johnson baby powder could cause you harm in any way?

A. No.

DEFENSE COUNSEL: Objection, form.

DEFENSE COUNSEL: Objection, leading, vague, ambiguous, overbroad, calls for expert opinion, lacks foundation, assumes facts.

Q. (By Mr. Neira) And based on everything that you knew about these companies, did you trust Clubman and J&J to provide safe products?

A. Yes.

DEFENSE COUNSEL: Objection.

DEFENSE COUNSEL: Same objections.

Q. (By Mr. Neira) Did you ever expect that you would be giving a deposition about your use of these products?

A. No.

DEFENSE COUNSEL: Same objections.

Q. (By Mr. Neira) Had you known these products were dangerous, would you have used them?

DEFENSE COUNSEL: Same objections.

DEFENSE COUNSEL: Form.

A. Well, no.

Q. (By Mr. Neira) No, you wouldn't have used them?

A. No.

DEFENSE COUNSEL: Same objection.

Q. (By Mr. Neira) Did you see any warnings on the Clubman Talc and the Johnson & Johnson baby powder that you used regarding asbestos and its dangers?

A. No.

DEFENSE COUNSEL: Same objections.

Q. (By Mr. Neira) Had you seen a warning about asbestos and its dangers on these products, would you have used them?

A. No.

DEFENSE COUNSEL: Form.

DEFENSE COUNSEL: Same objections.

Q. (By Mr. Neira) So when did you stop using these products?

A. When I retired.

Q. And you retired because you got sick?

A. Yes.

Q. What were your yearly earnings when you were -- when you were able to work full-time as a barber before the symptoms?

A. Around 30,000.

Q. Per year?

A. A year.

Q. And how long were you planning on working?

A. At least another four or five years.

MR. NEIRA: I think this is a good time for a break. We are going to take a ten-minute break and resume after that. Thank you.

THE VIDEOGRAPHER: Okay. Off the record at 11:37.

(Recess taken.)

THE VIDEOGRAPHER: And we're back on the record at 11:50.

Q. (By Mr. Neira) So, before we took a break, Jack, we talked about your use of talc products at work. Now I want to switch gears and discuss your own personal use of talc products. Are you ready to talk about that?

A. Yeah.

Q. What brands and kinds of talc products did you use?

A. I used foot --

DEFENSE COUNSEL: Objection --

DEFENSE COUNSEL: Objection, form, calls for speculation, foundation, vague, ambiguous, overbroad, assumes facts, and also compound.

A. I used foot powders.

Q. (By Mr. Neira) What brand?

DEFENSE COUNSEL: Same objections.

DEFENSE COUNSEL: Same objections.
A. Oh, what was that . . . Do I get to say what I used?
Q. (By Mr. Neira) Yeah.
A. Yeah, I used Gold Bond foot powder and one more. It's been a long time. Gold Bond and Dr. Scholl's was the one I remember too.
Q. So you used Dr. --
A. Those two. Off and on between them.
Q. So you used Dr. Scholl's and Gold Bond foot powders?
A. Yes.
DEFENSE COUNSEL: Objection, form.
DEFENSE COUNSEL: Leading.
Q. (By Mr. Neira) When did you start using these products?
A. When I --
DEFENSE COUNSEL: Objection --
DEFENSE COUNSEL: Objection, form.
DEFENSE COUNSEL: Objection, overbroad, vague, ambiguous, compound.
A. I started when I was in the Army.
Q. (By Mr. Neira) So that's in the mid 1960s?
A. Yes.
Q. Did you use them while you were training in

California?
A. Yes.
DEFENSE COUNSEL: Objection, form.
Q. (By Mr. Neira) And for how --
DEFENSE COUNSEL: Objection, leading.
Q. (By Mr. Neira) For how long did you use these products?
A. Oh, I --
DEFENSE COUNSEL: Objection, form.
DEFENSE COUNSEL: It's vague, ambiguous, also compound, overbroad.
A. Oh, I probably used 'em for five years, off and on.
Q. (By Mr. Neira) You mean, a total of five years off and on --
A. Yeah.
Q. -- throughout your life?
A. Yes.
DEFENSE COUNSEL: Objection, form.
Q. (By Mr. Neira) You said you started in the 1960s -- mid 1960s?
A. Yes.
Q. When did you last --
DEFENSE COUNSEL: Objection -- objection, form.

Q. (By Mr. Neira) When did you last use either the Gold Bond or the Dr. Scholl's foot powder?
A. Oh --
DEFENSE COUNSEL: Objection, compound, vague, ambiguous, calls for speculation.
A. Oh, I -- I'd say, it -- probably another three after that. I -- yeah, so probably '71 or '72.
Q. (By Mr. Neira) And throughout your career as a barber, you know, being up and active all the time, did you continue to use foot powders?
A. Occasionally.
DEFENSE COUNSEL: Objection, form.
DEFENSE COUNSEL: Objection, leading, assumes facts, calls for speculation, vague, ambiguous, and overbroad.
A. Yes.
Q. (By Mr. Neira) So they're going to object after my questions. Don't -- kind of bear that out. Don't listen to what they're saying. Just think about my question. Wait for them --
A. Yeah.
Q. -- to put their objections in the record. They're allowed to do that.
A. Yeah.
Q. And then you answer the question.

A. Okay.
Q. Okay? Just don't worry about them. Okay? So you -- you kept using those products off and on throughout your career --
A. Yes.
Q. -- for your --
DEFENSE COUNSEL: Objection, form.
DEFENSE COUNSEL: Objection, form.
DEFENSE COUNSEL: Objection, mischaracterizes testimony as well.
MR. NEIRA: If you could at least -- I'm fine with the objections, but please wait for me to be done with my questions first.
DEFENSE COUNSEL: Yeah, and --
DEFENSE COUNSEL: Counsel, we have -- the problem is that the witness is answering perhaps --
MR. NEIRA: Right.
DEFENSE COUNSEL: -- when you're not done with your questions, and we have the additional problem that you are deliberately asking compound questions that are just entirely indefinite as to any time frame.
MR. NEIRA: And so, like I just mentioned to Mr. LaSalle, I'm going to ask my question. He's going to give you some time for you guys to

object. And then he'll respond. So it will be easier for all of us, for the court reporter. So let's just do it that way.

DEFENSE COUNSEL: Thank you, Counsel.

DEFENSE COUNSEL: Thank you.

Q. (By Mr. Neira) So you continued to use the foot powders on and off for the rest of your life because you were active as a -- as a barber. Did you have any other reason to use --

DEFENSE COUNSEL: Objection --

DEFENSE COUNSEL: Objection, mischaracterizes prior testimony.

DEFENSE COUNSEL: I apologize, I think -- I don't think you were complete -- finished with your answer, and I think I prematurely objected. So, Counsel, do you want to finish your answer and then I have some objections?

Q. (By Mr. Neira) Why did you use those products?

A. I had --

DEFENSE COUNSEL: Objection, leading. Also it's vague, ambiguous, overbroad, compound.

A. I had athlete's foot.

Q. (By Mr. Neira) Any other reason you used these products?

A. No.
DEFENSE COUNSEL: Same objection, form.
A. No.
Q. (By Mr. Neira) You applied these products on your feet?
A. Yes.
DEFENSE COUNSEL: Objection.
DEFENSE COUNSEL: Objection, overbroad, and vague as to time frame.
A. Yes.
Q. (By Mr. Neira) So I'm going to ask you some questions about when and how often you used those products now. Are you ready for that?
A. Yes.
DEFENSE COUNSEL: Objection, form.
Q. (By Mr. Neira) Did you use either Dr. Scholl's foot powder or Gold Bond foot powder after you took a bath or a shower?
A. Yes.
DEFENSE COUNSEL: Objection, leading.
DEFENSE COUNSEL: Objection, form.
DEFENSE COUNSEL: Overbroad and -- and lacks foundation.
DEFENSE COUNSEL: And it's also vague, ambiguous, compound.

Q. (By Mr. Neira) Did you use it before you would do any sport activities?
DEFENSE COUNSEL: Objection, form.
DEFENSE COUNSEL: Same objections.
A. Yes.
Q. (By Mr. Neira) Did you put it in your shoes?
A. Yes.
DEFENSE COUNSEL: Same objection.
DEFENSE COUNSEL: Objection, form.
A. Yes.
Q. (By Mr. Neira) And you mentioned you had a recurring athlete's foot issue. Did you use those products for that reason too?
A. Yes.
DEFENSE COUNSEL: Objection, form.
DEFENSE COUNSEL: Objection, leading.
DEFENSE COUNSEL: Objection, vague.
A. Yes.
Q. (By Mr. Neira) Does that mean you used the products when your skin was, you know, chaffed or irritated?
A. Yes.
DEFENSE COUNSEL: Objection, form.
DEFENSE COUNSEL: Objection. It's -- it's all leading. It's vague. It's ambiguous. It's

compound. It's overbroad as to time and product.
A. Yes.
Q. (By Mr. Neira) And where did you apply -- and by "where," I mean, when -- where in your house did you apply the Gold Bond and Dr. Scholl's foot powder?
A. Bathroom.
DEFENSE COUNSEL: Same objections, form.
DEFENSE COUNSEL: Objection, leading.
A. The bathroom.
Q. (By Mr. Neira) And where did the powders go when you applied these products?
DEFENSE COUNSEL: Same objection, form.
DEFENSE COUNSEL: Objection, calls for speculation. Calls also for a narrative.
A. In the air.
Q. (By Mr. Neira) Could you see it on your feet?
A. Yes.
Q. Could you see it --
DEFENSE COUNSEL: Same objections.
Q. (By Mr. Neira) -- on your hands?
DEFENSE COUNSEL: Same objections.
DEFENSE COUNSEL: Same objections.
A. Yes.
Q. (By Mr. Neira) Could you smell the powders?
A. Yes.

DEFENSE COUNSEL: Objection, form.
A. Yes.
Q. (By Mr. Neira) Did you -- did you breathe the talc powders?
DEFENSE COUNSEL: Same objection --
DEFENSE COUNSEL: Objection, form.
DEFENSE COUNSEL: -- calls for expert opinion.
A. Yes.
Q. (By Mr. Neira) Why did you use Dr. Scholl's foot powder?
DEFENSE COUNSEL: Objection, form.
A. Because it worked.
Q. (By Mr. Neira) And why did you use Gold Bond foot powder?
A. The same reason --
DEFENSE COUNSEL: That's --
A. -- it worked well.
DEFENSE COUNSEL: -- that's vague and overbroad.
A. Because it worked.
Q. (By Mr. Neira) Would there always be either a bottle of Dr. Scholl's or Gold Bond at your house at any time?
DEFENSE COUNSEL: Objection --

DEFENSE COUNSEL: Objection, leading and compound.
DEFENSE COUNSEL: -- form.
DEFENSE COUNSEL: Vague as to time.
A. Yes.
Q. (By Mr. Neira) And where did you buy these powders from?
DEFENSE COUNSEL: Objection, form.
A. We had a supermarket close. Safeway was the name of it.
Q. (By Mr. Neira) Do you remember the address of the Safeway?
A. No.
Q. Does Sprague and McDonald ring a bell?
A. Yes, that's where they put it.
Q. And did it -- did it later move to Sprague and South Evergreen?
A. Yeah, it did. Yes.
Q. Do you remember what the bottle of Dr. Scholl's foot powder looked like?
A. Yeah.
DEFENSE COUNSEL: Objection, form.
A. It was a yellow bottle.
Q. (By Mr. Neira) Okay. And I want to show you what I've marked as Exhibit 32.

DEFENSE COUNSEL: And, Counsel, I'm just going to have an objection to Exhibit 32 as lacking foundation. It's also improper refreshing a recollection. It's also leading.

Q. (By Mr. Neira) So there are five pictures in Exhibit 32.

DEFENSE COUNSEL: We'll also lodge -- lodge the objection to using the -- the unauthenticated photos of products when there is no evidence and -- and based on the prior testimony earlier this morning, there is not going to be an effort to show that the witness ever even saw the photos that he's being shown.

A. Recognizable.

Q. (By Mr. Neira) And what did you see -- or what do you see in Exhibit 32?

A. The Dr. Scholl's.

Q. And how do you know it's Dr. Scholl's?

A. Because I used to buy it.

Q. Do you recognize the bottles that you see --

A. Yes.

Q. -- in Exhibit 32?

A. Yes, I do. Sorry.

DEFENSE COUNSEL: Objection, form.

DEFENSE COUNSEL: It's also vague, ambiguous, overbroad.

Q. (By Mr. Neira) Does Exhibit 32 fairly and accurately represent the types of bottles of Dr. Scholl's foot powder you personally used during your life?

A. Yes.

DEFENSE COUNSEL: Objection, form.

DEFENSE COUNSEL: Vague, ambiguous, overbroad as to time.

Q. (By Mr. Neira) What about the bottle of Gold Bond? Do you remember what it looked like?

A. Oh. Well --

DEFENSE COUNSEL: I'm going to put an objection that you said what about the photo of Gold Bond? I -- I don't believe any photo of Gold Bond has been entered. But even if it has, that's vague and overbroad and misleading. And there is no clarification on what the -- what time period we're talking about.

A. Blue is what I can come up with.

Q. (By Mr. Neira) The bottle was blue? Do you remember the -- the color of the cap -- I mean, the lettering?

A. It had a red cap. I remember that.

Q. Red cap.

A. And red lettering.

represent print ads you recall seeing about Dr. Scholl's foot powder?

A. Yes.

DEFENSE COUNSEL: Objection, vague --

DEFENSE COUNSEL: Objection, form.

DEFENSE COUNSEL: -- ambiguous, overbroad, lacks foundation, leading.

A. Yes.

Q. (By Mr. Neira) Did you think that the white dust that you saw and breathed from your use of Dr. Scholl's foot powder was safe?

A. Yes.

DEFENSE COUNSEL: Objection, form.

DEFENSE COUNSEL: It lacks foundation, calls for speculation, assumes facts not in evidence, also calls for an expert opinion. It's leading and argumentative.

Q. (By Mr. Neira) Did you think that the white dust that you saw and breathed from your use of Gold Bond foot powder was safe?

A. Yes.

DEFENSE COUNSEL: Objection, that -- that is leading. That's overbroad, outside of scope, lacks foundation, calls for speculation, calls for expert opinion.

Q. (By Mr. Neira) Did you know or expect that these products could cause you harm in any way?
A. No.
DEFENSE COUNSEL: Objection, leading.
DEFENSE COUNSEL: Objection, form.
DEFENSE COUNSEL: Objection, same objection.
A. No.
DEFENSE COUNSEL: Also assumes facts, calls for an expert opinion.
A. No.
Q. (By Mr. Neira) Based on everything you knew about these companies, did you trust Dr. Scholl's and Gold Bond to provide safe products?
A. Yes.
DEFENSE COUNSEL: That's leading, overbroad --
DEFENSE COUNSEL: Objection, form.
DEFENSE COUNSEL: -- time and scope, lacks foundation, and it assumes facts not in evidence.
A. Yes.
Q. (By Mr. Neira) Did you ever expect that you would be giving a deposition about your use of these products?
A. No.

DEFENSE COUNSEL: Objection, form.
DEFENSE COUNSEL: Same objection. It's leading. It's compound. It's vague, ambiguous, also argumentative.
A. No.
Q. (By Mr. Neira) Had you known these products were dangerous, would you have -- would you have used them?
A. No.
DEFENSE COUNSEL: Same objection.
DEFENSE COUNSEL: Calls for expert opinion, foundation, calls for speculation, and it's argumentative.
DEFENSE COUNSEL: And it's leading.
DEFENSE COUNSEL: And it's leading.
A. No.
Q. (By Mr. Neira) Did you see any warnings on the Dr. Scholl's and Gold Bond foot powder bottles you used regarding asbestos and its dangers?
A. No.
DEFENSE COUNSEL: Objection, form.
DEFENSE COUNSEL: Objection, calls -- calls for expert opinion. It lacks -- it lacks foundation. It calls for speculation.
A. No.

Q. (By Mr. Neira) Had you seen a warning about asbestos and its dangers -- and its dangers on these products, would you have used them?
A. No.
DEFENSE COUNSEL: Objection, form.
DEFENSE COUNSEL: It's leading. It also assumes facts. It's -- yeah, I think that's about it. That's all I got.
Q. (By Mr. Neira) All right.
A. No.
Q. I'd like to switch gears now and turn your attention to the events leading up to your diagnosis with mesothelioma and to -- to talk about your current medical condition. Are you okay to talk about that with us today?
A. Yes.
Q. So how was it discovered that you had mesothelioma?
A. Well, I had pain in the left side of my chest that I thought was a torn muscle or -- so I went in to get an X ray of -- from the oncologist because it -- I had had a quart and two drained off my left lung. I thought I better go see an oncologist. And the -- after the PET scans and -- was diagnosed as mesotheliam -- thelioma by one doctor. And then we had

REPORTER'S CERTIFICATE

I, MINDI L. PETTIT, the undersigned Certified Court Reporter pursuant to RCW 5.28.010 authorized to administer oaths and affirmations in and for the State of Washington, do hereby certify that the sworn testimony and/or proceedings, a transcript of which is attached, was given before me at the time and place stated therein; that any and/or all witness(es) were duly sworn to testify to the truth; that the sworn testimony and/or proceedings were by me stenographically recorded and transcribed under my supervision, to the best of my ability; that the foregoing transcript contains a full, true, and accurate record of all the sworn testimony and/or proceedings given and occurring at the time and place stated in the transcript; that a review of which was not requested; that I am in no way related to any party to the matter, nor to any counsel, nor do I have any financial interest in the event of the cause.

WITNESS MY HAND AND DIGITAL SIGNATURE this 22nd day of November 2022.

MINDI L. PETTIT, RPR
Washington State Certified Court Reporter #2519
Idaho State Certified Shorthand Reporter #1141
mindi.pettit.courtreporter@charter.net

SUPERIOR COURT OF CALIFORNIA
ALAMEDA COUNTY

JACK LaSALLE and DIANNE LaSALLE, )
Plaintiff(s), )
vs. ) 22CV018567
AMERICAN INTERNATIONAL INDUSTRIES, et al., )
Defendant(s). )

Video Recorded Deposition Upon Oral Examination of
JACK LaSALLE
Volume 7

10:32 a.m.
December 2, 2022
1100 North Sullivan Road, Suite 3218
Spokane, Washington

REPORTED BY: Mindi L. Pettit, RPR, WA CCR #2519, ID CSR #1141

# A P P E A R A N C E S

For the Plaintiff:

MARTIN P. NEIRA, ESQ.
Kazan, McClain, Satterley & Greenwood
55 Harrison Street, Suite 400
Oakland, California 94607
(510) 302-1000
mneira@kazanlaw.com

For the Defendant American International Industries:
(Present via Virtual Zoom)

NILOFAR KARBASSI, ESQ.
Lathrop GPM LLP
2101 Cedar Springs Road, Suite 1400
Dallas, Texas 75201
(469) 983-6023
nilofar.karbassi@lathropgpm.com

For the Defendant Chattem, Inc.:
(Present via Virtual Zoom)

THEODORE C. YARBROUGH, ESQ.
Gordon Rees Scully Mansukhani LLP
101 West Broadway, Suite 2000
San Diego, California 92101
(619) 544-7227
tyarbrough@grsm.com

For the Defendant Whittaker, Clark & Daniels, Inc.:
(Present via Virtual Zoom)

DREW BURFORD, ESQ.
Demler, Armstrong & Rowland, LLP
1990 North California Boulevard, Eighth Floor
Walnut Creek, California 94596
(415) 949-1900
jvw@darlaw.com

A P P E A R A N C E S (Continued)

For the Defendant Bayer Healthcare LLC:
(Present via Virtual Zoom)

SHAWN S. LEDINGHAM, JR., ESQ.
Proskauer
2029 Century Park East, Suite 2400
Los Angeles, California 90067
(310) 284-5677
sledingham@proskauer.com

For the Defendants Pfizer Inc., Barretts Minerals Inc., Specialty Minerals Inc.:
(Present via Virtual Zoom)

FERLIN P. RUIZ, ESQ.
Tucker Ellis LLP
201 Mission Street, Suite 2310
San Francisco, California 94105
(415) 617-2222
ferlin.ruiz@tuckerellis.com

For the Defendant Merck & Co., Inc.:
(Present via Virtual Zoom)

VANTHARA MEAK, ESQ.
Ridley Master
1900 O'Farrell Street, Suite 280
San Mateo, California 94403
(650) 365-7715
vmeak@hrmrlaw.com

For the Defendant Brenntag Specialties, LLC:
(Present via Virtual Zoom)

MICHAEL C. SCANLON, JR., ESQ.
Murrin & Associates LLC
3685 Mount Diablo Boulevard, Suite 353
Lafayette, California 94549
(925) 284-5770
michael.scanlon@murrinlaw.net

A P P E A R A N C E S (Continued)

For the Defendant Safeway, Inc.:
(Present via Virtual Zoom)

KELLEY OLAH, ESQ.
Barnes & Thornburg LLP
2029 Century Park East, Suite 300
Los Angeles, California 90067
(310) 284-3772
kelley.olah@btlaw.com

Also Present: Robert Guier, Veritext
(Present via Virtual Zoom)
Hannah Silverman

# I N D E X


| EXAMINATION BY: | PAGE(S) |
|---|---|
| MS. OLAH | 423 |
| MR. SCANLON | 433 |
| MR. BURFORD | 434 |
| MS. KARBASSI | 438 |
| MR. YARBROUGH | 443 |
| MR. BURFORD | 447 |
| MR. RUIZ | 448 |
| MR. BURFORD | 464 |
| MR. NEIRA | 466 |
| MR. MEAK | 489 |
| MS. KARBASSI | 493 |

| EXHIBITS FOR IDENTIFICATION | PAGE |
|---|---|
| (No exhibits marked.) | |

Spokane, Washington; December 2, 2022

10:32 a.m.

--oOo--

(Mr. Yarbrough not present.)

THE VIDEOGRAPHER: We're on the record at 10:32. This is the beginning of Volume 7 of the video recorded deposition of Jack LaSalle.

MS. OLAH: Are you able to hear me okay?

THE WITNESS: Yes.

MS. OLAH: My name is Kelley Olah, and I represent the grocery store Safeway. Thank you for your time today.

THE WITNESS: Um-hum.

JACK LaSALLE,

previously sworn as a witness by the Certified Court Reporter,

testified as follows:

EXAMINATION

BY MS. OLAH:

Q. Are you ready to give your best and truthful testimony here today?

A. Yes, ma'am.

Q. Any reason why you cannot proceed with your depo right now?

A. No.

mind that you used Dr. Scholl's foot powder?
A. No.
Q. Finally, the attorney for Gold Bond -- he also asked you a lot of questions about your use of Gold Bond foot powder?
A. Yes.
Q. Do you recall that?
A. Um-hum.
Q. Are you being truthful about your use of Gold Bond foot powder?
A. Yes.
Q. Is there any reason for you to lie?
A. No.
Q. Do you have any doubt in your mind that you used Gold Bond foot powder?
A. No.
Q. Okay. I want to -- I want to ask you some questions about your use of these products. Are you ready to answer -- to answer questions regarding that?
A. Yes.
Q. So you mentioned in your deposition that you started using Clubman while training at Dan's Barber School in 1969. Do you recall that?
A. Yes.
DEFENSE COUNSEL: Objection, leading,

misstates testimony.

Q. (By Mr. Neira) You also explained that you retired from barbering earlier this year, around the month of February. Do you recall that?

A. Yes.

DEFENSE COUNSEL: Same objections.

Q. (By Mr. Neira) And from 1969 through February 2022, how often did you use Clubman Talc for your work as a barber?

A. Every day I was working.

Q. Is it fair to say then that you have used Clubman Talc every working day of your 52-year career as a barber?

A. Yes, sir.

DEFENSE COUNSEL: Objection, leading, misstates testimony.

Q. (By Mr. Neira) You also mentioned during your deposition that you worked at dozens of different barbershops throughout your career. Is that right?

A. Yes.

Q. And you told us about some of the names that you remembered, and your responses to the joint defense interrogatories which was entered as an exhibit to your deposition transcript also lists some of the places that you worked at. Is that right?

other barbers around you would use talcum powder. Do you remember that?

A. Yes.

DEFENSE COUNSEL: Objection, leading, misstates testimony.

Q. (By Mr. Neira) Do you remember what brand of talc product they used?

A. Talc --

DEFENSE COUNSEL: Objection, leading, calls for speculation -- calls for speculation, and lack of foundation.

A. Clubman.

Q. (By Mr. Neira) And in your opinion, how often were you around other barbers using Clubman Talc around you?

A. Every time I worked --

DEFENSE COUNSEL: Objection, leading.

A. Every time I worked with another barber.

Q. (By Mr. Neira) And so that would be true for every establishment that you worked at during your 52-year career as a barber?

A. If there were other barbers --

DEFENSE COUNSEL: Same objection.

A. -- yes.

Q. (By Mr. Neira) And how do you know it was

Clubman Talc that you and other barbers used around you at this time?

DEFENSE COUNSEL: Objection, leading, misstates testimony.

A. Because it was the only professional product out there.

Q. (By Mr. Neira) Do you recognize the bottle?

A. Yes.

Q. And during your first day of questioning I showed you some pictures of bottles of Clubman Talc. Do you recall that?

A. Yes.

Q. Let me show them to you again. We had marked this has Exhibit 28. The attorneys for Clubman also asked you a series of questions about these pictures. Do you recall that?

A. Yes.

Q. And as you sit here today --

DEFENSE COUNSEL: I'm sorry, Counsel, which exhibit number is that?

MR. NEIRA: It's Exhibit 28.

Q. (By Mr. Neira) As you sit here today, Jack, and you look at these pictures again, do you have any doubt in your mind that the bottles of Clubman Talc represented in these pictures look like the bottles of

Clubman Talc you and other barbers around you used during your 52-year career as a barber?

A. There is --

DEFENSE COUNSEL: Objection, leading, lacks foundation, calls for speculation, and misstates testimony.

A. There -- there is no doubt.

Q. (By Mr. Neira) Okay. Can you give that back to me. Thank you.

A. Um-hum.

Q. The attorneys for Clubman have also asked you a series of questions about how you would apply the talc to your brush, how you would apply the talc to your clients' neck. Do you remember that?

A. Yes.

Q. And they asked you to quantify how many times you would shake the bottle, how many pours of talc you would put on the brush, how many times you would tap and shake the brush, and you know, how long you would take to brush your clients' neck and -- and all those questions. Do you remember them asking you that?

A. Yes.

Q. As you sit here today, are you able to quantify any of those things?

A. No.

Q. And why not?
A. Because everyone is different.
Q. Are you a meticulous person?
A. Yes.
Q. Did you try to do a thorough job with each and every one of your clients?
A. Yes.
DEFENSE COUNSEL: Objection, leading.
Q. (By Mr. Neira) Does that mean that you took however long it took to do any of these things properly?
A. Yes.
DEFENSE COUNSEL: Leading.
Q. (By Mr. Neira) And you mentioned that you taught students on how to cut hair, and in your own words, you taught them not to run clients through like sheep. Do you recall that?
A. Yes.
DEFENSE COUNSEL: Objection, leading, misstates testimony.
Q. (By Mr. Neira) Okay. Let me move on now to your use of foot powder. You were asked a lot of questions by the attorneys for Dr. Scholl's and Gold Bond talc foot powders. Do you recall that?
A. Yes.

Q. And you mentioned that you started using Dr. Scholl's talc foot powder in the mid 1960s. Do you recall that?
A. Yes.
DEFENSE COUNSEL: Objection, leading.
Q. (By Mr. Neira) You also explained that you couldn't recall specifically when you had last used Dr. Scholl's talc foot powder, but that it had been a few years. Do you recall that testimony?
DEFENSE COUNSEL: Objection.
A. Yes.
DEFENSE COUNSEL: Objection, leading. And also could you -- Madam Court Reporter, could you reask the question. It -- it cut out.
(Reporter read back as requested.)
DEFENSE COUNSEL: Okay. The objection is leading and also mischaracterizes and misstates prior testimony.
A. Yes.
Q. (By Mr. Neira) And I know you said it many times, but why did you use foot powder for all these years?
A. For athlete's foot.
Q. And so, from the mid 1960s up to a few years ago, is that something that you've been dealing with

off and on?

A. Yes.

DEFENSE COUNSEL: Objection.

A. Yes.

DEFENSE COUNSEL: Objection, leading. Also vague, ambiguous, over -- overbroad.

Q. (By Mr. Neira) From the mid 1960s to -- up to a few years ago then, did you continue to use Dr. Scholl's talc foot powder off and on to treat your athlete's foot?

A. Yes.

DEFENSE COUNSEL: Objection, lacks foundation, calls for speculation, leading, and it's overbroad.

Q. (By Mr. Neira) And during your deposition, you explained that you used foot powders for a total of five years off and on throughout your entire life. Do you recall saying that?

A. Yes.

DEFENSE COUNSEL: Objection, leading.

Q. (By Mr. Neira) And as you sit here today, is it your best recollection that you used foot powders for a total of five years off and on throughout your life?

DEFENSE COUNSEL: Objection, leading,

overbroad, vague, ambiguous, also compound.
A. Yes.
Q. (By Mr. Neira) And you also testified that during your civilian life, you have used another brand of talc foot powder. Do you recall that?
A. During my civilian life?
Q. When you were out of the Army, you used two different products, right?
A. Yes.
Q. And the other product was Gold Bond; is that correct?
A. Yes.
DEFENSE COUNSEL: Objection, leading.
Q. (By Mr. Neira) And you testified you at first used Gold Bond in the 1990s. Do you recall saying that?
A. Yes.
Q. As you sit here today, is it your best recollection that you started using Gold Bond talc foot powder in the 1990s?
A. Yes.
Q. The attorney for Gold Bond asked you a series of questions about your use of the product and about the bottle of Gold Bond that you still have at your house. Do you remember that?

A. Yes.

Q. And you said that you last used that bottle about three years ago. Is that right?

A. Yes.

Q. Is that the last time you used your Gold Bond foot powder?

A. Yes.

Q. Is that the last time you used any foot powder at all?

A. Yes.

Q. As you sit here today, is it your best recollection that the last time you used Gold Bond foot powder was about three years ago?

A. To the best of my recollection.

Q. Why did you start using Gold Bond in the 1990s if you were already using Dr. Scholl's prior to that?

A. I wanted to try something different.

Q. And did Gold Bond work any better, or did it work just about the same?

A. About the same.

Q. So, after the 1990s, did you continue to buy Dr. Scholl's foot powder?

A. From time to time.

Q. And did you continue to buy Gold Bond foot powder?

A. Yes, we did.
Q. And that bottle of Gold Bond that you still have at your house, that's a spray product; is that right?
A. Yes.
Q. Is that the Gold Bond foot powder you would usually buy?
A. No.
Q. Would you usually buy the -- the powder?
A. It would be the --
DEFENSE COUNSEL: Objection, leading, lacks foundation.
A. -- the -- the talc.
DEFENSE COUNSEL: Vague.
A. The talc.
Q. (By Mr. Neira) Okay. I just -- I have a few more questions for you, Jack.
A. Okay.
Q. Going back to Dr. Scholl's, how do you know it was Dr. Scholl's talc foot powder that you used over all these years?
A. I --
DEFENSE COUNSEL: Objection, vague, ambiguous, overbroad, calls for speculation, lacks foundation.

A. I recognize the bottle.

Q. (By Mr. Neira) And during your first day of questioning, I showed you some pictures of bottles of Dr. Scholl's foot powder. Do you recall that?

A. Yes.

Q. Let me show them to you again. We had marked this as Exhibit 32. And one of the attorneys for Dr. Scholl's also asked you a series of questions about these pictures. Do you recall that?

A. Yes.

Q. As you sit here today and you look at these pictures, do you have any doubt in your mind that the bottles of Dr. Scholl's talc foot powder represented in these pictures looked like the bottles of Dr. Scholl's talc foot powder that you used from the mid 1960s through a few years ago?

A. Yes.

DEFENSE COUNSEL: Objection, overbroad. It's compound. If you have a specific picture you want to show him, please do that. Because that's a multiple -- that exhibit is at least -- it's five pages. That's my recollection.

Q. (By Mr. Neira) Do you have any doubt in your mind?

A. No.

years ago?
A. Yes.
DEFENSE COUNSEL: Objection, overbroad, compound, vague.
DEFENSE COUNSEL: Leading.
A. No.
Q. (By Mr. Neira) No doubt?
A. No doubts.
Q. The attorneys for Dr. Scholl's and Gold Bond asked you a series of questions about how you would apply the talc powders to your feet. Do you recall that?
A. Yes.
DEFENSE COUNSEL: Objection, leading.
Q. (By Mr. Neira) They asked you to quantify how many talc -- how many times you would shake the bottle, how many pours of talc you would put on your feet, how long it would take for you to apply the powders, et cetera. Do you remember all these questions?
A. Yes.
Q. As you sit here today, are you able to quantify any of these things?
A. No.
Q. Why not?
A. 'Cause I used what was necessary.

Q. And you used these products, you told us, to get rid of your athlete's foot. Is that right?
A. Yes.
DEFENSE COUNSEL: Objection, leading.
Q. (By Mr. Neira) Each time you had to deal with this issue -- issue, you used whatever amount of powder you deemed necessary to get rid of the -- of the issue as fast as possible?
A. Yes.
DEFENSE COUNSEL: Objection, leading, vague, ambiguous, overbroad.
DEFENSE COUNSEL: Objection, leading -- yeah.
Q. (By Mr. Neira) And how long would the athlete's foot stay every time it came back?
A. Oh, I'd get on it as fast as I could. Maybe a couple -- couple days, few weeks at the very most.
Q. Couple days to a few weeks?
A. Yeah.
DEFENSE COUNSEL: Objection, misstates testimony.
DEFENSE COUNSEL: And leading.
Q. (By Mr. Neira) And during those times, would you use powder every day?
A. Yes.

REPORTER'S CERTIFICATE

I, MINDI L. PETTIT, the undersigned Certified Court Reporter pursuant to RCW 5.28.010 authorized to administer oaths and affirmations in and for the State of Washington, do hereby certify that the sworn testimony and/or proceedings, a transcript of which is attached, was given before me at the time and place stated therein; that any and/or all witness(es) were previously duly sworn to testify to the truth; that the sworn testimony and/or proceedings were by me stenographically recorded and transcribed under my supervision, to the best of my ability; that the foregoing transcript contains a full, true, and accurate record of all the sworn testimony and/or proceedings given and occurring at the time and place stated in the transcript; that a review of which was not requested; that I am in no way related to any party to the matter, nor to any counsel, nor do I have any financial interest in the event of the cause.

WITNESS MY HAND AND DIGITAL SIGNATURE this 6th day of December 2022.



MINDI L. PETTIT, RPR
Washington State Certified Court Reporter #2519
Idaho State Certified Shorthand Reporter #1141
mindi.pettit.courtreporter@charter.net




Plaintiff's Exhibit 27




EXHIBIT
28

Plaintiff's Exhibit 28


PINAUD
CLUBMAN
FINEST
TALC
World Famous Since 1810
NET WT. 11 OZ.


PINAUD
TALC




PINAUD®
CLUBMAN®
TALC
0 70066 02760 0
Ingredients: Talc, Zinc Oxide, Zinc Stearate,
Fragrance, D&C Red No. 27 Lake.
A.I.I.-Clubman
Los Angeles, CA 90040 • London, England UB4 0UJ


2
HDPE
4


PINAUD®
CLUBMAN®
FINEST
TALC
World Famous Since 1810
New York-Paris-London
NET WT. 11 OZ./311g






PINAUD®
CLUBMAN®
FINEST TALC
TALCO ULTRA-FIN
TALCO FINÍSIMO
World Famous since 1810
Réputé dans le monde depuis 1810
Famoso en todo el mundo desde 1810
255 g ℮ net wt 9 oz


ITCHING FOR A CURE FOR ATHLETE'S FOOT? DR. SCHOLL'S HAS IT!
If you've got athlete's foot, you need more than relief. You need a cure. Dr. Scholl's cures athlete's foot because it contains Tolnaftate, the clinically proven ingredient doctors recommend.
Dr. Scholl's athlete's foot products not only stop itching and burning, they kill the fungi that cause athlete's foot. Infected skin heals fast. And, used as directed, Dr. Scholl's prevents reinfection, too.
If you're suffering from athlete's foot, look for our Athlete's Foot products at the Dr. Scholl's display.
DR. SCHOLL'S. THE PROVEN CURE FOR ATHLETE'S FOOT.
Dr Scholl's
Fitness Begins With Healthier Feet.
Dr Scholl's
Athlete's Foot
Spray Liquid
PREVENTS REINFECTION
Dr Scholl's
Athlete's Foot Powder
PREVENTS REINFECTION
Dr Scholl's
Athlete's Foot
Spray Powder
PREVENTS REINFECTION
Dr Scholl's
Athlete's Foot Gel
PREVENTS REINFECTION
EXHIBIT
32


Dr. Scholl's
Foot
Powder
Absorbs perspiration
soothes, cools, dries
NET WT 3 OZ (85g)

The Wayback Machine - https://web.archive.org/web/20010629141305/http://drscholls.com:80/browse/?fuseactio…

Got a Problem? | Find a Product! | Where to Buy! | What's New?

Search










A Solution For: Odor & Wetness

## Original Foot Powder

A daily application of Dr Scholl's® Original Foot Powder is proven to keep feet cool and comfortable, neutralizing foot odor and absorbing excess moisture throughout the day. For complete odor absorption, use with Odor Destroyers Super Odor Destroying Insoles.

Where to Buy



Home | Got a Problem? | Find a Product! | Where to Buy! | What's New?

© 2001 Schering-Plough Healthcare Products, Inc Terms & Conditions | Privacy

Our Partners

Case 2:26-cv-03159-TL Document 14-3 Filed 09/09/26 Page 92 of 93

Dr Scholl's®

Search

Got a Problem? Find a Product! Where to Buy! What's New?



FREE Personal Performance℠ membership GO!

Playing Hard?
The Spa
Diabetic Foot Care
Pregnant?




# Find a PRODUCT!

A Solution For: Odor & Wetness

## Original Foot Powder




A daily application of Dr Scholl's® Original Foot Powder is proven to keep feet cool and comfortable, neutralizing foot odor and absorbing excess moisture throughout the day. For complete odor absorption, use with Odor Destroyers Super Odor Destroying Insoles.

Where to Buy

Home | Got a Problem? | Find a Product! | Where to Buy! | What's New?

© 2001 Schering-Plough Healthcare Products, Inc Terms & Conditions | Privacy
Our Partners

Search Products go

**YOUR FEET**

- Arch Pain
- Blisters
- Bunions
- Calluses
- Corns
- Foot Odor / Sweaty Feet
- Heel Pain
- Tired Aching Feet
- Nail Issues
- Warts

**OUR PRODUCTS**

- Athlete's Foot
- Blisters / Padding
- Bunions
- Calluses
- Corns
- Foot Powders
- Inserts
- Insoles
- Nail Issues
- Pedicure
- Pedicure Tools
- Warts

**Are You Gellin?™**




Home ▸ Foot Powders ▸ Dr. Scholl's® Original Foot Powder

# Dr. Scholl's® Original Foot Powder




View Large Image

## Features

- Cools and soothes
- Absorbs wetness
- Helps neutralize foot odor

**Tell a Friend**

## You may also like

**Dr. Scholl's® Odor Destroyers Shoe Shot® Medicated Powder**



**Dr. Scholl's® Odor Destroyers Shoe Shot® Deodorant Powder**



About Dr Scholl's | Shoes & Sandals | Privacy Policy | Terms & Conditions | Our Partners | Store Locator | Glossary

©2004 Schering-Plough HealthCare Products Inc. All rights reserved.
The graphics depicted herein constitute trademarks of Schering Corporation
Use as directed