# Exhibit 4

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

FOR KING COUNTY

-oOo-

JACK LaSALLE and DIANNE LaSALLE,
husband and wife,
Plaintiffs,
vs. No. 23-2-08165-0 SEA
AMERICAN INTERNATIONAL
INDUSTRIES, et al.,
Defendants,
_________________________________/

VIDEOCONFERENCE VIDEOTAPED DEPOSITION OF

CHARLES LOVELESS 30(b)(6)

VOLUME I

(Pages 1 through 152, inclusive)

Taken before JULIE HEYWARD

CSR No. 7907

March 20, 2024

# I N D E X


| | PAGE |
|---|---|
| EXAMINATION BY MR. REID | 7 |


## E X H I B I T S


| EXHIBIT | | PAGE |
|---|---|---|
| Exhibit 1 | Plaintiffs' Second Amended Notice of Deposition Videotaped CR 30(b)(6) Deposition of Defendant American International Industries | 11 |
| Exhibit 2 | Defendant American International Industries' Objections to Plaintiffs' Second Amended Notice of Videotaped CR 30(b)(6) Deposition | 11 |
| Exhibit 3 | MAS Project M71598, Talcum Powder Analysis, Clubman Powder dated 8-31-2023 | 131 |
| Exhibit 4 | MAS Project M71591, Talcum Powder Analysis, Clubman Powder dated 7-13-2023 | 131 |


UNANSWERED QUESTIONS: Pages 69, 96, 98, 99

VIDEOCONFERENCE VIDEOTAPED DEPOSITION OF
CHARLES LOVELESS 30(b)(6)

BE IT REMEMBERED, that pursuant to Notice, and on the 20th day of March, 2024, commencing at the hour of 10:08 a.m., at 19191 South Vermont Avenue, Suite 900, Torrance, California, before me, JULIE HEYWARD, a Certified Shorthand Reporter, State of California, appeared CHARLES LOVELESS, produced as a witness in said action, and being by me first duly sworn, was thereupon examined as a witness in said cause.

-oOo-

APPEARANCES

For the Plaintiffs:

MICHAEL T. REID
Kazan, McClain, Satterley & Greenwood
55 Harrison Street, Suite 400
Oakland, California 94607
(510) 302-1000
mreid@kazanlaw.com

For the Defendant COSTCO WHOLESALE CORPORATION:

ALEXANDRA ASCIONE
Barnes & Thornburg LLP
2029 Century Park East, Suite 300
Los Angeles, California 90067
(424) 343-5547
aascione@btlaw.com
(Appearance via Videoconference)

APPEARANCES (Continued):

For the Defendants BRENNTAG NORTH AMERICA, INC.; BRENNTAG SPECIALTIES, LLC:

HAYLEY D. HOLLIS
Bullivant Houser
One SW Columbia Street, Suite 800
Portland, Oregon 97204
(503) 228-6351
hayley.hollis@bullivant.com
(Appearance via Videoconference)

For the Defendant CHATTEM, INC.:

XANDER ASSADNIA
Miller & Martin PLLC
Volunteer Building Suite 1200
832 Georgia Avenue
Chattanooga, Tennessee 37402
(423) 785-8297
xander.assadnia@millermartin.com
(Appearance via Videoconference)

For the Defendants AMERICAN INTERNATIONAL INDUSTRIES, ARYZ CORP., ERX CORP., RAZY PROPERTIES, INC., SRYZ CORP., and GLAMOUR INDUSTRIES, CO.:

JULIA GOWIN
(Appearance via Videoconference)
NILOFAR KARBASSI
Nelson Mullins Riley & Scarborough LLP
Pacific Gateway
19191 South Vermont Avenue, Suite 900
Torrance, California 90502
(424) 221-7400
julia.gowin@nelsonmullins.com
nilofar.karbassi@nelsonmullins.com

For the Defendants AMERICAN INTERNATIONAL INDUSTRIES, ARYZ CORP., ERX CORP., RAZY PROPERTIES, INC., SRYZ CORP., and GLAMOUR INDUSTRIES, CO.:

ROBERT E. THACKSTON
Nelson Mullins Riley & Scarborough LLP
3333 Lee Parkway, Suite 740
Dallas, Texas 75219
(469) 484-4790
robert.thackston@nelsonmullins.com

APPEARANCES (Continued):

For the Defendant AMERICAN INTERNATIONAL INDUSTRIES:

CLAUDE BOSWORTH
Rizzo|Bosworth|Eraut PC
1300 SW Sixth Street, Suite 330
Portland, Oregon 97201
(503) 229-1819
cbosworth@rizzopc.com

For the Defendant PTI UNION:

ALLEN E. ERAUT
Rizzo|Bosworth|Eraut PC
1300 SW Sixth Street, Suite 330
Portland, Oregon 97201
(503) 229-1819
aeraut@rizzopc.com
(Appearance via Videoconference)

For the Defendants BAYER HEALTHCARE LLC; MERCK & CO., INC.:

DIRK BERNHARDT
Tanenbaum Keale LLP
One Convention Place
701 Pike Street, Suite 1575
Seattle, Washington 98101
(206) 889-5081
dbernhardt@tktrial.com
(Appearance via Videoconference)

Also Present:

VINCENT MAZZA, Videographer

THE VIDEO OPERATOR: Good morning. We are 10:08
going on the record at 10:08 a.m. Pacific Time, on
March 20th, 2024.
Please note that the microphones are sensitive and
may pick up whispering and private conversations. 10:08
Please mute your phones at this time.
Audio- and video-recording will continue to take
place unless all parties agree to go off the record.
This is Media Unit 1 of the video-recorded
deposition of Charles Lovelace -- I'm sorry -- Charles 10:09
Loveless, taken by counsel for plaintiff, in the matter
of Jack and Diane LaSalle versus American International
Industries, et al. Filed in the Superior Court of the
State of Washington for King County, case number
23-2-08165-0 SEA. 10:09
The location of this deposition is 19191 South
Vermont Avenue, Suite 900, Torrance, California 90502.
My name is Vincent Mazza representing Veritext and
I'm the videographer. The court reporter is Julie
Heyward from the firm Veritext. I'm not related to any 10:09
party in this action nor am I financially interested in
the outcome.
All parties have already been introduced.
Will the court reporter please swear in the witness
and then counsel may proceed. 10:10

CHARLES LOVELESS 10:10
sworn as a witness
testified as follows:

EXAMINATION BY MR. REID:

Q. Good morning, Mr. Loveless. 10:10
A. Good morning, sir.
Q. We met yesterday during one of your coworkers or companion 30(b)(6)'s deposition, but I introduced myself off the record and I'll introduce myself again for this record. 10:10
My name is Michael Reid, I'm the attorney representing the plaintiffs in this action, the LaSalle family.
Can you please state your name for the record.
A. Charles Loveless. 10:10
Q. And Mr. Loveless, suffice to say you've been deposed a few times; is that right?
A. I have.
Q. Are you familiar enough with what we call the deposition admonitions or ground rules that I can forego 10:11 those today?
A. Yes.
Q. Okay. The only additional caution that I'm sure that you heard me say yesterday was feel free if at any time if you don't understand my questions, whatever 10:11

question's pending, let me know, I'm happy to rephrase it, happy for us to get on the same page so that we can understand each other. Okay? 10:11

A. Perfect.

Q. All right. So to start with today, I want to get into what you personally did to prepare for your testimony today, that's where we're going to start. Okay? 10:11

A. Okay.

Q. Can you start by giving me an overview of what you did to prepare for the deposition today? 10:11

A. The first thing, we went through the Notice of Deposition and through the different categories. Anything within the categories that I didn't understand what the meaning of the question was was explained to me, and that's, basically, what I've done for this. 10:12

Q. Okay. Did you speak with anyone else at AII -- Well, let me back up real quick.

It's your understanding today that you're testifying on behalf of American International Industries; correct? 10:12

A. That is correct.

Q. And as the 30(b)(6) or corporate representative for American International Industries, it's as if the company itself is sitting in your seat and you're 10:12

testifying as them. 10:12
Do you understand that?
MR. THACKSTON: Objection; calls for a legal conclusion.
THE WITNESS: I've never heard 30(b)(6) before, 10:12 so that's a new term for me. Honestly, I don't know what that is. But I understand that I am -- I am here to tell the truth about what I know about what's happened at American International.
BY MR. REID: 10:13
Q. That's fair. Let me try the question again taking out the 30(b)(6) part because I understand that's attorney language that doesn't always pass on.
It's your understanding that you are testifying as the corporate representative for American International 10:13 Industries and in that way it's as if the company is sitting in your seat and you're testifying as them.
Do you understand that?
MR. THACKSTON: Calls for a legal conclusion.
THE WITNESS: I understand. And, again, I'm 10:13 here to tell the truth about everything I know as a representative of American -- as being the corporate representative of American International.
BY MR. REID:
Q. Okay. And to save both of us some breath 10:13

today, when I say "AII," can we both understand that to mean American International Industries? 10:13

A. We can.

Q. And when I say "alphabet corporations," can we both understand that to mean and include ARYZ Corp., 10:13 ERX Corp., RAZY Properties, Inc., SRYZ Corp?

A. We can.

Q. Okay. And when we say Glamour Industries," we can understand that to mean the company that was formerly known as Betty K Development Co.; correct? 10:14

A. Yes.

Q. Great. Let me go back to where we were, then.

Did you speak with anyone else at AII, any of the alphabet corporations, or at Glamour Industries for the purposes of preparing for your deposition today? 10:14

A. No.

Q. Okay. Did you review any documents in preparation for your deposition today?

A. I did review the Notice of Deposition, the APA, Asset Purchase Agreement. I think that's all I looked 10:14 at prior to coming here today.

Q. Okay. The Asset Purchase Agreement you're referring to is the Asset Purchase Agreement between American International Industries and -- I believe it's Kleer-Vu for the purposes of the Clubman product line, 10:15

is that what you're referring to? 10:15
A. That is the 1987 purchase agreement.
MR. THACKSTON: Kleer-Vu and Neslemur?
MR. REID: I'm sorry?
MR. THACKSTON: Kleer-Vu and Neslemur? 10:15
MR. REID: Yeah.
BY MR. REID:
Q. You had mentioned meeting with your attorneys for the purposes of going through the Notice of Deposition. 10:15
Can you tell me when you met with your attorneys for the purposes of preparing for today's deposition?
A. I don't remember the dates. There was a couple dates that we had met for, and then I came in yesterday, but we really didn't discuss anything for myself. And 10:16 then today.
Q. Okay.
MR. REID: I'm going to attach to the record now as Exhibit 1 "Plaintiffs' Notice of Deposition for the 30(b)(6) of American International Industries." 10:16
(Exhibit 1 was identified.)
MR. REID: I will attach as Exhibit 2 Defendants' Objections to that notice.
(Exhibit 2 was identified.)
MR. REID: And Mr. Loveless, I'm sure that we 10:16

to participate. So he kind of makes us all feel like we're part of an executive team, if that makes any sense. I think the longer you're there, depending on the position that you hold for him, he takes all of our input into making his decisions. So it's not like a team where -- like we don't come meet as an executive team, like have weekly meetings or monthly meetings, it's not that type of an executive team. The group and -- that Brian Dror referred to is a team of people that Mr. Ryzman relies on to give him information. That's a better way than saying an executive team even. 10:23 10:24 10:24

Q. Okay.

A. I don't know if that makes sense or not, but that's really -- it's --

Q. It does in a sense. Let me see if I can break it down any. Okay? 10:24

And I'm going to try doing it this way, you can tell me if you think of a better way.

A. Okay.

Q. In 1988, when you joined American International Industries, what generally was your role? 10:24

A. I was just brought in to bring -- to do special projects. One of the first things that I did when either -- we didn't have like a part number for all of our components and things like that. Our finished goods 10:25

that we were selling at the time had identifying part 10:25
numbers. But none of our components, like a box was called, you know, a blue box. You know, a bottle would be an eight-ounce bottle. And there weren't part numbers. So one of the first things that I did in 10:25
there, I established a part numbering system for all of our components for tracking all that.

I was also given the responsibility of the Clubman line to move the operations from the East Coast to the West Coast. 10:25

THE REPORTER: I'm sorry, the what line?

THE WITNESS: The Clubman line. Clubman.

MS. KARBASSI: Michael, I'm sorry, before your next question, can we go off the record for just one minute? 10:26

MR. REID: Yeah.

Off the record.

MS. KARBASSI: So sorry.

THE VIDEO OPERATOR: We're now going off the record. The time is 10:26 a.m. 10:26

(Recess taken 10:26 to 10:27.)

THE VIDEO OPERATOR: We're now going back on the record. The time is 10:27 a.m.

BY MR. REID:

Q. We're back from a short -- we'll call it 10:27

which was a much smaller part of the overall picture of things. 10:35

Q. Okay. Let me see if I can break this down a little bit more.

When you first began with American International Industries in 1988, how many facilities were in possession -- that American International Industries possess related to the Clubman product line? 10:35

A. I'm not sure I understand what you're asking.

Q. Sure. So you mentioned, for example, that the Clubman product line, the liquid products were being filled on the East Coast. 10:36

A. Yes.

Q. Do I have that right so far?

A. Yes, sir. 10:36

Q. Okay. Did American International Industries hold any facilities on the East Coast pertaining to the Clubman product line and those liquid products?

A. Well, we didn't have any facilities back there, there was a contract packager that filled for us. But once we moved it out of there, everything was filled out here on the West Coast. 10:36

Q. Okay. So, for example, there was no warehousing, no storage, no offices, nothing like that held on the East Coast pertaining to that -- any of the 10:36

product lines for Clubman; correct? 10:36
A. We never had anything like that.
Q. Okay.
A. All of our products were stored -- Excuse me -- at the contract packager's warehouse. 10:37
Q. And then it would be -- Strike that.
Would the contract packager then ship those products to American International Industries and then AII would distribute them or would the distribution take place from the contract manufacturer? 10:37
A. No, it was done out here. They would -- And that's one of the reasons why we had to move it is because we were shipping just full containers of heavy liquids across and then we would redistribute it out here. We only shipped out of our location here, we 10:37 didn't ship from any other warehouse.
Q. Okay. When you came on to American International Industries in 1988, what facilities did AII hold generally? And let -- let me clarify.
So it's my understanding that in -- I believe it's 10:38 1989, I could be off by that, but I believe it was in 1989, that AII purchased and acquired the Commerce facility; is that correct?
A. Yes.
Q. So prior to that, when you joined in '88, what 10:38

facilities did AII hold? 10:38
A. We had a facility in North Hollywood and that's where I worked for the first few months that I worked here. I don't remember the address there. But when I was hired, it was with the understanding that -- because 10:38 I'm from down in this area so it was like they were going to be moving that facility to the one in Commerce.
Q. So you had an understanding that your commute was going to be shortened at some point?
A. Yes, sir. 10:39
Q. Besides that facility in North Hollywood, did AII hold any other facilities?
A. Not to my knowledge, no, sir.
Q. All right. Let me probe that a little bit just based upon the clarification in your answer because you 10:39 said not to your knowledge.
A. Right.
Q. So that question, had you directed that question at any point in your service as the corporate representative and person most qualified for AII to 10:39 anyone else?
A. I don't -- I don't know if I -- I don't recall if I have, but I worked up there in that place and I knew the -- the businesses. If there was something prior to me starting there back in '84, '85, I don't 10:40

know if I've ever asked that question, I don't believe 10:40
that there was, though. They were there for a while
from what I had heard from coming in and that's why
they're happy to go to the one in Commerce. But I don't
know -- I don't recall if I've ever asked the question 10:40
"Hey, did you guys have a place prior to this that you
guys did it?"

Q. Sure. That facility in North Hollywood, can you give me a description of the size of that facility?

A. I can give you a description of it, but it's 10:40
going to be kind of like your kitchen table from yesterday. I don't know the actual square feet. It wasn't -- It wasn't a big building. I -- If I was going to estimate, maybe 40,000 square feet.

Q. And let me see if I can help with some 10:41
clarification or at least some context.

Prior to the move to the Commerce facility in 1989, it is my understanding, correct me if I'm wrong, but AII was not doing any in-house manufacturing; is that correct? 10:41

A. Of Clubman.

Q. Okay.

A. Yes.

THE REPORTER: I'm sorry, of --

THE WITNESS: Clubman. 10:41

BY MR. REID: 10:41

Q. Okay. So let me get into that.

What was American International Industries in-house manufacturing, if anything?

A. We were filling nail powders, we were assembling nail tips, I believe we were filling polish remover. I'm trying to remember the production floor up there, I wasn't up there very long. There may have been others besides that. 10:42

Q. Okay. And after the move in 1989 to the Commerce facility, AII began in-house manufacturing additional products; right? 10:43

A. Yes.

Q. And part of the reason for the move from the North Hollywood facility to the Commerce facility was for the additional space and growth of that in-house manufacturing; right? 10:43

A. Yes.

Q. And so the facility in North Hollywood in contest with the Commerce facility was much smaller; right? 10:43

A. It was smaller.

Q. That, at least, is true for the purposes of the in-house manufacturing space; right?

A. Of -- And for growth, yes. 10:43

In 1988, you mentioned that the -- for the purchasing department and the acquisition talc, meaning just buying the talc, the raw ingredient talc, would be done primarily through the contract manufacturer, but that it would fall under the non-print buyer. 11:09 11:10

MR. THACKSTON: Vague.

BY MR. REID:

Q. What I want to understand is what role, if any, did the non-print buyer have in purchasing the raw ingredient talc? 11:10

MR. THACKSTON: Okay. Vague, overbroad, assumes facts.

THE WITNESS: They placed an order with the contract packager, Rebgro, for how many units we wanted them to produce for us, that was -- that was their role. 11:10

BY MR. REID:

Q. Okay. Was their role in -- Strike that.

Let me clarify this a little.

The number of units being the number of units of the Clubman product? 11:10

A. Yes.

Q. Okay. The non-print buyer did not have a role in telling the contract manufacturer what talc to purchase?

A. No, that was already established. There was a 11:11

formula sheet that we received from Neslemur for all of 11:11
the items that had a -- it's like a recipe; right?
that -- how to make this, and it includes what bottle,
what cap, what color cap, what label to use, all that
comes on there. So that would have already been with 11:11
the vendor to follow.
Q. And that same non-print buyer would not have
any responsibility in telling Rebgro or the talc source
how much talc to purchase; correct?
A. That's correct. 11:11
Q. Okay. The responsibility of the non-print
buyer as it relates to the talc or the Clubman talc line
would have been limited to simply telling Rebgro "This
is how many units of the Clubman final product that I
want." 11:12
Do I have that right?
A. Yes.
Q. Okay. In 1988, who was the non-print buyer?
A. When I started there, I don't remember who was
assisting. I don't remember the person's name. 11:12
Q. Okay. Are you picturing the person in your
mind?
A. It was a girl, I believe.
Q. Okay. Do you have an understanding as to how
long that woman who was the non-print buyer was with AII 11:12

Q. Okay. At least at that point in 1988, it would be Ms. Cooper or Mr. Ryzman that would be interacting the most with that woman regarding the non-print buying since they were in charge of purchasing; correct? 11:13

MR. THACKSTON: Calls for speculation. 11:14

THE WITNESS: It's possible, yes, sir.

BY MR. REID:

Q. Okay. It's my understanding that AII ceased contract manufacturing with Rebgro in 1989 when they began manufacturing the Clubman line out of their new Commerce facility; correct? 11:14

A. Yes, approximately around that time, yes, sir.

Q. Okay. When that occurred in approximately 1989, was it the same woman, that non-print buyer, responsible for purchasing the raw ingredient talc for use in manufacturing the Clubman line in Commerce, California? 11:14

A. No, that's when I stepped in, when we started moving the -- Excuse me -- the facility from being manufactured Back East or filled Back East to filled out here. That's when I was -- That's when I was given the responsibility for the Clubman line. 11:15

Q. Okay. And as part of your responsibility with the Clubman line, it was your responsibility to purchase the raw ingredient talc? 11:15

A. Yes. 11:15
Q. Do I have that correct?
And so it was your responsibility to communicate directly with your talc distributor to acquire whatever amount of raw ingredient talc for use in the 11:16 manufacturing; correct?
A. Yeah, we would determine that quantity based upon what our -- I think we had a min-max system back in those days, a minimum-max, so based upon what level of inventory you had, you'd bring it back initially. 11:16
Q. Okay. Your talc distributor at that time, my understanding is that was Whittaker, Clark & Daniels; correct?
A. That is correct.
Q. Okay. And at Whittaker, Clark & Daniels, who 11:16 was the contact that you spoke with regarding the purchasing of raw ingredient talc when you took over that responsibility in approximately 1989?
A. I have no idea.
Q. Was it always the same individual or was it a 11:17 different individual?
A. I don't even -- I don't know. I don't -- I don't remember having a -- like a salesperson who was customer service back there. I have no idea what the name would be or different names over the time. 11:17

Q. Okay. 11:17

MR. THACKSTON: Can we take five when you get a chance to just run down the hall?

MR. REID: Sure. Give me two seconds. Now might not be a bad time for a break. 11:18

BY MR. REID:

Q. Let me clean this up.

At any point in time between 1989 and when AII stopped manufacturing talc-containing products in approximately 2017, did the individual in charge of 11:18 purchasing, meaning you, did that ever change for the purposes of the Clubman line, specifically for the talc raw ingredient?

A. No, I was always responsible for that.

Q. From approximately 1989 -- 11:18

A. Yes.

Q. -- until 2017; correct?

A. Yes.

Q. Okay. Okay.

MR. REID: We can take a break. 11:18

MR. THACKSTON: Okay.

MR. REID: Off the record?

THE VIDEO OPERATOR: We're now going off the record. The time is 11:18 a.m.

(Recess taken 11:18 to 11:30.) 11:30

to answer. 13:51

BY MR. REID:

Q. Are you going to follow your attorney's instruction not to answer?

A. Yes, sir. 13:51

Q. Okay. Mr. Loveless, when is the first time that AII received any communication from an insurer regarding issues related to asbestos talcum powder claims?

A. I'm not sure I understand the question. 13:52

Q. Sure. It is my understanding based upon the testimony of Mr. Dror yesterday that AII received word that its insurer would no longer cover it for talcum powder product liability in approximately 2017.

Are we on the same page about that? 13:52

A. Yes, sir.

MR. THACKSTON: Objection; assumes facts.

BY MR. REID:

Q. Okay. My question is when is the first time that AII received a communication from its insurer 13:53 regarding asbestos liabilities connected to talcum powder litigation? So, for example, was that first communication in 2017 or was there an earlier communication regarding asbestos and talcum powder liabilities? 13:53

MR. THACKSTON: Vague, overbroad, assumes facts, compound. 13:53

THE WITNESS: My understanding was at that time as well.

BY MR. REID: 13:53

Q. All right. "That time" being in 2017?

A. Yes.

Q. Mr. Dror's testimony yesterday was that --
Well, strike that.

For the record, you were here when Mr. Dror testified yesterday; correct? 13:53

A. Yes.

Q. And Mr. Dror's testimony yesterday was that in approximately May of 2017, late May of 2017, AII received word that its insurer would no longer cover talcum powder product liability; correct? 13:54

A. Yes.

Q. And is that your understanding as well?

MR. THACKSTON: Vague, overbroad, misstates testimony. 13:54

THE WITNESS: That -- That's my understanding of what he said. I was -- I didn't receive the letter, so --

BY MR. REID:

Q. Okay. Mr. Dror was the one that received the 13:54

letter? 13:54
MR. THACKSTON: Objection; assumes facts.
THE WITNESS: I don't know.
BY MR. REID:
Q. Okay. Mr. Dror's testimony was then that AII was able to cease manufacturing of talcum powder by July of 2017. 13:54
Is that a true statement?
A. Yes.
Q. Okay. And AII was able to switch that manufacturing from talcum powder to a cornstarch formulation within that approximate one-month time period; correct? 13:54
A. We were -- We were forced to do that, yes, sir.
Q. Okay. Had AII at any point prior to May 2017 investigated a cornstarch formulation for what was then a talcum powder? 13:55
A. I'm not --
MR. THACKSTON: Objection; argumentative, vague, overbroad, ambiguous. 13:55
THE WITNESS: Not that I recall.
BY MR. REID:
Q. Okay. Prior to May 2017, did AII ever receive any communication that an insurer was either thinking of or planning on refusing to insure talcum powder product 13:55

don't know, you would expect them to know, who was 14:04
involved in the logistics of the move from North
Hollywood to Commerce; right?

MR. THACKSTON: Foundation, assumes facts,
calls for speculation, asked and answered. 14:04

THE WITNESS: Yeah, I'm not sure who would know
on that.

BY MR. REID:

Q. To your knowledge, the first time that AII was
involved in any lawsuit related to allegations of 14:05
asbestos in its talcum powder was approximately 2005;
correct?

A. Yes, it was in the mid-2000s.

Q. Okay. Do you have an understanding as to what
a litigation hold is? 14:05

MR. THACKSTON: Objection; calls for a legal
conclusion.

THE WITNESS: No.

BY MR. REID:

Q. Okay. A litigation hold is a notice that's 14:05
generally sent out in a company to hold or preserve
documents for the purposes of a lawsuit.

Are we on the same page about that?

MR. THACKSTON: That's not a question, really,
that's a statement of legal opinion. So object to 14:05

A. Yes.

Q. But you didn't review any other documents; right?

A. No, that's correct.

Q. It becomes muscle memory for all of us, I didn't even notice, you're fine.

I'm going to attach to the record now, I believe it's just Exhibit 3, MAS Project M71598, Talcum Powder Analysis, Clubman Powder.

(Exhibit 3 was identified.)

MR. REID: And attach as Exhibit 4 MAS Project M71591, Talcum Powder Analysis, Clubman Powder.

(Exhibit 4 was identified.)

MR. REID: For the record, both of these exhibits include -- I guess it would be, essentially, their appendix of photographs of the Clubman samples that were tested.

BY MR. REID:

Q. And Mr. Loveless, while we were on break, your counsel and I gave you both Exhibit 3 and 4 to take a look through those photographs; is that correct?

A. That is correct.

Q. Okay.

MR. THACKSTON: Could you identify them just by date, Exhibit 3 date and Exhibit 4 date?

MR. REID: Yes. 3 was 8-31-2023. 4 was 7-13-2023 14:57

MR. THACKSTON: Thank you.

MR. REID: Sure.

BY MR. REID: 14:58

Q. And Mr. Loveless, a couple questions that I have for you regarding those photographs is as AII, and to your knowledge, do each of the photographs represent a Clubman sample?

A. Yes, they do. 14:58

Q. Okay. Do you have any reason to contest that the photographs, the samples in the photographs, are not Clubman samples based upon their appearance?

A. Not the ones that were in the plastic bottle. The ones from the tin bottles, I'm assuming they are 14:58 because that looks like it, but --

Q. Okay.

A. -- from this, because I never -- I mean, we never made that or sold that, those bottles, but it looks like what I've seen. 14:58

Q. Let me explore that a little bit.

A. Okay.

Q. You personally as it relates to the tin bottles, AII never manufactured tin bottles; correct?

A. We personally never manufactured tin bottles. 14:59

There was a time period that the product was in tin, but it had "AII" as the legal name on those tin bottles. The photographs in the picture aren't those. 14:59

Q. Okay.

A. But we didn't make the tin bottles, that was made by Rebgro, we didn't have the means to do a tin. 14:59

Q. Got it. And the tin bottles in the photographs, you are only familiar with based upon your review of containers previous to AII's in-house manufacturing; is that correct? 14:59

A. I'm not sure.

Q. Yeah, let me rephrase. Let me start closer towards the beginning.

For all the plastic containers of Clubman in both Exhibit 3 and Exhibit 4, you do not contest that at least based on appearance those are Clubman bottles; correct? 15:00

A. That's what they appear to be, yes.

Q. Okay. In terms of the metal containers or the tin containers, you personally -- Well, strike that. 15:00

In terms of the metal containers or the tin containers, AII never in-house manufactured tin containers; is that correct?

A. Yes.

Q. Okay. And AII did manufacture tin containers 15:00

in the sense that they had Rebgro contract manufacture 15:00
those containers; is that correct?
A. That's correct.
Q. Okay. In addition, previous to AII's ownership
of the Clubman line, the previous entities, for example, 15:00
Neslemur, manufactured a tin container version of the
Clubman product; correct?
A. Yes.
Q. Okay. As you sit here today, you do not have
reason to contest that the tin containers are, indeed, 15:01
based upon appearance actual Clubman containers;
correct?
A. Yes. They appear to be, but I don't
have -- there's nothing on there that says that they're
not or they are, for my view. 15:01
Q. And, for example, you don't have a catalog or
old document or witness that informs you to say that
those are, in fact, not Clubman bottles, you don't have
that; right?
A. Do you mind if I look at the pictures one more 15:01
time?
Q. Absolutely.
A. I was looking for the one that's all rusted and
I just -- I thought there might have been some different
markings on there, but no, I'm sorry. Yeah, that's -- 15:02

Q. Okay. Where would you go to get that answer? 15:09
A. From our computer system.
Q. Okay. If I wanted to know the cost of one pound of the talc in 2017, who would I ask for that question? 15:10
A. Same person and same place.
Q. Okay. Is that answer available in the computer system at AII currently?
A. Yes.
Q. Do you have an understanding as to whether or 15:10 not the talc or the cornstarch, which one cost more per pound for AII to acquire for the purposes of billing Clubman?
MR. THACKSTON: Vague, overbroad, without respect to time period. 15:10
THE WITNESS: I don't -- I don't know specific, I think they're similar, but I don't know.
BY MR. REID:
Q. Okay. But as we established, it is possible for you to look at the computer system to determine the 15:10 answer to that question; right?
A. Yes.
Q. Do you -- Strike that.
Did AII ever perform any market research to determine if its consumers preferred a talc variant or a 15:11

REPORTER'S CERTIFICATE

I, JULIE HEYWARD, a Shorthand Reporter, State of California, do hereby certify:

That CHARLES LOVELESS, in the foregoing deposition named, was present and by me sworn as a witness in the above-entitled action at the time and place therein specified;

That said deposition was taken by me at said time and place, and was taken down in shorthand by me, a Certified Shorthand Reporter of the State of California, and was thereafter transcribed into typewriting, and that the foregoing transcript constitutes a full, true and correct report of said deposition and of the proceedings that took place;

IN WITNESS WHEREOF, I have hereunder subscribed my hand this 21st day of March 2024.



JULIE HEYWARD, CSR NO. 7907

State of California

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

FOR KING COUNTY

-oOo-

JACK LaSALLE and DIANNE LaSALLE,
husband and wife,

Plaintiffs,

vs. No. 23-2-08165-0 SEA

AMERICAN INTERNATIONAL
INDUSTRIES, et al.,

Defendants,

________________________________/

VIDEOCONFERENCE VIDEOTAPED DEPOSITION OF

CHARLES LOVELESS 30(b)(6)

VOLUME II

(Pages 156 through 247, inclusive)

Taken before JULIE HEYWARD

CSR No. 7907

April 9, 2024

I N D E X


| | PAGE |
|---|---|
| EXAMINATION BY MR. REID | 162, 215, 237 |
| EXAMINATION BY MR. THACKSTON | 197, 229 |


E X H I B I T S


| EXHIBIT | | PAGE |
|---|---|---|
| Exhibit 5 | Screenshot printout of cost for cornstarch and talc (Not provided) | 165 |
| Exhibit 6 | Printout demonstrating sales loss of the Clubman product when AII switched the product formulation from talc to cornstarch in approximately May of 2017 (Not provided) | 167 |
| Exhibit 7 | Chain of Custody Record for AII's Cosmetic Grade Talc Retains | 179 |
| Exhibit 8 | Western Analytical Laboratory, Inc. Test Report | 191 |
| Exhibit 9 | Formula Sheets | 198 |
| Exhibit 10 | General Production Documents | 207 |

VIDEOCONFERENCE VIDEOTAPED DEPOSITION OF
CHARLES LOVELESS 30(b)(6)

BE IT REMEMBERED, that pursuant to Notice, and on the 9th day of April, 2024, commencing at the hour of 10:06 a.m., before me, JULIE HEYWARD, a Certified Shorthand Reporter, State of California, remotely appeared CHARLES LOVELESS, produced as a witness in said action, and being by me first duly sworn, was thereupon examined as a witness in said cause.

-oOo-

APPEARANCES

For the Plaintiffs:

MICHAEL T. REID
Kazan, McClain, Satterley & Greenwood
55 Harrison Street, Suite 400
Oakland, California 94607
(510) 302-1000
mreid@kazanlaw.com
(Appearance via Videoconference)

For the Defendant COSTCO WHOLESALE CORPORATION:

EDWARD SATCHWILL
Barnes & Thornburg LLP
11 South Meridian Street
Indianapolis, Indiana 46204
(317) 261-7876
edward.satchwill@btlaw.com
(Appearance via Videoconference)

APPEARANCES (Continued):

For the Defendants AMERICAN INTERNATIONAL INDUSTRIES, ARYZ CORP., ERX CORP., RAZY PROPERTIES, INC., SRYZ CORP., and GLAMOUR INDUSTRIES, CO.:

JULIA GOWIN
NILOFAR KARBASSI
Nelson Mullins Riley & Scarborough LLP
Pacific Gateway
19191 South Vermont Avenue, Suite 900
Torrance, California 90502
(424) 221-7400
julia.gowin@nelsonmullins.com
nilofar.karbassi@nelsonmullins.com
(Appearance via Videoconference)

For the Defendants AMERICAN INTERNATIONAL INDUSTRIES, ARYZ CORP., ERX CORP., RAZY PROPERTIES, INC., SRYZ CORP., and GLAMOUR INDUSTRIES, CO.:

ROBERT E. THACKSTON
Nelson Mullins Riley & Scarborough LLP
3333 Lee Parkway, Suite 740
Dallas, Texas 75219
(469) 484-4790
robert.thackston@nelsonmullins.com
(Appearance via Videoconference)

For the Defendant AMERICAN INTERNATIONAL INDUSTRIES:

CLAUDE BOSWORTH
Rizzo|Bosworth|Eraut PC
1300 SW Sixth Street, Suite 330
Portland, Oregon 97201
(503) 229-1819
cbosworth@rizzopc.com
(Appearance via Videoconference)

For the Defendant PTI UNION:

SHAUN MARY MORGAN
Rizzo|Bosworth|Eraut PC
1300 SW Sixth Street, Suite 330
Portland, Oregon 97201
(503) 229-1819
smorgan@rizzopc.com
(Appearance via Videoconference)

APPEARANCES (Continued):

For the Defendants BAYER HEALTHCARE LLC; MERCK & CO., INC.:

MALIKA JOHNSON
Tanenbaum Keale LLP
One Convention Place
701 Pike Street, Suite 1575
Seattle, Washington 98101
(206) 889-5081
mjohnson@tktrial.com
(Appearance via Videoconference)

Also Present:

CHAD GIVEN, Videographer
(Appearance via Videoconference)

THE VIDEO OPERATOR: Good morning. We are going on the record at 10:06 a.m., on April 9th, 2024. 10:06

Please note that this deposition is being conducted virtually. Quality of the recording depends on the quality of the camera and internet connection of participants. What is seen from the witness and heard on the screen is what will be recorded. 10:06

Audio- and video-recording continue to take place unless all parties agree to go off the record.

This is Media Unit 1 of the video-recorded deposition, Charles Loveless, Volume II, taken by counsel for plaintiff, in the matter of Jack and Diane LaSalle versus American International Industries, et al., filed in the Superior Court of the State of California of the State of Washington for King County. The case number is 23-2-08165-0 SEA, located remotely via Zoom. 10:07 10:07

My name is Chad Given, representing Veritext, and I am the videographer. The court reporter is Julie Heyward from the firm of Veritext. I am not related to any party in this action nor am I financially interested in the outcome. 10:07

If there are any objections to proceeding, please state them at the time of your appearance.

All counsel have already previously stated their 10:08

appearances. 10:08

Will the court reporter please swear in the witness.

CHARLES LOVELESS 10:08

previously sworn as a witness

testified as follows:

EXAMINATION BY MR. REID:

Q. So Mr. Loveless, welcome back. Once again, my name is Michael Reid, I'm counsel for the plaintiffs in 10:08 the LaSalle action.

To begin with, you understand that you're still under oath today; correct?

A. Yes.

Q. Okay. And it's been a few weeks since the last 10:08 volume of your deposition, I should say your first and only volume of your deposition in this case.

Since that time, have you done anything for the purposes of either preparing -- reviewing documents, preparing notes, speaking with anyone, anything like 10:09 that, for the purposes of preparing for today or for the purposes of reviewing any of the questions that were asked you or any of the information that was asked you from the last volume of the deposition?

MR. THACKSTON: Compound, vague, overbroad. 10:09

THE WITNESS: I have looked at a couple things, yes. 10:09

BY MR. REID:

Q. Okay. So let's start out with talking about what you've done since the last volume of your deposition, then. Okay? 10:09

When you say you've looked at a couple things, can you tell me about what you've looked at?

A. Yes. One of the questions you had asked me was the cost of cornstarch versus talcum powder. And I went back and looked and found out that the cornstarch was about 5 percent less expensive than the -- the talc that we were using. I didn't know the -- when you first asked me the question, I don't -- I didn't remember what the differences was, but that's what it was. 10:09 10:10

Q. Okay. What did you look at to find out that information?

A. It was the field history for the item.

Q. Okay. Is that a screen -- Strike that.

Can you tell me about how you accessed that information? 10:10

A. I went to Manage 2000 and looked at what the cost of the talc was and what the cost of the cornstarch was.

Q. Okay. Is -- And so that's a screen in the 10:11

manufacturing line. Okay? Meaning that it's, you know, the Clubman container product and that is a sample that AII has maintained. Okay? So I'm going to ask you about that first. Okay? 10:31

A. Okay. 10:32

Q. How many samples of end product Clubman powder does AII currently maintain?

MR. THACKSTON: Vague, overbroad, assumes facts.

THE WITNESS: We don't have any of those. 10:32

BY MR. REID:

Q. Okay. Did AII at any point in time maintain any end product samples of Clubman talc?

A. Not that I recall.

Q. Okay. All right. Now, let me ask you about something else that's slightly distinguishable; right? 10:32

How many samples of talc that was intended to go into the Clubman product does AII maintain?

A. Of the bulk powder you're speaking of?

Q. I'm so sorry, I didn't understand that. Was that -- 10:33

A. The bulk talc is what you're asking?

Q. Yes.

A. We had 53 samples.

Q. Okay. And do you have an understanding as to 10:33

the weight or size of each of those samples? 10:33

A. I don't.

Q. Okay. Those 53 samples are still maintained by AII today; correct?

MR. THACKSTON: Objection; vague, overbroad, foundation. 10:33

THE WITNESS: These samples were given to our lawyers.

BY MR. REID:

Q. Okay. So they -- Are they in the possession of Mr. Thackston's law firm? 10:34

MR. THACKSTON: Objection; assumes facts, vague, overbroad.

THE WITNESS: I'm not sure exactly where they are at this time. 10:34

BY MR. REID:

Q. Okay. But to your knowledge, the samples were last given to your attorneys being Mr. Thackston's law firm; is that correct?

MR. THACKSTON: Vague, overbroad, compound, assumes facts, misstates testimony. 10:34

THE WITNESS: I'm trying to remember the actual chain of custody of what they went to and who they actually went to. And I don't recall what that is.

BY MR. REID: 10:34

was. 10:37

BY MR. REID:

Q. Sure. Let me -- Let me break it down a little bit.

AII currently has 53 -- Well, strike that because that's not true. 10:38

AII is aware of 53 talc retains.

Has AII ever had additional talc retains outside of those 53?

A. There would have been talc retains prior, I think these retains go back to the early 2000s. We would have had retains in the 1990s as well. 10:38

Q. Okay. These 53 talc retains, can you tell me what was the purpose that AII retained these samples?

A. It's part of our -- when we -- when we receive a shipment of raw material, we take a sampling of it for our -- for our retains. 10:39

Q. What does AII do with that sample of raw talc, what's the purpose of taking it?

A. So that we -- It's so we have a sample of what was sent to us. We do some visual inspections of it to make sure its bill is white and specific to the talc, you know, the color of it. I'm not sure what other inspections that we do on it. But that's, basically, it. 10:39 10:40

Q. The visual inspections that you reference, 10:40
what -- what are the tests or the inspections that that sample goes through?

MR. THACKSTON: Vague, overbroad, assumes facts. 10:40

THE WITNESS: So the -- the talc itself, the pharmaceutical grade talc that we're using that we buy from -- from Brenntag through -- from Barretts, it starts out being tested, tested at their facility. And there's -- I believe there's three different tests that 10:40
they do on this. It gets taken to us, we take a sampling of it and we look at it to -- for color and I'm not sure what else we do.

BY MR. REID:

Q. Do you have an understanding if you test or 10:41
look at it for the purposes of organic matter?

MR. THACKSTON: Objection; assumes facts, vague, overbroad.

THE WITNESS: Yeah, I'm not sure what organic matter is. 10:41

BY MR. REID:

Q. Okay. Besides color, do you have an under- -- do you have an understanding of any of the other tests or inspections that AII itself performed on that sample of talc retain when you receive it? 10:41

performed -- tests or visual inspection being performed 10:44
by AII of each retained when that shipment of raw talc
is received.

A. I don't know there are any tests.

Q. For example, you mentioned color, the color 10:44
inspection, and potentially other inspections that
you're unaware of as you sit here today.

Would Mr. Kormas be aware of those other
inspections?

MR. THACKSTON: Speculation. 10:45

THE WITNESS: Yeah, I don't know.

BY MR. REID:

Q. Okay. Would he be in a better position to tell
us than you are since you do not know?

MR. THACKSTON: Speculation, argumentative. 10:45

THE WITNESS: I'm not sure, sir.

BY MR. REID:

Q. Okay. You have not asked Mr. Kormas these
questions; correct?

A. I have not. 10:45

Q. Okay. Do you have an understanding as to what
year the 53 talc retains go back to, what's the first
year there for these 53 retains?

A. It was in the early 2000s. I'm not sure if
it's 2001, 2002, I don't recall the exact year for 10:46

those. 10:46
Q. Okay. What was AII's retention policy as it relates to these talc retains or how long would a retain be held by AII?
A. Typically, a retain is kept for three years. 10:46
MR. THACKSTON: I'm sorry, how many?
THE WITNESS: Three. Three years.
MR. THACKSTON: Okay.
THE WITNESS: Three to five, approximately.
BY MR. REID: 10:47
Q. Do you have an understanding as to why talc retains from the early 2000s were kept for longer than that retention period?
A. My understanding is they were kept part of the litigation. 10:47
Q. And you're referring to litigation being the first time that AII was sued in talc-related litigation in 2005?
A. I don't know if it's 2005 or not, sir, I know it was in the 2000s. 10:47
Q. Okay. In terms of that raw talc shipment -- Well, strike that.
Let me go back a little bit here.
That retainer sample of talc, you had mentioned, for example, the color inspection. 10:48

AII did not perform any testing for asbestos itself on that talc retain; correct? 10:48

MR. THACKSTON: Objection; asked and answered.

THE WITNESS: Well --

BY MR. REID: 10:48

Q. When it received the shipment.

A. I'm sorry?

Q. When it received the shipment.

A. Oh. That is correct. The -- The documentation that we received with the -- had the tests for those included in it. 10:48

Q. And it's your understanding that was testing performed by AII's talc supplier; correct?

A. By the --

MR. THACKSTON: Well, let me object as assumes facts, vague, overbroad. 10:49

THE WITNESS: And it was done by the -- my art is saying it was done by the company -- not directly from Brenntag, but from Barretts, it was done by Barretts. 10:49

MR. THACKSTON: So I object to the vague and overbroad nature of the term "supplier."

MR. REID: Sure.

MR. THACKSTON: Hey, Michael, anytime if you want to take five, we'll send you the document that you 10:50

BY MR. REID: 10:53

Q. Okay. Do you have any understanding as to when in terms of the year that testing was performed?

MR. THACKSTON: Objection; compound, vague, overbroad. 10:53

THE WITNESS: You're talking about by the plaintiffs?

BY MR. REID:

Q. Yes.

A. I don't recall the -- the year of that. 10:53

Q. Okay. Besides the testing performed by Barretts that you are aware of, are you aware of anyone testing the talc used in the Clubman product on behalf of AII prior to 2017, anyone else?

A. I don't know of any other test that was done by 10:54 anybody prior to that. We had independently sent it to Western Analytical ourself, not at the direction of defense or plaintiffs' lawyer, we just had it done. That's all that I believe.

Q. And who was it that you had it sent to? 10:55

A. A company by the name of Western Analytical.

Q. Do you recall when that was done?

A. It was -- I don't remember the date. It was in 2016 or '17, but I don't remember the exact date of that test. 10:55

here. 11:16

This next area, I'm going to ask you regarding formulas for the Clubman products that predate AII's acquisition of the product in 1987. And I understand you may or may not have information regarding that and 11:16 that's okay. Okay?

Does AII have in its possession any formula sheets for the Clubman product that predated its acquisition in 1987?

A. Only what we've given to our lawyers. 11:17

Q. Okay.

THE REPORTER: I'm sorry, I didn't hear that. I couldn't hear that.

THE WITNESS: Only what we've given to our lawyers. 11:17

MR. THACKSTON: And I object as vague, overbroad, and compound.

BY MR. REID:

Q. Let me see if I can help.

Do you have an understanding as to whether or not 11:17 the formulas given to your attorneys include any formula sheets that predate 1987?

MR. THACKSTON: Vague, overbroad, assumes facts.

THE WITNESS: I believe they do. 11:17

BY MR. REID: 11:17

Q. Okay. Do you have an understanding as to how far back the formula sheets that have been given to your attorneys go?

A. I don't recall the -- the year of those, sir. 11:17

Q. Okay. Is there any way that you can provide me an estimate, so, for example, they go back all the way through the 1980s or into the '70s or anything like that, any rough estimate?

MR. THACKSTON: Michael, I can also -- we can 11:18 also provide you that document.

MR. REID: I'm just asking the question right now.

MR. THACKSTON: Okay.

THE WITNESS: They go back -- 30 years, but I 11:18 don't know the exact date, sir, I'm sorry.

BY MR. REID:

Q. 20 --

MR. THACKSTON: I'm sorry, it cut out, it cut out. I didn't hear -- 11:18

MR. REID: Yeah, yeah.

MR. THACKSTON: Can you repeat the answer, please?

MR. REID: Madam Court Reporter, can you read back the answer? 11:18

(Record read.) 11:18
MR. THACKSTON: Thank you.
THE WITNESS: Actually, I said 20 to 30 years.
MR. REID: And I think -- I think that's correct. I believe he said 20 to 30 years, in fairness. 11:19
BY MR. REID:
Q. And Mr. Loveless, is -- when you say 20 to 30 years, is that 20 to 30 years predating the acquisition in 1987?
A. Yes. 11:19
Q. Okay. And Mr. Loveless, you have no reason to dispute what is included on those formula sheets predating 1987; correct?
MR. THACKSTON: Vague, overbroad, compound.
THE WITNESS: I'm not sure what you mean, sir. 11:20
BY MR. REID:
Q. Sure. Let me clarify.
If the formula sheet says that pre 1987 X talc was used, you have no reason to say, no, actually, it wasn't X talc, it was something else; right? 11:20
MR. THACKSTON: Vague, overbroad, assumes facts.
THE WITNESS: Yeah, I don't know one way or the other. I just know what the document says.
BY MR. REID: 11:20

Q. Okay. So you would not dispute whatever the document says regarding the talc or the formulation used for the Clubman product predating 1987; right? 11:20
A. The document says what it says, so whatever it says is what I know. 11:20
Q. Okay. Mr. Loveless, that is all the questions that I have for you. And with that, I'll pass the witness. Thank you so very much for your time.
A. Thank you, sir.
MR. THACKSTON: Let me go back and ask a few questions, not too many, I don't think. 11:21
EXAMINATION BY MR. THACKSTON:
Q. Mr. Loveless, let's start where you left off.
The question about the formula sheets you said gave to your lawyers, what formula sheet are you referring to? 11:21
A. There was a formula sheet for the talc of -- I believe there was two of them that I recall seeing that had the formula of how to make the talc.
Q. When you say "how to make the talc," what product are you talking about? 11:21
A. We're talking about the Clubman -- the Clubman talc that came in the can.
MR. THACKSTON: Let's now mark as Exhibit 9 a document that I'll call the formula cards. And let me 11:22

see if I can display that. 11:22

(Exhibit 9 was identified.)

BY MR. THACKSTON:

Q. Are you able to see the document on the screen?

A. I am not. 11:22

MR. REID: I can't either.

MR. THACKSTON: Let me -- I'll stop sharing and get somebody more competent to do it, perhaps, than me to pull it up.

The formula sheets, we'll mark as Exhibit 9. 11:23

BY MR. THACKSTON:

Q. Mr. Loveless, do you recognize the document that we're --

MR. THACKSTON: We'll send it to you as well, Michael. 11:24

BY MR. THACKSTON:

Q. -- the documents that we're displaying on the screen, it has a title of "Pinaud," P-i-n-a-u-d, "Clubman Talc," open parens, "Flesh," close paren, "Style #2760"? 11:24

A. Yes, I see it.

Q. And what -- it says one of 12 pages, what is that document?

A. This is the formula sheet for making the Clubman talc that came in the can. 11:24

Q. Okay. And where did you find this document? 11:24
A. This was part of the documents that we received from the asset purchase of Clubman.
Q. And was this -- was this information that you received from Neslemur? 11:24
A. Yes.
Q. And other than -- What was your understanding -- I believe you testified about this on the first day of your deposition.
What was your understanding of the type of talc 11:25 that was being used to make Clubman at the time that AII purchased the brand in 1987?
A. When we -- When we purchased the brand, the talc they were using is the pharmaceutical grade talc.
Q. And do you know for how long before you 11:25 purchased the brand that Neslemur or anyone else had been using the pharmaceutical grade talc to make Clubman?
A. I don't know how many years they've been using it, but that was the talc that they were using at the 11:25 time that we purchased the assets of the Clubman brand.
Q. And this document, Exhibit Number 9, was this found in the records of AII?
A. Yeah, this was part of what was -- was given to me from David Woolf. 11:26

Q. Okay. So my question now is about anyone else on the executive team or anyone else that is employed by AII, you're not able to say whether or not Mr. Ryzman has had any communications with them regarding business decisions one way or the other. 12:20 12:21

A. Yeah, I was never part of those conversations, so I wouldn't know about them.

Q. Okay. Mr. Loveless, that's all the follow up I have for you.

A. Thank you very much. 12:21

Q. Thank you, sir.

MR. THACKSTON: Let me -- Let me ask just one follow up to that.

EXAMINATION BY MR. THACKSTON:

Q. Going back to that Exhibit Number 9, the formula sheets, when AII purchased the Clubman brand, what type of talc was Neslemur using in Clubman? 11:49

A. At the time we purchased, they were using the pharmaceutical grade talc for their Clubman talc.

Q. And was there -- From the time you became involved in Clubman, was there any reason to go back and investigate what other ingredients they might have used in the product years before you purchased it? 12:22

A. No, we only looked at what we were producing at the time and continued with that. Not only for the 12:22

Clubman talc, but for the rest of the -- the line as well. 12:22

Q. And when you said that -- I think you said it was only a small percentage, were you talking about the Clubman talc as a percentage of the overall Clubman brands that you purchased? 12:22

A. Clubman, the big part of the business was the aftershaves and the other products, not -- not the Clubman talc.

Q. You've looked at that catalog with plaintiffs' counsel and it had things like aftershave, deodorant, shaving cream, hair gel, things like that? 12:22

A. Well, those are some of the items, yes.

Q. And you know having -- And when you say you've looked at what R.O. talc -- tried to figure out what R.O. talc meant, was that in the context of litigation that you tried to figure that out? 12:23

A. Yes, it was.

Q. Have you also looked at those formula cards to see what was the last time that they mentioned any use of Italian talc? 12:23

A. Yeah, the Italian talc was back in the 1970s, from what I recall.

Q. Like around 197- -- '73, the last time it's listed? 12:23

A. Yes. 12:23
MR. REID: Lacks foundation.
BY MR. THACKSTON:
Q. Whatever --
A. 1970s. 12:23
Q. Whatever the document says, is that the extent of your knowledge about what the ingredients were that were being used in Clubman before AII purchased the brand?
A. That's my only knowledge of it, yes, sir. 12:23
Q. And you talked about -- you talked about Rebgro.
So at the time that AII purchased that brand, was it being -- was it being manufactured by a third party, not Neslemur or not AII? 12:24
A. Yes. So when we -- when AII purchased the assets of the Clubman from Neslemur, the products were being made at different contract packagers. For the Italian talc, it was Rebgro and they were providing the pharmaceutical grade talc. And when we purchased the 12:24 brand we continued with the same pharmaceutical grade talc to Rebgro, along with the cans and shippers for them to produce for us.
Q. Did AII buy all the brands that Neslemur had?
A. No. 12:25

Are you familiar with -- Did Clubman talcum powder have an aroma? 12:28

A. Yes. So the Clubman talc used the same fragrance as the Clubman aftershave used. It was -- And the same fragrance that our shave cream and at the time 12:29 deodorant spray used, it was all the same fragrance used in all of them.

Q. Was it a unique fragrance, was it something that Clubman tried to keep as a -- Well, first of all, was it unique, was it a unique Clubman fragrance? 12:29

A. Yes. So the Clubman fragrance is a fragrance that was made for -- for Clubman. And proprietary to us only.

Q. Are you familiar with -- Are you familiar with that scent? 12:29

A. Yes, I am.

Q. Could you smell one of your containers and compare it to another and be able to tell which one's Clubman? Suppose it's not in a container, suppose it's in a pile, can you smell a powder and tell somebody 12:30 whether it's Clubman?

A. Yeah, if there was a pile of talc that had a different fragrance from what Clubman is, you'd be able to tell the difference. There's a unique -- I'll give you -- you know, if you had a pile of Clubman talc and a 12:30

BY MR. REID: 12:34
Q. Why is -- How is it not?
A. We don't make the scent, we buy the fragrance.
Q. Okay. Okay. Let me back up, then.
Who do you buy the fragrance from? 12:34
A. Currently, we are buying it from Belmay, I believe, but I don't know that -- You're talking about today; right?
Q. Yes.
A. Yeah, I think it's Belmay, but I'm not sure if it's them or not. 12:34
Q. Okay. Can you spell Belmay for me?
A. Yeah, it's B-e-l-m-a-y.
Q. Okay. Has AII always purchased the fragrance from Belmay? 12:35
A. No.
Q. Okay. When did AII start purchasing the fragrance from Belmay?
A. I don't know the exact date.
Q. Okay. I will come back to that question, then. 12:35
Who did AII purchase the fragrance from before Belmay?
MR. THACKSTON: Asked and answered.
THE WITNESS: Originally, the fragrance was purchased from Elias Fragrance is what my recollection 12:35

are. It's E-l- -- 12:35
BY MR. REID:
Q. Can you spell that?
A. Yeah. E-l-i-a-s.
Q. Okay. Is that true from 1987 all the way until 12:36
AII switched to Belmay?
A. That's my recollection, yes.
Q. Okay. Is the fragrance, to your knowledge, the same fragrance between Elias and Belmay?
MR. THACKSTON: Vague and overbroad, compound. 12:36
THE WITNESS: It is the same scent, yes.
BY MR. REID:
Q. Do you have an understanding as to whether or not it's the same formula between Elias and Belmay?
A. I do not have that understanding. I don't know 12:36
what their formulas are. Their formulas are private -- proprietary to the fragrance houses. And they don't give that to us.
Q. Okay. How does AII receive the fragrance from Belmay and then also from Elias for purposes of the 12:37
Clubman talc?
A. It comes in containers.
Q. Is it a liquid fragrance?
A. Yes.
Q. Okay. Does AII retain any retains or samples 12:37

REPORTER'S CERTIFICATE

I, JULIE HEYWARD, a Shorthand Reporter, State of California, do hereby certify:

That CHARLES LOVELESS, in the foregoing deposition named, was remotely present and by me sworn as a witness in the above-entitled action at the time and place therein specified;

That said deposition was taken by me at said time and place, and was taken down in shorthand by me, a Certified Shorthand Reporter of the State of California, and was thereafter transcribed into typewriting, and that the foregoing transcript constitutes a full, true and correct report of said deposition and of the proceedings that took place;

IN WITNESS WHEREOF, I have hereunder subscribed my hand this 10th day of April 2024.



JULIE HEYWARD, CSR NO. 7907
State of California

EXHIBIT 9

## PINAUD CLUBMAN TALC (FLESH)

## STYLE #2760

| PART # | | PERCENT % |
|---|---|---|
| 8-410 | PERFUME OIL G-2262 | 0.6250 |
| 9-051 | R.O. TALC | 7.5000 |
| 9-006 | ZINC OXIDE | 1.1250 |
| 9-007 | ZINC STEARATE | 1.1250 |
| 500-060 | FLESH COLOR BASE | 0.4 |
| 9-051 | R.O. TALC | 89.125 |

## FLESH COLORED TALC CONC.

## FOR CLUBMAN TALC

## STYLE #500-060

| PART # | | PERCENT % |
|---|---|---|
| 9-051 | TALC | 94.953 |
| 6-209 | FDC RED 3 LAKE | 4.25 |
| 6-005 | ULTRAMARINE BLUE | 0.75 |
| 6-008 | UMBER BC | 0.047 |

# The Nestle-LeMur Company, 114 Fifth Avenue, N.Y. 10011

**TITLE:**

**FORMULATION FOR:**

CLUBMAN TALC

**Page** ______ **of** ______

**Revision #** FIRST

**Supercedes #** FLESH COLORED Talc formulation

**Scope:** DOMESTIC AND INTERNATIONAL

**Date:** February 12,1985

**Written By:** E.A.MacLennan (signature)

**Approved By:** J.Whittemore

**Approved By:**

| INGREDIENTS | PERCENT BY WEIGHT |
|---|---|
| TALC (9-051) | 99.60 |
| *FRAGRANCE (8-410) | 0.40 |
| TOTAL | 100% |

*Originally Fragrance G-2262, will be replaced by the Musk Ambrette-Free version, Fragrance G2262/1.

# The Nestle-LeMur Company, 114 Fifth Avenue, N.Y. 10011

**TITLE:**

**FORMULATION FOR:** NEW

CLUBMAN TALC

**Page** ______ **of** ______

**Revision #** FIRST

**Supercedes #** FLESH COLORED Talc formulation

**Scope:** DOMESTIC AND INTERNATIONAL

**Date:** February 12,1985

**Written By:** EAM E.A.MacLennan

**Approved By:** J.Whittemore

**Approved By:**

| INGREDIENTS | PERCENT BY WEIGHT |
|---|---|
| TALC (9-051) | 99.60 |
| *FRAGRANCE (8-410) | 0.40 |
| TOTAL | 100% |

*Originally Fragrance G-2262, will be replaced by the Musk Ambrette-Free version, Fragrance G2262/1.

11 oz CAN

The Nestle-LeMur Company, 114 Fifth Avenue, N.Y. 10011

| | |
|---|---|
| TITLE: FORMULATION FOR: CLUBMAN TALC | Page ____ of ____<br>Revision # FIRST<br>Supercedes # FLESH COLORED Talc formulation |
| Scope: DOMESTIC AND INTERNATIONAL | Date: February 12,1985 |

| Written By: | Approved By: | Approved By: |
|---|---|---|
| E.A.MacLennan (signature) | J.Whittemore | |

| INGREDIENTS | PERCENT BY WEIGHT |
|---|---|
| TALC (9-051) | 99.60 |
| *FRAGRANCE (8-410) | 0.40 |
| TOTAL | 100% |

*Originally Fragrance G-2262, will be replaced by the Musk Ambrette-Free version, Fragrance G2262/1.

MASTER FORMULA SHEET

REVISED

STYLE NO. 2760-2720

PRODUCT PINAUD CLUBMAN TALC (FLESH)

SPECIFIC GRAVITY

FORMULATOR

APPROVED BY H. Fishman DIRECTOR OF RESEARCH

DATE 1-20-84

| INGREDIENTS | | % | 100 Lbs. | | | | | METRIC |
|---|---|---|---|---|---|---|---|---|
| PART # | TRADE. CHEMICAL OR CODE NAME | | GALS. | LBS. | OZ. | GRAMS | CC | 100 |
| 8-410 | Perfume Oil G-2262 | 0.6250 | | 0 | 10 | | | |
| 9-051 | R O Talc | 7.5000 | | 7 | 8 | | | |
| 9-006 | Zinc Oxide | 1.1250 | | 1 | 2 | | | |
| 9-007 | Zinc Stearate | 1.1250 | | 1 | 2 | | | |
| 500-060 | Flesh Color Base | 0.4 | | 0 | 6.4 | | | |
| 9-051 | R O Talc | ~~89.7500~~ 89.225 | | 89 | 4 | | | |
| | Total | 100.0000 | | 100 | 0 | | | |

# MASTER FORMULA SHEET

ST''E NO. 2760

PRODUCT Clubman Talc

SPECIFIC GRAVITY

FORMULATOR

APPROVED BY

DIRECTOR OF RESEARCH

DATE 2/20/73

| | INGREDIENTS | | % | 100 lbs | | | | | METRIC |
|---|---|---|---|---|---|---|---|---|---|
| | PART # | TRADE, CHEMICAL OR CODE NAME | | GALS. | LBS. | OZ. | GRAMS | CC | 100 |
| 1 | 8-410 | G2262 | 0.625 | | — | 10 | | | |
| 2 | 9-051 | RO Talc | 7.5 | | 7 | 8 | | | |
| 3 | 9-006 | Zinc Oxide | 1.125 | | 1 | 2 | | | |
| 4 | 9-007 | Zinc Stearate | 1.125 | | 1 | 2 | | | |
| 5 | 0-060 | Flesh Color Base | 0.875 | | — | 14 | | | |
| 6 | 9-051 | RO Talc | 88.75 | | 88 | 12 | | | |

# MASTER FORMULA SHEET

STYLE NO. 500-060 REVISED

PRODUCT FLESH COLORED TALC CONC. (FOR CLUBMAN TALC)

SPECIFIC GRAVITY

FORMULATOR

APPROVED BY H. Fishman DIRECTOR OF RESEARCH

DATE 1-23-84

| | INGREDIENTS | | % | 100 LBS. | | | | | METRIC |
|---|---|---|---|---|---|---|---|---|---|
| | PART # | TRADE, CHEMICAL OR CODE NAME | | GALS. | LBS. | OZ. | GRAMS | CC | 100 |
| 1 | 9-051 | Talc | 94.953 | | 95 | 0 | | | |
| 2 | 6-209 | FDC Red 3 Lake | 4.25 | | 4 | 4 | | | |
| 3 | 6-005 | Ultramarine Blue | 0.75 | | 0 | 12 | | | |
| 4 | 6-008 | Umber BC | 0.047 | | 0 | 3/4 | | | |
| 5 | | | | | | | | | |
| 6 | | | | | | | | | |
| 7 | | | | | | | | | |
| 8 | | | | | | | | | |
| 9 | | | | | | | | | |
| 0 | | | | | | | | | |
| 1 | | | | | | | | | |
| 2 | | | | | | | | | |
| 3 | | | | | | | | | |
| 4 | | | | | | | | | |
| 5 | | | | | | | | | |
| 6 | | | | | | | | | |
| 7 | | | | | | | | | |
| 8 | | | | | | | | | |
| 9 | | | | | | | | | |
| 0 | | | | | | | | | |
| 1 | | | | | | | | | |
| 2 | | | | | | | | | |
| 3 | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

# MASTER FORMULA SHEET

STYLE NO. 2720-2760 REVISED

PRODUCT FLESH COLORED TALC CONCENTRATE (FOR CLUBMAN TALC)

SPECIFIC GRAVITY

FORMULATOR

APPROVED BY H. Fishman DIRECTOR OF RESEARCH

DATE 5/18/82

| | INGREDIENTS | | % | 100 lbs | | | | | METRIC |
|---|---|---|---|---|---|---|---|---|---|
| | PART # | TRADE. CHEMICAL OR CODE NAME | | GALS. | LBS. | OZ. | GRAMS | CC | 100 |
| 1 | 9-051 | TALC. | 95.578 | | 95 | 9 | | | |
| 2 | 6-209 | FDC RED #3 LAKE | 4 | | 4 | 0 | | | |
| 3 | 6-005 | ULTRA BLUE | 0.375 | | 0 | 6 | | | |
| 4 | 6-008 | UMBER 1985 OR UMBER BC | 0.047 | | 0 | 3/4 | | | |
| 5 | | | | | | | | | |
| 6 | | | | | | | | | |
| 7 | | | | | | | | | |
| 8 | | | | | | | | | |
| 9 | | | | | | | | | |
| 0 | | | | | | | | | |
| 1 | | | | | | | | | |
| 2 | | | | | | | | | |
| 3 | | | | | | | | | |
| 4 | | | | | | | | | |
| 5 | | | | | | | | | |
| 6 | | | | | | | | | |
| 7 | | | | | | | | | |
| 8 | | | | | | | | | |
| 9 | | | | | | | | | |
| 0 | | | | | | | | | |
| 1 | | | | | | | | | |
| 2 | | | | | | | | | |
| 3 | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

# MASTER FORMULA SHEET

STYLE NO. 2720 - 2760

PRODUCT **TALC COLOR CONCENTRATE - FLESH (FOR CLUBMAN TALC)**

SPECIFIC GRAVITY

FORMULATOR

APPROVED BY [signature] DIRECTOR OF RESEARCH

DATE Mar 26, 1973

| | INGREDIENTS | | % | 100 | | | | | METRIC |
|---|---|---|---|---|---|---|---|---|---|
| | PART # | TRADE, CHEMICAL OR CODE NAME | | GALS. | LBS. | OZ. | GRAMS | CC | 100 |
| 1 | 9-003 | Italian Talc | 98.3905 | | 98- | 6 | | | |
| 2 | | | | | | | | | |
| 3 | ~~[illegible]~~ | ~~Geranium Red # 13 - 10%~~ | .9375 | | 0- | 15 | | | |
| 4 | 6-209 | FDC Red 3 Lake | | | | | | | |
| 5 | ~~6-125~~ | Red 3080 | .2500 | | 0- | 4 | | | |
| 6 | 6-232 | | | | | | | | |
| 7 | 6-005 | Ultra Blee | .3750 | | 0- | 6 | | | |
| 8 | | | | | | | | | |
| 9 | 6-008 | Umber 1985 | .0470 | | 0- | 3/4 | | | |
| 10 | | | | | | | | | |
| 11 | | | 100.0000 | | 100- | 0 | | | |
| 12 | | | | | | | | | |
| 13 | | | | | | | | | |
| 14 | | | | | | | | | |
| 15 | | | | | | | | | |
| 16 | | | | | | | | | |
| 17 | | | | | | | | | |
| 18 | | | | | | | | | |
| 19 | | | | | | | | | |
| 20 | | | | | | | | | |
| 21 | | | | | | | | | |
| 22 | | | | | | | | | |
| 23 | | | | | | | | | |

# MASTER FORMULA SHEET

STYLE NO. ~~2720~~ - 2760 TALC COLOR CONCENTRATE FLESH (FOR CLUBAMN TALC)

PRODUCT

SPECIFIC GRAVITY

FORMULATOR

APPROVED BY *Theodore Buaske* DIRECTOR OF RESEARCH

DATE *Jan 25, 1973*

| INGREDIENTS | | % WT | 100 lbs | | | | | METRIC |
|---|---|---|---|---|---|---|---|---|
| PART # | TRADE, CHEMICAL OR CODE NAME | | GALS. | LBS. | OZ. | GRAMS | CC | 100 |
| 9-003 | Italian Talc | 98.3905 | | 98 | 6 | | | |
| 6-103 | K 7966 *replaced with Geranium Red #13 (10%)* | .9375 | | 0 | 15 | | | |
| 6-125 | Red 3080 | .2500 | | 0 | 4 | | | |
| 6-005 | Ultra Blue | .3750 | | 0 | 6 | | | |
| 6-008 | Umber 1985 | .0470 | | 0 | 3/4 | | | |
| | | 100.0000 | | 100 | 0 | | | |

MASTER FORMULA SHEET

STYLE NO. ~~2720~~ - 2760

PRODUCT **PINAUD CLUBMAN TALC (FLESH)**

SPECIFIC GRAVITY

FORMULATOR

APPROVED BY

DIRECTOR OF RESEARCH

DATE Feb 20, 1973

| INGREDIENTS | | % WT. | 100 LBS. | | | | | METRIC |
|---|---|---|---|---|---|---|---|---|
| PART # | TRADE, CHEMICAL OR CODE NAME | | GALS. | LBS. | OZ. | GRAMS | CC | 100 |
| 8-261 | Perf. Oil BAB 1104 (domestic) | 0.6250 | | 0 - | 10 | | | |
| 9-051 | R O Talc | 7.5000 | | 7 - | 8 | | | |
| 9-006 | Zinc Oxide | 1.1250 | | 1 - | 2 | | | |
| 9-007 | Zinc Stearate | 1.1250 | | 1 - | 2 | | | |
| 500-060 | Flesh Color Base | 0.8750 | | 0 - | 14 | | | |
| 9-051 | R O Talc | 88.7500 | | 88 - | 12 | | | |
| | Total | 100.0000 | | 100 | | | | |

MASTER FORMULA SHEET

STYLE NO. 2720 - 2760 TALC COLOR CONCENTRATE FLESH (FOR CLUBAMN TALC)

PRODUCT

SPECIFIC GRAVITY

FORMULATOR

APPROVED BY

DIRECTOR OF RESEARCH

DATE Jan 25, 1973

| INGREDIENTS | | % WT | 100 lbs. | | | | | METRIC |
|---|---|---|---|---|---|---|---|---|
| PART # | TRADE. CHEMICAL OR CODE NAME | | GALS. | LBS. | OZ. | GRAMS | CC | 100 |
| 9-003 | Italian Talc | 98.3905 | | 98 | 6 | | | |
| | GERANIUM RED #13 (10%) | | | | | | | |
| 6-103 | [illegible] K 7966 (D+C Red # 3 Al. Lake) | .9375 | | 0 | 15 | | | |
| 6-125 | 1919 Red 3080 Only Red W.C.D | .2500 | | 0 | 4 | | | |
| 6-005 | Ultra Blue LA 9818 | .3750 | | 0 | 6 | | | |
| 6-008 | Umber 1985 | .0470 | | 0 | 3/4 | | | |
| | | 100.0000 | | 100 | 0 | | | |