# Exhibit 6

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| BARRETTS MINERALS INC., *et al.*,[1] | : | Case No. 23-90794 (DRJ) |
| Debtors. | : | **(Joint Administration Requested)** |

**DECLARATION OF DAVID J. GORDON, CHIEF RESTRUCTURING OFFICER OF THE DEBTORS, IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

Under 28 U.S.C. § 1764, I, David J. Gordon, declare as follows under the penalty of perjury:

1. I am the Chief Restructuring Officer ("**CRO**") of Barretts Minerals Inc. ("**BMI**") and Barretts Ventures Texas LLC ("**BVT**", and together with, BMI, the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"). I own and operate a management services business, DJG Services, LLC ("**DJG**"), through which I began working with BMI as a consultant in April 2023 prior to my retention as CRO in July 2023. I was subsequently retained as CRO of BVT in September 2023. I am the President and own 50% of DJO Services, LLC ("**DJO**"). DJO owns equity interests in a number of currently non-operating companies that face asbestos personal injury litigation and provides management services to each of them. From late 2019 until 2022, I was the President and Chief Restructuring Officer of Paddock Enterprises, LLC. I served in that position through the conclusion of its chapter 11 case. From 2017 to 2020, I was the President of

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Barretts Minerals Inc. (8715) and Barretts Ventures Texas LLC (0787). The Debtors' address is 5605 North MacArthur Boulevard, Suite 1000, PMB 139, Irving, Texas 75038.

Fraser's Boiler Service, Inc., including through its bankruptcy from 2018 to 2020 in a chapter 11 case involving asbestos mass tort and related insurance issues. In my personal capacity, I serve as Liquidating Trustee to the Fraser's Boiler Liquidating Trust and the Old Revco Talc Personal Injury Liquidating Trust and as Director of Insurance and Litigation for a regional contractor in the Northwest. I have also served as an independent director for three other companies since 2018. Prior to starting DJO in 2015, I served as Vice President and then President and Chief Executive Officer ("**CEO**") of The Flintkote Company ("**Flintkote**") from 2000 to 2017, including through its chapter 11 bankruptcy. In my capacity as CEO of Flintkote, I also served as the CEO of Plant Insulation Company from 2007 to 2012, including through its chapter 11 bankruptcy. I also currently serve as the trustee for the Flintkote Trust. From 1997 to 2003, I served in various capacities for Flintkote's former parent, Imasco Holdings Group, Inc., including as the President of Roy Rogers Restaurants and as President of MRO Mid-Atlantic Restaurants. Prior to that time, I served in senior counsel positions for Hardee's Food Systems, Inc. from 1987 to 1997 and Burger King Corporation from 1980 to 1987.

2. Since I was engaged as CRO in July 2023 and September 2023, respectively, I have been responsible for overseeing the restructuring activities and operations of the Debtors as well as developing and managing the real estate business of the Debtors. As a result of my experience with the Debtors, my review of public and non-public documents (including the Debtors' books and records), and my discussions with other members of the Debtors' management team, I am generally familiar with the Debtors' businesses, financial condition, policies and procedures, day-to-day operations, and books and records, and have also become generally familiar with the operations and business of various Non-Debtor Affiliates (as defined below), including Minerals Technologies Inc. ("**MTI**"), the Debtors' ultimate parent. Except as otherwise noted, I have

personal knowledge of the matters set forth herein or have gained knowledge of such matters from the Debtors' employees or retained advisers that report to me in the ordinary course of my responsibilities. References to the Bankruptcy Code (as defined below), the chapter 11 process, and related legal matters are based on my understanding of such matters in reliance on the explanation provided by, and the advice of, counsel. I am authorized to submit this declaration (this "**First Day Declaration**") on behalf of the Debtors. If called upon to testify, I would testify competently to the facts set forth in this First Day Declaration.

3. On the date hereof (the "**Petition Date**"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Southern District of Texas (the "**Court**"). The Debtors will continue to operate their businesses and manage their properties as debtors in possession.

4. I submit this First Day Declaration in support of the Debtors' (a) voluntary petitions for relief and (b) "first-day" pleadings, which are being filed concurrently herewith (collectively, the "**First Day Pleadings**").[2] The Debtors seek the relief set forth in the First Day Pleadings to minimize the adverse effects of the commencement of the Chapter 11 Cases on their businesses. I have reviewed the Debtors' petitions and the First Day Pleadings, and have had their contents explained to me, and it is my belief that the relief sought therein is essential to ensure the uninterrupted operation of the Debtors' businesses and to successfully maximize the value of the Debtors' estates.

---

[2] Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to them in the applicable First Day Pleadings.

5. The primary purpose of the Chapter 11 Cases is to address and comprehensively resolve BMI's liabilities arising from talc. The Debtors intend to achieve this goal by continuing to negotiate – and ultimately confirming – a plan of reorganization pursuant to sections 524(g) and 1129 of the Bankruptcy Code that creates a section 524(g) trust vested with substantial assets for the benefit of current and future talc claimants and provides for a channeling injunction prohibiting claimants from asserting claims arising from BMI's talc prior to its emergence from the Chapter 11 Cases against the Debtors or any Non-Debtor Affiliate. Although BMI disputes all talc-related liability, increasing volumes of litigation with associated *ad hoc* settlements and increasing incurrence of associated costs are not sustainable and, therefore, the Debtors believe that the filing of the Chapter 11 Cases and the creation of a section 524(g) trust would be the most efficient and expeditious way for the Debtors to ensure that holders of current and future Talc Claims (as defined below) are treated in a fair and just manner. The Debtors are confident that the tools and protections available in chapter 11 will facilitate negotiations that will ultimately result in a court-approved plan.

6. To facilitate this process, the Debtors intend to pursue a sale of BMI's assets through a Court-approved sale process, the proceeds of which will be used to fund the Chapter 11 Cases and the section 524(g) trust (as applicable). Until the Sale (as defined below) is consummated, the Debtors intend to rely on proceeds from the DIP Facility (as defined below) to fund the Chapter 11 Cases. The Debtors contemplate that amounts drawn under the DIP Facility will be repaid from the proceeds of the Sale.

7. Part I of this First Day Declaration provides an overview of the Debtors' businesses, organizational structure, BMI's talc-related liabilities, and the events leading to the filing of the Chapter 11 Cases. Part II sets forth the relevant facts in support of the First Day Pleadings.

**PART I**

# I. COMPANY AND BUSINESS OVERVIEW

## A. Background

8. BMI is a wholly-owned subsidiary of Specialty Minerals Inc. ("**SMI**"), which in turn is a wholly-owned subsidiary of MTI. BVT is a wholly-owned subsidiary of BMI. A corporate organization chart is attached hereto as Exhibit A. As used herein "**Non-Debtor Affiliates**" is a reference to MTI and its subsidiaries, excluding the Debtors.

9. BMI's current operations are focused on the mining, beneficiating, processing, and sale of industrial talc. BMI historically supplied a relatively minor percentage of its sales into cosmetic applications. BMI's talc is sold to distributors and third-party manufacturers for use in such parties' products, which are then incorporated into downstream products eventually sold to consumers. BMI does not manufacture any products containing talc or directly sell any such products to consumers. In addition to BMI's talc business, the Debtors manage certain real property holdings that provide a consistent stream of rental income.

10. BMI is facing significant potential liability resulting from an increasing number of lawsuits alleging personal injuries caused by exposure to talc allegedly contaminated with asbestos that was mined, beneficiated, processed, and sold by BMI (the "**Talc Claims**"). BMI believes that the Talc Claims are entirely without merit and that all talc sold by BMI is and always has been safe.

11. As of the Petition Date, BMI and certain Non-Debtor Affiliates have been sued in over 880 cases asserting Talc Claims and seeking damages for alleged exposure to asbestos-containing materials related to products purportedly containing talc sold by BMI. The overwhelming majority of the Talc Claims allege mesothelioma or other diseases arising from

asbestos exposure, typically as a result of exposure to asbestos-contaminated talc in cosmetic products or in an occupational setting.

12. The Debtors' decision to commence the Chapter 11 Cases was prompted by the growing number of Talc Claims coupled with: (i) an increase in settlement demands with respect to Talc Claims; (ii) the unavailability of insurance coverage due to allegations of asbestos contamination; (iii) the unwillingness of Pfizer (as defined below), despite its contractual indemnification obligations, to provide comprehensive indemnification for BMI's mounting potential liability exposure; and (iv) an anticipated increase in the number of Talc Claims that are not covered by insurance or indemnification.

13. As described in further detail in Section II below, BMI has been faced with substantial litigation costs,[3] including because Pfizer has resisted providing comprehensive indemnification to BMI for Talc Claims. BMI has historically relied on the Pfizer Indemnity (as defined below) to fund settlements with claimants alleging Talc Claims, however the indemnity applies only to Talc Claims alleging exposure before October 23, 1992.[4] More recently, Pfizer has disputed its obligations under the Pfizer Indemnity as to certain claims and has also demanded that BMI reimburse Pfizer with respect to a portion of certain Talc Claims that it has settled. With no asbestos-related insurance coverage, increasing reimbursement demands from Pfizer and increasingly limited access to indemnity, BMI lacks the financial wherewithal to litigate against the mounting Talc Claims being asserted against it in the tort system.

---

[3] As further described below, litigation costs and settlements have been funded by MTI. BMI has an obligation to reimburse MTI for these expenses pursuant to the Intercompany Loan Agreement (as defined herein).

[4] As further described in Section II.D, October 23, 1992, is referred to herein as the "**Reorganization Date**". Pursuant to the Reorganization Agreement (as defined below), Pfizer agreed to indemnify BMI, MTI, and SMI for all Talc Claims other than those alleging a date of first exposure on or after the Reorganization Date.

14. In addition, and as further discussed below, the Debtors also engaged in prepetition discussions with the Ad Hoc Plaintiffs' Group and the Prepetition FCR (each as defined below), which led the Debtors to conclude that commencement of the Chapter 11 Cases was the optimal path for resolving BMI's talc-related liabilities in a manner that will maximize value for all stakeholders.

**B. History of the Debtors**

15. BMI's talc operations were historically part of an unincorporated division of Pfizer Inc. ("**Pfizer**"). On August 7, 1992, BMI was incorporated as a wholly-owned subsidiary of Pfizer. In 1992, Pfizer sought to divest its minerals businesses. To effectuate the separation, Pfizer undertook a number of restructuring transactions whereby MTI was reorganized from a wholly-owned subsidiary of Pfizer to an independent company owning, through its subsidiaries, Pfizer's specialty minerals businesses.

16. The restructuring transaction was implemented in several parts. On September 28, 1992, MTI and Pfizer entered into that certain Reorganization Agreement (the "**Reorganization Agreement**"), pursuant to which Pfizer conveyed its rights to the stock of SMI, BMI, and certain other subsidiaries to MTI. In connection with the Reorganization Agreement, Pfizer transferred to BMI, as a capital contribution, certain assets used in the business of mining, processing, and selling talc. The transfer was made pursuant to that certain Asset Contribution Agreement, dated September 28, 1992 by and between Pfizer and BMI (the "**Asset Contribution Agreement**"). Pfizer also consummated certain other transactions to transfer its remaining non-talc specialty minerals assets to MTI or one of its subsidiaries other than BMI. Subsequent to transferring the assets and equity interests related to its specialty minerals businesses to MTI and its subsidiaries,

on October 23, 1992, Pfizer took MTI public via an initial public offering. MTI has remained the direct parent of SMI and the indirect parent of BMI since the Pfizer reorganization.

17. BVT was organized in July 2023, as a wholly-owned subsidiary of BMI. As discussed below, BVT manages property in San Angelo, Texas.

**C. Overview of BMI's Operations and Revenues**

**1. *Talc Operations***

18. MTI, with its subsidiaries (including BMI), is a resource and technology based company that develops, produces, and markets on a worldwide basis a broad range of specialty mineral, mineral-based and synthetic mineral products and supporting systems and services.

19. BMI is primarily in the business of mining, beneficiating, and processing talc, which is then sold to distributors and product manufacturers. Talc is a hydrated magnesium silicate that is used in the manufacturing of dozens of products in a variety of sectors, including coatings, rubber, paper, polymers, cosmetics, food, and pharmaceuticals. Talc is mined from talc deposits, which were geologically formed through the transformation of existing rocks under the effect of hydrothermal fluids carrying one or several of the components needed to form the mineral. There are many types of talc and each ore body has its own features and its own geology. Accordingly, the mining and processing of talc requires highly technical and specialized knowledge.

20. BMI owns the full value chain of its talc operations, from mining to milling and processing to packaging, which allows it to produce the highest quality talc. BMI's differentiated manufacturing capabilities provide it operational flexibility to meet demand from a diverse set of customers across numerous end markets.

21. BMI's talc operations include two mines in Dillon, Montana (the Regal-Imperial Mine and the Treasure Mine), and two processing and transportation facilities located in Dillon, Montana and Bay City, Texas. The Regal-Imperial Mine is an open-pit operation, where operations consist of conventional open-pit mining methods, with drilling, blasting, loading and hauling to staging pads or directly to the processing facility in Dillon. With the Regal pit approaching depletion status, mining began at the Imperial pit in 2023. The Treasure Mine is a development project which contemplates expanding on the prior Treasure open-pit operations. Operations at the Treasure Mine are similar to those performed at the Regal-Imperial Mine.

22. The processing and transportation facilities in Dillon and Bay City provide BMI




with direct access to rail and road shipments. Talc processed by BMI at these facilities goes through three stages (or circuits): (i) beneficiation, (ii) dry milling, and (iii) packaging. At the

beneficiation stage, talc is sorted to identify and discard mineral waste or sub-tier talc. At the dry milling stage, talc is then milled, processed, classified and stored according to its future use. After the talc is processed, it enters the packaging stage with a variety of packaging options, including centralized packing, packout, semi-bulk and bulk rail packaging. The packaged talc is then either shipped to customers or stored. Currently, BMI controls 2.5 million tons of premium high-quality talc resources with 1.5 million tons of reserves.




23. In addition to the foregoing, BMI is headquartered in and utilizes offices located in Dillon, Montana. BMI currently has 68 employees and often utilizes temporary employees. The majority of those employees are stationed at the Dillon facility or provide maintenance services related to BMI's operations, with the other employees split between (i) mining operations, (ii) the Bay City facility, (iii) plant management, and (iv) quality assurance.

24. In 2022, BMI's talc sales were driven by over 300 products found in the following end-markets: ceramics (31%); coated (30%); antiblock (20%);[5] construction (10%); plastics (4%); and USP talc (4%).[6] BMI sells talc both directly to downstream manufacturers and to distributors,

---

[5] Antiblock is a super-purity additive for plastics, films and polymers that improves transparency, enhances mechanical properties, reduces contact stickiness, and reduces haze.

[6] USP talc, as further discussed below, is talc that meets the strength, quality and purity requirements for pharmaceutical applications.



US-DOCS\145076763.11

who in turn provide the talc to their customers. BMI's total revenue in 2022 from its talc operations was approximately $57 million.

### 2. *BMI's Talc*

25. As discussed above, BMI's talc has a variety of applications and is used in a number of products and commercial segments – *e.g.*, construction, consumer products, and transportation. Historically, a relatively minor percentage of BMI's talc has been used for certain consumer applications, including over-the-counter cosmetic products – most notably, body powders. Although BMI no longer sells talc intended for use in cosmetic products, the Talc Claims primarily allege injury from exposure to asbestos allegedly contained in cosmetic products that used BMI's talc.

26. BMI historically manufactured and sold talc, including USP talc and BP-210 talc, that it understood was used by some manufacturers for body powders and other cosmetic applications (the "**Cosmetic Talc**"). The USP talc was manufactured to adhere to the standards set forth by United States Pharmacopeia (the "**USP Standards**"), a scientific nonprofit organization that sets public standards for identity, strength, quality and purity of medicines, which are enforced by the U.S. Food and Drug Administration (the "**FDA**"). Aside from being tested for asbestos (as further described below), the USP talc required additional testing, including microbiology testing and mold testing, to comply with the USP Standards. Beginning in 1995, BMI sold USP talc to certain customers, which BMI understands may have been used in the following products: Gold Bond, Clubman Powder, and Caldesene Powder. Though BMI stopped selling USP talc for cosmetic products in 2014, it continues to sell USP talc for certain non-cosmetic, consumer applications – *e.g.*, food and pharmaceuticals. BMI has no knowledge that any customers purchased USP talc post-2014 for cosmetic products.

27. BP-210 talc was designed specifically for use in body powders. Although BP-210 was not required to meet the USP Standards, all BP-210 talc that was sold to customers satisfied the stringent asbestos testing requirements implemented by BMI. BMI understands that BP-210 talc may have been used in certain body powder products manufactured by Vi-Jon Laboratories, Inc. Beginning in 2016, BMI's sales of BP-210 talc began to decline at BMI's behest. In 2015, annual sales of BP-210 talc exceeded $3,000,000. Between 2016 and 2019, BMI's BP-210 talc annual sales dwindled substantially – from $2,000,036 in 2016 to $922,228 in 2017 and to just $14,903 in 2019. Since 2019, BMI has not sold any BP-210 talc to customers. BMI understands that the final shipment of BP-210 talc to Vi-Jon Laboratories, Inc. for use in body powder was made in Q3 2016, and has no knowledge whether sales to other distributors from 2016 to 2019 were ultimately incorporated into body powders or other cosmetic products.

28. Since its inception, BMI has implemented robust operating and testing procedures designed to test all of its talc, including Cosmetic Talc, for asbestos contamination and to ensure that all talc sold was safe. BMI conducts tests both before mining its talc and after completing the milling process.

29. Before excavating a new area of its mines, BMI conducts asbestos testing using blast hole sampling, which allows BMI to take samples from drill holes in locations where BMI identified talc ore or believed talc ore might be. As part of this process, BMI sets up blast holes at 15 by 15 feet intervals, which cover an entire bench,[7] and draws samples from each blast hole. The blast hole samples are then composited and tested. While the testing is conducted, the area of the mine being sampled is quarantined until the test results are returned. BMI follows this procedure for every new bench excavation, which translates to blast hole sampling approximately

---

[7] BMI excavates areas of its mines in layers measuring 30 feet deep, referred to as a "bench."

every two to four weeks. If a blast hole sample tests positive for regulated asbestiform minerals, BMI tests each blast hole from the composite, which allows BMI to identify which blast hole or blast holes contain regulated asbestiform minerals. BMI then isolates the affected area(s) and implements safety procedures to remove and dispose of the contaminated ore.

30. Talc with no regulated asbestiform minerals is extracted and transported to BMI's processing facilities where it is processed. Towards the end of the milling process, a second sample of the near-finished or finished talc product is tested to confirm the finished product contains no regulated asbestiform minerals. As a result of the foregoing, at all times, BMI has only mined, milled, and sold talc, including Cosmetic Talc, that received "non detect" testing results.

31. Beginning in 1992, Analytical Services Group ("**ASG**"), a testing service housed at SMI, performed all asbestos testing on BMI talc. Specifically, ASG tested the samples using Transmission Electron Microscopy with Selected Area Electron Diffraction and Energy Dispersive X-Ray Spectroscopy, as well as X-Ray Diffraction. No regulated asbestiform minerals were detected in any testing performed by ASG. The RJ Lee Group ("**RJ Lee**"), a third-party testing lab, also performed a second level of asbestos testing on the Cosmetic Talc that confirmed ASG's conclusions that the Cosmetic Talc did not contain detectable regulated asbestiform minerals. In 2008, ASG outsourced microscopy testing to RJ Lee, which included Polarized Light Microscopy, in addition to Transmission Electron Microscopy with Selected Area Electron Diffraction and Energy Dispersive X-Ray Spectroscopy. After 2008, ASG continued to test talc samples using X-Ray Diffraction. In addition to the foregoing, RJ Lee also tests composite samples of BMI's talc on a quarterly basis. At no time have RJ Lee or ASG detected any regulated asbestiform minerals in BMI talc, including Cosmetic Talc. Further, in 2012, the FDA commissioned AMA Analytical

Services, Inc. to test the Cosmetic Talc as part of a study of cosmetic grade talc and talc containing products. AMA Analytical Services, Inc. detected no asbestiform minerals in BMI's talc.

32. In addition to the foregoing, BMI also administers an occupational safety program, pursuant to which it contracts with an industrial hygienist to annually conduct dust and noise monitoring at the processing facilities. The Federal Mine Safety Health Administration also conducts bi-annual air monitoring at the processing facilities and BMI's mines. These air sampling tests have never detected asbestos fibers in the air at BMI's mines or processing facilities. In addition, none of BMI's employees have ever brought claims alleging the development of mesothelioma, asbestosis, talcosis, or lung cancer as a result of their employment at BMI.

**3. *Real Property Business***

33. In addition to BMI's talc-related operations, the Debtors own and manage certain real property in San Angelo, Texas (the "**San Angelo Property**") and San Antonio, Texas (the "**San Antonio Property**" and, together with the San Angelo Property, the "**Properties**").

34. The purchase of the San Angelo Property by BMI closed on September 28, 2023, for $2,350,000, and is subject to a triple-net lease[8] with Whataburger Restaurants, LLC, which is the brand owner of a successful chain of quick service hamburger based restaurants. Prior to the closing of the purchase, BMI assigned its interests in the San Angelo Property to BVT pursuant to that certain Assignment of Interests in Agreement of Purchase and Sale. Annual rent at the San Angelo Property is $110,000 through May 2038, with a 10% increase every five years thereafter. The lease term of 15 years commenced in May 2023, with three five-year renewal options.

[8] In a typical triple-net lease arrangement, the owner of the real property leases the property to a lessee, which then operates a business on the premises and pays the owner-landlord rent. In addition to the obligation to pay rent, the tenant is customarily responsible for all expenses associated with the property and the business, including real estate taxes, insurance, common charges, maintenance of the premises, and any other costs, charges, or expenses relating to the premises or operation of the business.

35. The purchase of the San Antonio Property by BMI closed on September 27, 2023, for $3,061,000, and that property is also subject to a triple-net lease. The tenant at the San Antonio Property is McDonalds USA LLC, which owns and operates the McDonalds brand in the United States. The term of the lease is twenty years, with eight five-year renewal options, and annual rent is $116,000 for the first five years, with a 10% increase every five years.

### D. Shared Services

36. As is common with corporate enterprises, the Debtors participate in shared service arrangements with certain Non-Debtor Affiliates (the "**Service Providers**") that are essential to the Debtors' operations and enable the Debtors to access critical services at reduced costs (the "**Shared Services**"). Provision of the Shared Services with respect to BMI is governed by that certain Services Agreement, by and among MTI, SMI, and BMI, dated as of June 19, 2023, and effective as of January 1, 2023 (the "**Initial Shared Services Agreement**"). The Initial Shared Services Agreement was amended on September 28, 2023 (the "**Shared Services Amendment**" and, together with the Initial Shared Services Agreement, the "**Shared Services Agreement**"). The Shared Services Agreement formalized the pre-existing shared services relationship between BMI and the Non-Debtor Affiliates.[9]

37. Provision of the Shared Services with respect to BVT is governed by that certain Services Agreement, by and among MTI, SMI, BMI, and BVT, dated as of September 28, 2023 (as may be amended or supplemented, the "**BVT Shared Services Agreement**"). Pursuant to the BVT Shared Services Agreement, BVT receives Shared Services from the Service Providers and BMI.

---

[9] Pursuant to the Shared Services Agreement, the parties agreed that the Shared Services Agreement would be further amended after any sale of BMI's assets to cover only those specific Shared Services that will be required post-sale.

38. The Shared Services can be broken into two categories: (i) Enterprise Services and (ii) Business Unit Services. Enterprise Services refer to general business services that MTI offers to all of its subsidiaries. Effectively, the Enterprise Services enable MTI to maintain cost-effective and cohesive operations for the MTI enterprise – *i.e.*, administrative and operational services that benefit each of its subsidiaries. On the other hand, Business Unit Services are services offered by SMI to the Debtors and other SMI subsidiaries that form the "Performance Minerals" Business Unit. These services are more directly designed to fulfill similar and common operational and administrative needs that are specific to the "Performance Minerals" entities – *e.g.*, sales and marketing and research and development related to, among other minerals, talc, calcium carbonates and limestone.

39. As further described in the Cash Management Motion,[10] the Debtors receive Shared Services in the following fields (as applicable), which serve various corporate and administrative functions:

- ***Executive Services*** – general executive oversight and strategic planning;
- ***Financial and General Business Services*** – general finance, tax, treasury, internal audit, insurance, corporate assessment and accounting services;
- ***Information Technology Services*** – general information technology support, hardware and software support, and email and other communication services;
- ***Human Resources Services*** – benefits and compensation planning and employee resources regarding worker's compensation, salary, and benefits;
- ***Legal Services*** – legal support in areas such as litigation management and analysis, compliance and labor and employment;

10 The "**Cash Management Motion**" means the *Debtors' Emergency Motion for Entry of Interim and Final Orders (A) Authorizing Continued Use of Existing Cash Management System, Including Maintenance of Existing Bank Accounts, Checks, and Business Forms, (B) Authorizing Continuation of Existing Deposit Practices, (C) Approving the Continuation of Certain Ordinary Course Intercompany Transactions, and (D) Granting Related Relief*, which will be filed concurrently herewith.

- ***Strategic Supply Chain Services*** – strategic supply chain services, including negotiating with suppliers and buyers and overseeing logistics;

- ***Testing Services*** – testing services through an independent business unit that conducts minerals testing within MTI's corporate structure;

- ***Sales and Marketing Services*** **–** general marketing, sales and related services through SMI's sales and marketing team;

- ***Research and Development Services*** – research and development services relating to new product development, technology and innovation, and mitigation; and

- ***Other General and Administrative Services at the Business Unit Level*** – financial and management services, human resources services, providing office space and paying applicable taxes related to the facilities, and environmental, health and safety services; and

- ***Property Management Services*** – BMI provides property management services to BVT as related to the San Angelo Property.

40. BMI is invoiced monthly for the Shared Services, which are charged to BMI at a flat rate of $101,673 per week (the "**Shared Services Fee**"). The Shared Services Fee was determined based on the historic cost of the Shared Services. Pursuant to the Shared Services Agreement, BMI maintains the right to request a comparison of the Shared Services Fee with the actual cost of the Shared Services on a quarterly basis, and can seek a refund if it determines that the cost of the Shared Services is inconsistent with the Shared Services received by BMI during the relevant period. Prior to the Petition Date, amounts for the Shared Services were either satisfied with BMI cash swept to the MTI Concentration Account, added to the balance of the Intercompany Loan Agreement, or paid directly by BMI (in accordance with the Cash Management Agreement (as defined below)). However, after the Petition Date, BMI intends to pay the Service Providers for the Shared Services on a monthly basis in cash after receiving an invoice for the Shared Services.

41. Pursuant to the BVT Shared Services Agreement, BVT is invoiced monthly for the Shared Services, which are charged to BVT at a flat rate of $225 per week for the Shared Services

received from the Service Providers and $125 per week for the Shared Services received from BMI (the "**BVT Shared Services Fee**"). BVT has a similar right to seek a refund from the Service Providers and/or BMI (as applicable) to the extent it determines that the BVT Shared Services Fee is inconsistent with the Shared Services received by BVT during the relevant period.

42. The Shared Services and general intercompany relationship between the Debtors and the Non-Debtor Affiliates are further described in the Cash Management Motion.

**E. Summary of Prepetition Debt and Intercompany Relationships**

***1. Previous Obligations Under the MTI Financing Agreements***

43. BMI was previously (i) a guarantor under that certain Indenture, dated as of June 30, 2020, among MTI, the Guarantors from time to time parties thereto and The Bank of New York Mellon Trust Company, N.A., as Trustee (the "**MTI Indenture**"), relating to MTI's 5.000% Senior Notes due 2028, and (ii) a direct obligor under that certain Credit Agreement, dated as of May 9, 2014 (as amended by the Refinancing Facility Agreement, dated as of June 23, 2015, the Second Amendment, dated as of February 14, 2017, the Third Amendment and Incremental Facility Amendment, dated as of April 18, 2018 and the Refinancing Facility Agreement, dated as of August 11, 2022, and as otherwise amended, amended and restated, supplemented or otherwise modified prior to the date hereof, the "**MTI Credit Agreement**" and together with the MTI Indenture, the "**MTI Financing Agreements**"), among MTI, the Borrowing Subsidiaries party thereto, the Lenders party thereto, JPMorgan Chase Bank, N.A., as Administrative Agent, and the other agents party thereto. However, as set forth in the Indemnity Agreement, BMI is no longer party to, or obligated under, the MTI Financing Agreements.

***2. Cash Management System***

44. As described in detail in the Cash Management Motion, the Debtors each maintain one operating account (respectively, the "**BMI Account**" and the "**BVT Account**"). In addition

to the BMI Account, BMI maintains three other bank accounts that were opened prior to the Petition Date to aid the Debtors with operating as debtors in possession in the Chapter 11 Cases (collectively with the BMI Account and the BVT Account, the "**Debtor Bank Accounts**"). For example, BMI opened one account to hold the adequate assurance deposit for certain utility providers and one account to hold proceeds of the Debtors' DIP Facility (the "**BMI DIP Account**"). The Debtor Bank Accounts operate within the larger MTI cash management system, which, as related to the Debtors, includes four other relevant accounts – (i) the MTI Concentration Account, (ii) the MTI Disbursement Account, (iii) the MTI Payroll Account, and (iv) the SMI Account.

45. Payments due to BMI from its talc operations are deposited by customers directly into the SMI Account, which is used to collect customer payments for BMI, SMI, and certain of SMI's subsidiaries.[11] At the end of each day, all funds in the SMI Account are automatically swept to the MTI Concentration Account. Once in the MTI Concentration Account, MTI runs a comprehensive report that identifies which receipts are related to the operations of SMI or another Non-Debtor Affiliate and which receipts are related to BMI's operations, and BMI cash is subsequently transferred to the BMI Account. To avoid erroneously moving BMI funds into an incorrect account, a reconciliation is performed at the end of each week or Monday of the following week to reallocate funds into the appropriate operating account (as applicable).[12]

[11] BMI and SMI share a significant number of customers that pay BMI and SMI on a consolidated basis. As such, funds due to BMI are paid to the SMI Account rather than paid to BMI directly. As discussed herein, the receipts are later allocated to the appropriate entity.

[12] To the extent BMI receives customer payments directly, such funds are held in the BMI Account. Similarly, rental income received from the San Antonio Property is deposited directly in the BMI Account and not swept to the MTI Concentration Account. Funds from the BMI DIP Account will also be transferred to the BMI Account to fund BMI's expenses.

46. Cash is then transferred from the BMI Account to the MTI Concentration Account to reimburse MTI for all amounts paid by MTI on behalf of BMI. MTI provides invoices to BMI on a weekly basis for amounts due and owing. Though invoices are provided weekly, amounts due under the invoices may relate to payments made or services rendered in the weeks or month preceding the invoice. BMI then reviews the invoice and, if applicable, approves the reimbursement. For the avoidance of doubt, MTI will continue to pay for the majority of expenses incurred by BMI in the ordinary course of its operations as unwinding this system will be unduly burdensome and disruptive to BMI's operations. After the Petition Date, BMI will pay MTI in cash for any and all amounts due to MTI. BMI also intends to pay certain go-forward costs related to the Chapter 11 Cases, such as professional fees, directly from the BMI Account.

47. The flow of funds between BMI and the Non-Debtor Affiliates is governed by that certain Cash Management Agreement, dated as of September 28, 2023, by and among BMI, SMI, and MTI (as may be amended or modified, the "**Cash Management Agreement**"), which formalizes the reimbursement process described above. Among other things, the Cash Management Agreement provides that: (i) MTI and SMI will maintain the Non-Debtor Bank Accounts and continue to make payments on behalf of BMI in the ordinary course (as they did prior to the Petition Date); (ii) MTI will transfer BMI cash from the MTI Concentration Account to BMI (as noted above); (iii) MTI will provide BMI with a true and accurate accounting of BMI's reimbursement obligations; and (iv) BMI will have an opportunity to dispute amounts claimed as being due and owing from BMI.

48. BVT, unlike BMI, will pay the majority of its operational expenses directly with rental income from the San Antonio Property. In addition, all BVT cash will be retained in the BVT Account and will not be swept to the MTI Concentration Account. To the extent MTI pays

any operational expenses on behalf of BVT, BVT intends to reimburse MTI for all such payments. In such a case, BVT funds will be paid directly to the MTI Concentration Account. Moreover, BVT is party to the BVT Shared Services Agreement and will remit certain amounts to MTI and BMI on account of the Shared Services on a regular basis. For the avoidance of doubt, BVT is not party to the Intercompany Loan Agreement and has no obligations to MTI under the Intercompany Note (as defined below).

### 3. *Intercompany Debt*

49. Prior to the Petition Date, MTI and BMI entered into that certain Intercompany Loan Agreement (the "**Intercompany Loan Agreement**"), dated as of September 29, 2023, and effective as of August 1, 2023, pursuant to which MTI provided interest bearing loans to BMI in the amount of funds paid by MTI on BMI's behalf for (i) operational expenses (*e.g.*, vendor payments, shared services expenses, payroll, and monies used to purchase the Properties) incurred on and after January 1, 2023 that exceeded the total amount of BMI customer payments that were swept into the MTI Concentration Account, and (ii) settlement amounts paid to talc claimants and legal costs related to the talc litigation in and after Q4 2022.[13] The amounts due under the Intercompany Loan Agreement are evidenced by an intercompany note (the "**Intercompany Note**"), which accrues interest at a rate per annum equal to 10%. As of the Petition Date, the current loan balance is $33,161,672.50. Aside from Talc Claims, the amounts due under the Intercompany Note account for the largest unsecured claim against the Debtors.

---

[13] Prior to the Petition Date, amounts owed from BMI to MTI in respect of settlement payments and talc-related litigation costs and post-January 1, 2023 operational expenses not covered by BMI customer collections swept into the MTI Concentration Account were added to the balance of the Intercompany Loan Agreement.

### 4. *Bonds*

50. As further described in the Insurance and Bonding Motion and the Indemnity Agreement,[14] there are currently ten bonds posted on behalf of BMI that cover, among other things, the costs of obligations related to the reclamation of the land on which BMI's mines are located, as well as certain performance obligations and licenses/permits. MTI has historically paid the applicable surety directly on account of BMI, which is then named as the principal on the bond. As of the Petition Date, the total amount of bonds posted on behalf of BMI was approximately $14.7 million.

### 5. *Intellectual Property Agreement*

51. On July 24, 2023, BMI (as licensee) and MTI and Specialty Minerals (Michigan) Inc. (as licensors) entered into that certain Intellectual Property License Agreement (the "**IP Agreement**"), pursuant to which the licensors provided BMI with a non-exclusive license to certain intellectual property. The IP Agreement, which is effective as of January 1, 2023, governs BMI's access to intellectual property that is necessary to its operations. The licensed intellectual property is included on Exhibit A to the IP Agreement. The fees related to the IP Agreement are included in the Shared Services Fee.

### 6. *Trade Debt*

52. In the ordinary course of its operations, BMI incurs trade debt with numerous vendors in connection with the mining, beneficiating, and processing of talc. BMI is substantially current with respect to its unsecured trade debt, and does not believe there are material unsecured

---

[14] "**Insurance and Bonding Motion**" means the *Debtors' Emergency Motion for Entry of Order (A) Authorizing Debtors to (I) Maintain Insurance Program and Bonding Program and (II) Honor All Insurance Obligations And Bond Obligations; and (B) Granting Related Relief*, which will be filed concurrently herewith.

liabilities other than the Talc Claims (which are contingent and disputed) and the claim related to the Intercompany Note.

## II. LITIGATION AND EVENTS LEADING TO THE CHAPTER 11 FILING

53. As discussed above, BMI is a defendant in hundreds of actions brought before federal and state courts by plaintiffs asserting Talc Claims. BMI believes this litigation is without merit. However, as a result of the growing volume of litigation resulting in the increasing incurrence of associated defense costs and *ad hoc* settlements, coupled with the unwillingness of Pfizer to provide coverage for BMI's potential liability exposure and the anticipated increase in the number of Talc Claims not covered by insurance or contractual indemnity rights,[15] the Debtors determined that the commencement of the Chapter 11 Cases was the best option to protect the Debtors' estates and preserve value for all stakeholders. BMI lacks the financial wherewithal to remain in the tort system.

### A. Overview of Talc Litigation

54. The overwhelming majority of plaintiffs have asserted claims alleging mesothelioma or other diseases arising from asbestos exposure, typically as a result of exposure to asbestos-contaminated talc in cosmetic products or in an occupational setting. Certain plaintiffs asserting Talc Claims also concurrently allege non-talc exposure to asbestos that the Debtors believe is unrelated to BMI's products or operations.

55. Prior to 2018, BMI had only been named in 14 lawsuits alleging Talc Claims. In 2018 and 2019, plaintiffs began filing Talc Claims at an increasing pace, rising to 18 in 2018 and 48 in 2019. In the wake of recent high-profile verdicts, including one multi-billion dollar verdict,

---

[15] As discussed above, BMI has no insurance coverage related to its talc liabilities, as BMI was created after a general asbestos exclusion was applied by insurers to industrial policies subsequent to the *Johns Manville* bankruptcy. Though BMI has access to the Pfizer Indemnity, the Pfizer Indemnity does not apply to Talc Claims that do not allege pre-Reorganization Date exposure.

and the ensuing media focus on talc litigation, the number of claims increased to 93 in 2020, 169 in 2021, and 205 in 2022. As of the Petition Date, there are approximately 555 pending Talc Claims. No cases alleging Talc Claims against BMI have gone to trial.

56. As discussed below, Pfizer has historically settled Talc Claims and obtained releases for BMI and the Non-Debtor Affiliates, given Pfizer's indemnification obligations under the Reorganization Agreement. When BMI and/or a Non-Debtor Affiliate was named in a talc-related lawsuit that alleged pre-Reorganization Date exposure to talc, the claim would be tendered to and typically independently resolved by Pfizer. However, a dispute has arisen with Pfizer with respect to the scope of its indemnity obligations under the Reorganization Agreement, and Pfizer has excluded BMI from certain recent settlements. Prior to 2022, BMI had not settled any Talc Claims with plaintiffs directly. Since then, BMI has settled 24 Talc Claims with plaintiffs directly.

57. BMI maintains that its talc is both free from detectable asbestos and safe, that the Talc Claims are entirely without medical or scientific merit, and that exposure to BMI talc has not caused any personal injuries. BMI has been and continues to be committed to the quality and safety of its talc above all else. Nevertheless, the substantial increase in alleged Talc Claims in the last few years, combined with the current state of the U.S. tort system, has led to current and projected litigation costs that BMI cannot sustain in either the immediate or long terms.

### B. Pfizer Indemnity Rights and Obligations

58. Pursuant to the terms of the Reorganization Agreement, MTI, on the one hand, and Pfizer and its affiliates Pfizer Ltd. and Pfizer S.A. (the "**<u>Pfizer Entities</u>**"), on the other hand, agreed to indemnify each other with respect to certain liabilities, damages, and expenses. Specifically, the Reorganization Agreement provides that Pfizer shall, or shall cause the Pfizer Entities to, indemnify and hold MTI harmless on a net after-tax basis from and against "[a]ny and all liabilities,

obligations, damages and expenses" (other than attorney's fees) that "arise from . . . any product liability lawsuits or claims now pending or brought at any time in the future to the extent they allege damages or injury from the use or handling of, or exposure to, any product sold by the Business prior to the Reorganization Date" (the "**Pfizer Indemnity**").[16] The Reorganization Agreement also contains a provision requiring MTI to indemnify and hold each of the Pfizer Entities harmless from and against, among other things, any and all debts, claims, liabilities, obligations, damages and expenses of BMI, SMI, and certain other entities that are not "Excluded Liabilities."[17]

59. The Reorganization Agreement was subsequently amended by that certain Letter Agreement, dated as of October 29, 1992 (the "**Letter Agreement**"), which among other things, expanded Pfizer's indemnification obligations to include MTI's subsidiaries and provided greater specificity regarding Pfizer's indemnification obligations concerning certain taxes. Nothing in either the Reorganization Agreement or the Letter Agreement obligates BMI to indemnify Pfizer for any claims or liabilities.

60. Given the broad indemnification language in the Reorganization Agreement, Pfizer is obligated to fully indemnify MTI and its affiliates for any liabilities that arise from current and future talc-related lawsuits or claims where such lawsuits or claims allege damages or injury from exposure to products sold prior to the Reorganization Date. Said another way, if a claim alleges

---

16 For completeness, the Pfizer Entities had other indemnification obligations related to (a) compliance with the covenants in the Reorganization Agreement; (b) taxes owed in connection with (1) the operation of the business prior to the Reorganization Date and (2) the reorganization of the business; and (c) certain environmental claims. Pursuant to Section 9.05 of the Reorganization Agreement, as amended by the Letter Agreement (as defined herein), such indemnification obligations appear to have expired by the terms of the Reorganization Agreement, as amended.

17 The Reorganization Agreement also provides that certain "Excluded Liabilities" (which include product liability lawsuits) are to remain liabilities of the Pfizer Entities, and MTI and its subsidiaries shall have no responsibility with respect to such liabilities, except as set forth in the Reorganization Agreement.



US-DOCS\145076763.11

*any* exposure to pre-Reorganization Date talc, it falls within the scope of the Pfizer Indemnity. Pfizer has disputed this plain reading of the Reorganization Agreement, instead arguing that the Pfizer Indemnity does not extend to any post-Reorganization Date exposure – *i.e.*, for claims that allege pre- and post-Reorganization Date exposure, settlement (or judgment) costs should be allocated between Pfizer and BMI based on the ratio of alleged pre- and post-Reorganization Date exposure.

61. Though the parties disagree on the scope of Pfizer's obligations under the Reorganization Agreement, the Debtors understand that Pfizer has obtained the full and final release of BMI and the Non-Debtor Affiliates in connection with the majority of the settlements that it has entered into where post-Reorganization Date exposure has been alleged. To date, Pfizer has settled and obtained releases for BMI and the Non-Debtor Affiliates in over 160 cases. Pfizer has typically sought reimbursement from MTI for settlement amounts related to claims tendered to Pfizer based on Pfizer's proposed allocation of responsibility between MTI and Pfizer. This allocation focuses on the number of months of exposure alleged prior to the Reorganization Date and the number of months of exposure alleged after the Reorganization Date with respect to each such claim. BMI and the Non-Debtor Affiliates have not made any payments related to Pfizer's requests, and have continued to reject any responsibility for claims that allege pre-Reorganization Date exposure.

62. Even though BMI enjoys the benefit of the Pfizer Indemnity, BMI's ability to obtain releases from Pfizer's settlement efforts is uncertain and, as discussed above, the scope of the Pfizer Indemnity has been disputed by Pfizer. Indeed, Pfizer has recently begun to unilaterally settle certain actions pre-trial without obtaining a release for BMI or the Non-Debtor Affiliates, leaving BMI and the Non-Debtor Affiliates with little choice but to settle such actions at inflated

values. BMI and the Non-Debtor Affiliates intend to enforce their rights under the Pfizer Indemnity with respect to such settlements.

### C. Indemnity Agreement

63. On September 28, 2023, BMI, on the one hand, and MTI and SMI (collectively with the other Non-Debtor Affiliates, the "**Indemnitees**"), on the other hand, entered into that certain Indemnity Agreement (the "**Indemnity Agreement**"), pursuant to which BMI agreed to indemnify, defend, and hold harmless the Indemnitees for any Losses (as defined in the Indemnity Agreement) arising directly or indirectly from (i) Indemnitor Liabilities[18] and (ii) reimbursement or other obligations of the Indemnitees under or in respect of any appeal bonds or similar litigation-related surety contracts that are or have been posted or entered into, or that may in the future be posted or entered into, by the BMI Affiliates in connection with Proceedings in respect of or related to any Indemnitor Liabilities (the "**BMI Indemnity**"). The BMI Indemnity was provided to the Indemnitees in exchange for (i) release of BMI from its obligations under the MTI Financing Agreements (the "**Release Transaction**"), (ii) maintenance of certain surety bonds in respect of BMI's operations, (iii) continued insurance coverage to BMI and BVT, at the same level of insurance in place as of the date of the Indemnity Agreement, (iv) prepayment by MTI or SMI of up to $1.2 million on account of certain amounts owed to employees, utilities, and vendors critical to BMI's operations, without any corresponding repayment obligations, and (v) cooperation with the transfer of certain intellectual property assets related to BMI's talc business to a purchaser in connection with the sale of all or substantially all of BMI's talc assets.

[18] "Indemnitor Liabilities" is defined in the Indemnity Agreement as "any Liabilities related in any way to (i) Indemnitor Assets or (ii) alleged conduct of or failures to act by Indemnitor, including, without limitation, any such conduct or failures to act relating to products mined or sold by Indemnitor. A true and correct copy of the Indemnity Agreement is attached hereto as Exhibit B.

64. The Indemnity Agreement provides significant benefits to BMI. First, it reduces the complexity and associated expense of the Chapter 11 Cases and the Sale as a result of the Release Transaction. Previously, BMI's obligations under the MTI Credit Agreement were secured by substantially all of the assets of BMI. Without the benefit of the Release Transaction and BMI's designation as an "Unrestricted Subsidiary" under the MTI Financing Agreements, the Debtors may have faced significant hurdles in respect of the Sale and their decision to commence the Chapter 11 Cases. Rather than enter into bankruptcy with hundreds of millions of dollars of secured debt and publicly-traded notes obligations, the Release Transaction resulted in a dramatic reduction of BMI's secured and unsecured obligations and eliminated significant potential objectors to goals the Debtors seek to achieve in the Chapter 11 Cases. Second, BMI obtained assurance of both insurance coverage and surety bond availability at no cost to BMI. Third, BMI ensured the prepayment of certain expenses critical to its operations in advance of any filing, further smoothing its transition into bankruptcy, and with no parallel repayment obligation to MTI. Finally, MTI agreed to transfer – and bear the costs to transfer – certain intellectual property associated with BMI's talc business to a purchaser in connection with the sale or potential sale of all or substantially all of BMI's talc assets.

65. In exchange, BMI was able to negotiate for a capped indemnity. In comparison to the substantial consideration it received, BMI's indemnification obligations will not exceed the lesser of (x) the value as of the Indemnity Effective Time (as defined in the Indemnity Agreement) of the Indemnitor's assets; and (y) the obligations under the Credit Agreement.

## D. Prepetition Activities

### 1. *Prepetition Negotiations*

66. As a result of increasing Talc Claims and the unwillingness of Pfizer to provide full coverage for BMI's litigation exposure, Latham & Watkins LLP ("**Latham**") was retained to assist

BMI in evaluating a number of strategic options designed to resolve BMI's talc liabilities. In connection with the foregoing, BMI and Latham worked with BMI's litigation defense counsel, Capes, Sokol, Goodman & Sarachan, P.C. and Kirkland & Ellis LLP, to assess the current talc-related litigation faced by BMI and analyze the costs and benefits associated with continued litigation of the Talc Claims in the tort system. BMI also retained The Claro Group, LLC as claims analyst.

67. At the same time, BMI explored, among other options, the viability of using bankruptcy to address the Talc Claims by channeling the claims to a trust created under section 524(g) of the Bankruptcy Code that would be structured to ensure fair and equitable treatment of present and future claimants. In April 2023, BMI began exploratory efforts regarding the implementation of a potential chapter 11 strategy if and when authorized by its board of directors. To that end, BMI entered into nondisclosure agreements with The Gori Law Firm; Maune Raichle Hartley French & Mudd, LLC; Weitz & Luxenberg P.C.; and Simon Greenstone Panatier, PC (collectively, the "**<u>Ad Hoc Plaintiffs' Group</u>**") to facilitate negotiations regarding the possibility of a pre-arranged chapter 11 filing. The Ad Hoc Plaintiffs' Group subsequently retained Brown Rudnick LLP as legal counsel and Province, LLC ("**<u>Province</u>**") as financial analyst to provide advice in connection with these negotiations. The Ad Hoc Plaintiffs' Group's professionals were engaged at BMI's expense.

68. With Province, the Ad Hoc Plaintiffs' Group initiated an extensive diligence process into BMI's business and the pending talc litigation. BMI has worked constructively with the Ad Hoc Plaintiffs' Group and Province throughout this process, and has provided the Ad Hoc Plaintiffs' Group and Province with access to a fulsome data room and responses to numerous

information requests. The Debtors' advisors have also attended multiple meetings with the Ad Hoc Plaintiffs' Group to discuss a potential resolution of the Talc Claims, among other things.

69. In addition to the foregoing, in August 2023, BMI engaged Sander L. Esserman of Stutzman, Bromberg, Esserman & Plifka, P.C. as the prepetition future claimants' representative (the "**Prepetition FCR**") to represent the interests of individuals who may in the future assert talc-related demands against BMI. The Prepetition FCR retained Young, Conaway, Stargatt & Taylor, LLP as counsel and NERA Economic Consulting as claims analyst. As with the Ad Hoc Plaintiffs' Group and its advisors, the Prepetition FCR and its advisors engaged in a diligence process and constructive discussions with BMI surrounding the viability of a global settlement that would resolve the claims of all talc claimants, including future claimants.[19]

70. The Debtors had hoped to fully negotiate a resolution of the Talc Claims prior to the commencement of the Chapter 11 Cases, however the Debtors had insufficient time, given BMI's pending trial calendar and the increasing settlement costs associated with BMI's talc liabilities. Nevertheless, the negotiations with the Ad Hoc Plaintiffs' Group and the Prepetition FCR confirmed, from the Debtors' perspective, the viability of using chapter 11 to resolve the Talc Claims in a manner that will maximize the distributable value for all stakeholders and fairly and equitably resolve the Talc Claims. Indeed, the Debtors believe that the prepetition engagement with the Ad Hoc Plaintiffs' Group and the Prepetition FCR will be advantageous to the ultimate resolution of the Chapter 11 Cases, as it will enable the Debtors to commence the Chapter 11 Cases with the beginnings of a potential framework that may enable efficient negotiations with holders of Talc Claims.

---

[19] The Debtors intend to seek the appointment of Mr. Esserman as the future claimants' representative. Given the knowledge of the Talc Claims that Mr. Esserman and his advisors gained during the prepetition diligence process, the Debtors believe his appointment will benefit the Debtors' creditors and estates.

### 2. *Marketing BMI's Assets*

71. As a result of the increasing cost associated with BMI's alleged talc liabilities, MTI and BMI also sought to explore strategic alternatives for BMI's talc operations, including a potential sale of BMI's assets and/or MTI's equity interests in BMI.

72. To that end, Jefferies LLC ("**Jefferies**") was engaged as investment banker to assist with the evaluation of a potential sale of BMI's assets (the "**Sale**").[20] Following its engagement, Jefferies has worked closely with BMI's management, board of directors, and other advisors to prepare marketing materials in conjunction with the Sale and to define the terms, conditions and impact of the Sale.

73. Jefferies initiated the Sale process on May 9, 2023, and in the following weeks contacted 98 potential purchasers, 57 of whom signed a non-disclosure agreement. On June 26, 2023, MTI publicly announced that BMI will exit the talc business and disclosed the ongoing Sale process. This led to additional inquiries from potential purchasers. As a result of this effective marketing process, Jefferies received 14 non-binding indications of interest, and began to engage in a detailed diligence process, which included management presentations and site visits.

74. Although the Debtors were unable to identify a suitable stalking horse bidder prior to the Petition Date, the Debtors intend to file bidding procedures shortly after the First Day Hearing with the aim to further market and ultimately sell BMI's talc-related assets. Indeed, one of the key milestones in the Interim DIP Order is the Debtors' entry into a stalking horse purchase agreement no later than 100 days after the Petition Date.

---

[20] Jefferies was also engaged to evaluate a potential legacy liability transaction involving the sale of BMI's equity to a third-party that would then resolve or "run-off" BMI's talc-related liabilities. BMI and its advisors determined this path not to be viable.

75. The Debtors plan to use proceeds from the Sale to fund the Chapter 11 Cases. Any proceeds not utilized by the Debtors during the course of the Chapter 11 Cases will be transferred to a trust established pursuant to section 524(g) of the Bankruptcy Code and used to pay current and future Talc Claims.

### 3. *DIP Facility*

76. The Debtors determined that third party financing would be required to fund the Chapter 11 Cases. Accordingly, prior to the Petition Date, Jefferies began marketing potential debtor-in-possession financing for the Debtors. After a robust process, the Debtors, with input from Jefferies and their other advisors, agreed to enter into a financing arrangement with JMB Capital Partners Lending, LLC, (the "**DIP Lender**"). The DIP Lender agreed to provide $30,000,000 in debtor-in-possession financing (the "**DIP Facility**"). As more fully set forth in the DIP Motion filed contemporaneously herewith, the Debtors are seeking approval to access: (a) $15,000,000 of the DIP Facility upon entry of an order by the Court approving the relief sought in the DIP Motion on an interim basis (the "**Interim DIP Order**"); and (b) $15,000,000 of the DIP Facility upon (i) entry of an order by the Court approving the relief sought in the DIP Motion on a final basis and (ii) satisfaction of certain conditions precedent described in the Interim DIP Order (including entry into a stalking horse purchase agreement within the first 100 days of the Chapter 11 Cases.

77. The Debtors intend to utilize the DIP Facility until they are able to access proceeds from the Sale. The DIP Facility will be paid off from the Sale proceeds, and the Debtors believe that they will have sufficient remaining cash to confirm a 524(g) plan in the Chapter 11 Cases. The Debtors expect that between the liquidity provided under the DIP Facility, cash flow from continued operations, and the proceeds from the Sale, the Chapter 11 Cases will be adequately financed and that the Debtors will be well-positioned to maximize the value of their estates.

#### 4. *Authorization to File Chapter 11 Cases*

78. After extensive discussions with their advisors, the Debtors ultimately determined that continued litigation in the tort system was not a viable option and that the commencement of the Chapter 11 Cases was in the best interests of the Debtors, their estates and their stakeholders. Accordingly, on October 1, 2023, BMI's board of directors and BVT's sole member (BMI) authorized the filing of the Chapter 11 Cases.

## PART II

79. In furtherance of the objective of preserving value for all stakeholders, the Debtors have sought approval of the First Day Pleadings and related orders (the "**Proposed Orders**"), and respectfully request that the Court enter the Proposed Orders granting the relief sought in such First Day Pleadings. For the avoidance of doubt, the Debtors seek authority, but not direction, to pay amounts or satisfy obligations with respect to the relief requested in the First Day Pleadings.

### I. ADMINISTRATIVE MOTIONS

- **Joint Administration Motion:** *Debtors' Emergency Motion for Entry of an Order Authorizing Joint Administration of Chapter 11 Cases*

- **Complex Case Designation:** *Notice of Designation as Complex Chapter 11 Bankruptcy Case*

- **Claims Agent Application:** *Emergency Ex Parte Application for Entry of an Order Authorizing the Employment and Retention of Stretto Inc. as Claims, Noticing, and Solicitation Agent*

- **Notice Procedures Motion:** *Debtors' Emergency Motion for Entry of an Order (A) Authorizing the Filing of a List of the Top 26 Law Firms Representing Talc Claimants; (B) Approving Certain Notice Procedures for Talc Claimants; (C) Authorizing the Debtors to File a Consolidated Creditor Matrix; (D) Authorizing the Redaction of Certain Personal Identification Information; (E) Approving the Form and Manner of Notice of the Commencement of the Chapter 11 Cases; and (F) Granting Related Relief*

- **Schedules and Statements Extension:** *Debtors' Emergency Motion for Entry of an Order (A) Extending Time to File (I) Schedules of Assets and Liabilities (II) Schedules of Current Income and Expenditures, (III) Schedules of Executory*

*Contracts and Unexpired Leases, and (IV) Statements of Financial Affairs and (B) Granting Related Relief*

## II. OPERATIONAL MOTIONS

- **Cash Management Motion:** *Debtors' Emergency Motion for Entry of Interim and Final Orders (A) Authorizing Continued Use of Existing Cash Management System, Including Maintenance of Existing Bank Accounts, Checks, and Business Forms, (B) Authorizing Continuation of Existing Deposit Practices, (C) Approving the Continuation of Certain Ordinary Course Intercompany Transactions, and (D) Granting Related Relief*

- **Workforce Obligations Motion:** *Debtors' Emergency Motion for Entry of an Order (A) Authorizing Payment of Certain Prepetition Workforce Obligations, (B) Authorizing Continuance of Workforce Programs, (C) Authorizing Payment of Withholding and Payroll-Related Taxes, (D) Authorizing Payment of Prepetition Claims Owing to Administrators, and (E) Granting Related Relief*

- **Tax Motion:** *Debtors' Emergency Motion for Entry of an Order (A) Authorizing Debtors to Pay Certain Taxes and Fees and (B) Granting Related Relief*

- **Insurance and Bonding Motion:** *Debtors' Emergency Motion for Entry of an Order (A) Authorizing Debtors to (I) Maintain Insurance Program and Bonding Program and (II) Honor All Insurance Obligations And Bond Obligations; and (B) Granting Related Relief*

- **Utilities Motion:** *Debtors' Emergency Motion for Entry of an Order (A) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Service; (B) Approving Proposed Adequate Assurance of Payment; (C) Establishing Procedures for Resolving Requests for Additional Assurance of Payment; and (D) Granting Related Relief*

- **Lien Claimant Motion:** *Debtors' Emergency Motion for Entry of an Order (A) Authorizing Debtors to Pay Certain Prepetition Claims of Shippers, Lien Claimants, Royalty Interest Owners, and 503(B)(9) Claimants; (B) Confirming Administrative Expense Priority of Undisputed and Outstanding Prepetition Orders; and (C) Granting Related Relief*

## III. FINANCE MOTION

- **DIP Motion:** *Debtors' Emergency Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to (I) Obtain Senior Secured Superpriority Postpetition Financing and (II) Use Cash Collateral; (B) Granting Liens and Providing Claims with Superpriority Administrative Expense Status; (C) Modifying the Automatic Stay; (D) Scheduling a Final Hearing; and (E) Granting Related Relief*

80. I am familiar with the content and substance of the First Day Pleadings. I have reviewed each of the First Day Pleadings, Proposed Orders, and exhibits thereto (or have otherwise had their contents explained to me), and the facts set forth therein are true and correct to the best of my knowledge, information, and belief, and each such factual statement is incorporated herein by reference.

81. Moreover, I believe that the relief sought in each of the First Day Pleadings (a) is vital to enabling the Debtors to make the transition to, and operate in, chapter 11 with minimal interruptions and disruptions to their businesses or loss of productivity or value and (b) constitutes a critical element in the Debtors being able to successfully maximize value for the benefit of their estates. Failure to grant the relief requested in any of the First Day Pleadings may result in immediate and irreparable harm to the Debtors, their businesses, and the estates. Accordingly, for the reasons set forth herein and in each respective First Day Pleading, the Court should grant the relief requested in each of the First Day Pleadings.

## CONCLUSION

82. The Debtors' ultimate goal in the Chapter 11 Cases is to confirm a plan of reorganization providing for trust mechanisms that will address all current and future Talc Claims against BMI, while simultaneously preserving value and allowing the Debtors to emerge from chapter 11 free of historic talc-related liabilities. In the near term, however, to minimize any loss of value during this Chapter 11 Cases, the Debtors' immediate objective is to maintain a business-as-usual atmosphere during the early stages of the Chapter 11 Cases, with as little interruption or disruption to the Debtors' operations as possible. I believe that if the Court grants the relief requested in each of the First Day Pleadings, the prospect for achieving these objectives and confirmation of a chapter 11 plan will be substantially enhanced.

83. I hereby certify that the foregoing statements are true and correct to the best of my knowledge, information and belief, and respectfully request that all of the relief requested in the First Day Pleadings be granted, together with such other and further relief as is just and proper.

[*Remainder of page intentionally left blank*]

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 2nd day of October 2023.

*<u>/s/ David J. Gordon</u>*
David J. Gordon
Chief Restructuring Officer
Barretts Minerals Inc. and Barretts Ventures Texas LLC