UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| DIANNE LASALLE, individually, as Personal Representative of the Estate of Decedent JACK LASALLE, and on behalf of all wrongful death beneficiaries of Decedent JACK LASALLE,<br><br>Plaintiff,<br><br>v.<br><br>AMERICAN INTERNATIONAL INDUSTRIES, sued individually, as alter-ego of, and as successor-in-interest to PINAUD, INC., ED PINAUD, INC., d/b/a ED. PINAUD, THE NESLEMUR COMPANY f/k/a THE NESTLE-LE MUR COMPANY, et al.,<br><br>Defendants. | CASE NO. 2:26-cv-03159-TL<br><br>ORDER ON MOTION TO REMAND |

This matter is before the Court on Plaintiff's "Emergency Application for Immediate Remand of Mesothelioma Lawsuit Back to Washington State Court." Dkt. No. 13. Having reviewed Plaintiff's motion, Defendants' Response (Dkt. No. 40), Plaintiff's reply (Dkt. No. 42),

and the relevant record, and finding oral argument unnecessary, *see* LCR 7(b)(4), the Court GRANTS the motion and REMANDS this case to King County Superior Court.

## I. BACKGROUND

### A. Factual Background

This is a wrongful-death tort action arising out of the demise of Jack LaSalle, who died from malignant mesothelioma on March 29, 2024. Dkt. No. 1-3 (state-court complaint) ¶ 1. Jack LaSalle worked as a barber from 1970 until 2022, during which time he regularly used a product called Clubman Talc. *See* Dkt. No. 13 at 11–12. Talc, in powder form, was used "to help remove moist hair clippings that were stuck to customers' skin"; barbers applied it to customers' necks and ears with a dusting brush, "which created visible talc dust in the air." *Id.* at 12. In a November 17, 2022, deposition, Mr. LaSalle asserted that, as a barber, he "almost exclusively" used Clubman Talc. Dkt. No. 14-3 (J. LaSalle Dep.) at 15:19–20. In 2022, Mr. LaSalle was diagnosed with mesothelioma, which Plaintiff alleges was caused by "his cumulative exposures to asbestos-containing talc, as well as fibrous talc itself, including from the Clubman . . . product[]." Dkt. No. 13 at 17.[1]

Plaintiff Dianne LaSalle is the surviving spouse of Mr. LaSalle and sues in multiple capacities:

> (1) as Personal Representative of the Estate of the Decedent Jack LaSalle, asserting Mr. LaSalle's surviving claims for personal injuries; (2) individually, asserting her claims for loss of consortium; and (3) individually, and on behalf of all other wrongful death beneficiaries of Decedent Jack LaSalle, asserting all of their claims for wrongful death.

Dkt. No. 1-3 ¶ 1.

[1] Plaintiff also attributes Mr. LaSalle's mesothelioma to his exposure to Dr. Scholl's–branded talc. *See* Dkt. No. 13 at 17.

There are multiple Defendants in this case, two of which are particularly relevant to the instant motion. Defendant American International Industries ("A-I-I") "made and sold" Clubman Talc between 1987 and 2017. Dkt. No. 40 at 10. Defendant Barretts Minerals, Inc. ("BMI") was the exclusive supplier of talc for Defendant A-I-I's Clubman product. *Id.* Defendants characterize Defendant A-I-I as having been a "downstream blender of a product made exclusively with talc supplied by BMI[.]" Dkt. No. 1 (notice of removal) ¶ 2. In contrast, "BMI was a talc miner and manufacturer; it did not make finished consumer products." *Id.*

**B. Procedural Background**

**1. The LaSalle Wrongful Death Lawsuit**

On September 27, 2022, Dianne LaSalle and Jack LaSalle filed a state-court action in Alameda County, California. *See* Dkt. No. 41-4 (California complaint). On November 22, 2022, Defendants stipulated to jurisdiction in Washington (*see* Dkt. No. 15-1 (verified state-court records) at 8–9), and on May 4, 2023, the LaSalles re-filed their case in King County Superior Court (*see id.* at 1–6). On March 29, 2024, Jack LaSalle died, and the personal-injury complaint was converted into a wrongful-death action and re-pleaded as such. *See generally* Dkt. No. 1-3. After four years of litigation, a jury trial is scheduled to begin on November 2, 2026, in King County Superior Court. Dkt. No. 13 at 6.

On September 3, 2026, Defendant A-I-I removed Plaintiff's claims against A-I-I. *See* Dkt. No. 1 at 2. On September 9, 2026, Plaintiff moved to remand those claims back to state court. Dkt. No. 13.

**2. The BMI Bankruptcy**

On October 2, 2023, Defendant BMI sought bankruptcy protection under Chapter 11 of the Bankruptcy Code. *See* Dkt. No. 40 at 10. Defendant A-I-I asserts that Defendant BMI's bankruptcy is "a result of lawsuits alleging [that] its talc contained asbestos and caused personal

injury and death." *Id.* Defendant BMI's bankruptcy is proceeding in the United States Bankruptcy Court for the Southern District of Texas. *Id.*

Upon Defendant BMI's filing for bankruptcy, Plaintiff's state-law claims against BMI were immediately and automatically stayed pursuant to 11 U.S.C. § 362. *See* Notice of Suggestion of Pendency of Bankruptcy and Automatic Stay of Proceedings, *LaSalle v. Am. Int'l Indus.*, No. 23-2-08165-0 SEA (Wash. Super. Ct. Oct. 2, 2023); *see also* Dkt. No. 1-5 (state-court docket sheet) at 22.[2] Defendant BMI provided notice of the automatic stay to all parties to the state-court matter on the same day it initiated its Chapter 11 case. *See id.* On May 6, 2024, Defendant A-I-I filed a Proof of Claim against Defendant BMI "for any and all amounts adjudicated, or otherwise determined, to be owed to A-I-I by [BMI] in connection with" asbestos-liability claims brought against Defendant BMI, on the basis that BMI had supplied Defendant A-I-I with talc that was purportedly free from asbestos. *See* Motion to Fix Venue at 8, *In re BMI Oldco Inc.*, No. C25-2193 (S.D. Tex. Sept. 2, 2026), Dkt. No. 102; Proof of Claim at 579–82, *In re BMI Oldco Inc.* (Sept. 2, 2026), Dkt. No. 102-2.

On May 14, 2025, in an Abatement Order and Report and Recommendation to District Court ("AORR"), the bankruptcy court recommended that the district court withdraw its reference of Defendant BMI's bankruptcy matter. *See* AORR at 1, *In re BMI Oldco Inc.*, (May 14, 2025), Dkt. No. 1. The bankruptcy court recommended that, "Because the question of the presence of disease-producing asbestos is fundamental and common to personal injury and wrongful death claims in this bankruptcy case, the Bankruptcy Court believes that the determination of the presence of asbestos must be determined by the United States District

---

[2] The Court "may take judicial notice of undisputed matters of public record, including documents on file in federal or state courts." *Harris v. County of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012); *see* Fed. R. Evid. 201(c)(1) (providing that the Court "may take judicial notice on its own").

Court." *Id.* at 3 (citing 28 U.S.C. § 157(b)(5)[3]).

On June 22, 2026, the United States District Court for the Southern District of Texas adopted the AORR. Order on AORR at 1, *In re BMI Oldco Inc.* (June 22, 2026), Dkt. No. 42. That district court will therefore determine in a separate proceeding "whether any talc sold by BMI contained sufficient quantity and form of asbestos to potentially cause mesothelioma or other asbestos related diseases." AORR at 9.

## II. LEGAL STANDARD

Regarding the removal of a state-court case to federal court,

> [I]f the case stated by the initial pleading is not removable, a notice of removal may be filed within thirty days after receipt by the defendant, through service or otherwise, of a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable.

28 U.S.C. § 1446(b)(3). When evaluating the timeliness of removal under this statute, Ninth Circuit courts employ an "'unequivocally clear and certain' standard," meaning that "an amended pleading, motion, order, or other paper must make a ground for removal unequivocally clear and certain before the removal clock begins[.]" *Dietrich v. Boeing Co.*, 14 F.4th 1089, 1095 (9th Cir. 2021). Further, "'other paper' . . . is defined as a written or printed document or instrument," not including "oral testimony." *Id.* at 1095 (citation modified).

## III. DISCUSSION

### A. The *Dietrich* Case

*Dietrich v. Boeing* controls the disposition of Plaintiff's motion. In *Dietrich*, the Ninth Circuit established a standard to enable courts to decide when the "removal clock . . . start[s]"

[3] "The district court shall order that personal injury tort and wrongful death claims shall be tried in the district court in which the bankruptcy case is pending, or in the district court in the district in which the claim arose, as determined by the district court in which the bankruptcy case is pending." 28 U.S.C. § 157(b)(5).

under 28 U.S.C. § 1446(b)(3). *Id.* at 1091. The *Dietrich* case began in October 2018 as a state-court action in which the original complaint did not initially demonstrate that the case was removable under the federal-officer removal statute, 28 U.S.C. § 1442. *Id*. But some six months later, on April 19, 2019, Dietrich served amended responses to Boeing's discovery requests, and the basis for removal became clear. *See id.* at 1092. Twenty-seven days after that, on May 16, 2019, Boeing removed the case to federal court. *See id.* The district court remanded the case, concluding that under Section 1446(b)(3), Boeing's 30-day window to remove the case had opened "when the defendant had sufficient information to be *able* to remove," which was "certainly prior to April 16, 2019[.]" *Id.*

The Ninth Circuit reversed. The court interpreted "ascertain," as used in Section 1446(b)(3), to mean "to find out or learn *with certainty*." *Id.* at 1093 (quoting Merriam-Webster). Therefore, the removability of a case may be "ascertained" when it is "unequivocally clear and certain" that the case may be removed. *Id.* at 1093–94. Applying this standard, the Ninth Circuit found that Dietrich's April 19, 2019, service of amended discovery responses—which revealed that "Dietrich's claims against Boeing were related to her husband's service in the military" and, therefore, removable under 28 U.S.C. § 1442—started the removal clock on that date. *Id.* at 1095.

The question here, then, is when did it become unequivocally clear and certain that this case could be removed to federal court.

**B. Removability**

**1. Basis for Removal**

First, the Court must establish grounds for removal. In the Notice of Removal, Defendant A-I-I asserts that "[t]he grounds for removal are that the claims against A-I-I are related to the bankruptcy of the sole supplier to A-I-I of the pharmaceutical grade talc used in A-I-I's Clubman

Talcum powder, which Plaintiff alleges caused the decedent's harm." Dkt. No. 1 at 2. The statutory basis for removal is 28 U.S.C. § 1452(a), which permits "[a] party" to remove a case where the "district court has jurisdiction of [the] claim or cause of action under [28 U.S.C. § 1334]." 28 U.S.C. § 1452(a). Section 1334, in turn, provides district courts with jurisdiction over "civil proceedings . . . related to cases under title 11." *Id.* § 1334(b). Defendant A-I-I's position is that the instant matter is "related to" a Title 11 case—*In re BMI Oldco, Inc.*, No. BK24-90794 (Bankr. S.D. Tex.), "the Chapter 11 reorganization case currently pending in the United States Bankruptcy Court for the Southern District of Texas." Dkt. No. 1 ¶ 15.

**2. "Related-to" Jurisdiction**

"The Ninth Circuit has adopted the '*Pacor* test' for determining the scope of 'related to' jurisdiction." The *Pacor* test contemplates whether

> *the outcome of the proceeding could conceivably have any effect on the estate being administered in bankruptcy.* Thus, the proceeding need not necessarily be against the debtor or against the debtor's property. An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate.

*In re Pegasus Gold Corp.*, 394 F.3d 1189, 1193 (9th Cir. 2005) (quoting *In re Fietz*, 852 F.2d 455, 457 (9th Cir. 1988)); *see Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984). Relying on the findings of the bankruptcy court in *In re BMI Oldco*, Defendant A-I-I argues that this "standard is satisfied several times over here." Dkt. No. 40 at 16.

"The Bankruptcy Court," Defendant A-I-I asserts, "has already found that the threshold causation issue presented by claims arising from BMI's talc directly affects administration of the Bankruptcy Case, the value of claims against the Estate, the feasibility of any plan, and the

resolution of future claims." *Id.* at 17. Indeed, Defendant A-I-I goes so far as to assert that "[t]he claims against A-I-I [in the instant case] . . . are, in essence, claims against BMI talc." *Id.* at 10.

The record supports Defendant A-I-I's position. The bankruptcy court abated bankruptcy proceedings specifically because it found that, in the aggregate, personal-injury or wrongful-death cases like the instant case in this Court constitute "a process involving hundreds of separate trials [that] will drain available resources from the estate[.]" AORR at 3. That is to say, the disposition of this case will have a direct and quantifiable effect on the disposition of the bankruptcy proceedings, and the outcome will unquestionably affect Defendant BMI's liabilities. It is obvious that "drain[ing] available resources from the estate" affects the estate. Moreover, the district court's adoption of the AORR endorses this conclusion. Simply put, it is very nearly impossible to imagine a situation where the instant case does not "conceivably have any effect on the estate being administered in bankruptcy." *Pegasus Gold*, 394 F.3d at 1193.

**3. Timeliness**

When, then, did it become unequivocally clear and certain that this Court had jurisdiction over Plaintiff's case? "The record of the state court is considered the sole source from which to ascertain whether a case originally not removable has since become removable." *Peabody v. Maud Van Cortland Hill Schroll Tr.*, 892 F.2d 772, 775 (9th Cir. 1989) (citation modified). Defendant A-I-I's argument that, despite the thousands upon thousands of pages of docket entries in this case (*see* Dkt. Nos. 15–26, 28 (state-court records)), its removability remains unascertainable is, frankly, implausible. *See* Dkt. No. 40 at 14 ("It is A-I-I's position that no 30-day removal clock has been triggered, and its Notice of Removal was timely."). As demonstrated below, this case has been removable—and unequivocally known to have been removable—for quite some time.

For Defendant A-I-I's removal to have been timely, the earliest it could have ascertained removability is August 4, 2026—that is, 30 days before the September 3, 2026, removal. *See* 28 U.S.C. § 1446(b)(3). But this Court's jurisdiction became clear long before August 2026.

* * *

This case was first filed in King County Superior Court on May 4, 2023. *See* Dkt. No. 15-1 at 1. From that point, the documents began to accumulate in the "record of the state court," *Peabody*, 892 F.2d at 775. As in *Dietrich*, the original pleading did not definitively establish removability. But as Plaintiff's case moved forward, and additional facts were revealed, federal-court jurisdiction became more and more clear, finally becoming unequivocally certain with Defendant BMI's October 2, 2023, bankruptcy, and the subsequent notice thereof.

**a. Allegations in the Washington State-Court Proceeding**

Plaintiff first argues that the 30-day removal clock started on May 4, 2023, the day the case was filed in Washington state court. *See* Dkt. No. 13 at 21. By that date, Plaintiff asserts, Defendants knew from Mr. LaSalle's November 2022 deposition (which was taken in the California case (*see* Dkt. No. 14-3 at 1)), that he "almost exclusively" used Clubman Talc (*id.* at 15:19–20). Defendants do not dispute this. *See generally* Dkt. No. 40. The Court agrees that Defendants would have known that Clubman Talc is at issue at the very outset of the Washington state case, as (1) they participated in, and agreed to the transfer of, the California case in which Mr. LaSalle's deposition was taken (*see* Dkt. No 15-1 (Defendants' stipulated consent to jurisdiction in Washington) at 8–12); (2) Defendant A-I-I admits that it made and sold a talcum powder product called Clubman Talc (Dkt. No. 41-8 (Declaration of Charles Loveless, Executive Vice President of A-I-I) ¶ 3); and (3) A-I-I obtained 100 percent of the pharmaceutical-grade talc that it blended into its Clubman product from Defendant BMI (*id.* ¶ 4).

However, the fact that Defendants knew that Clubman Talc was at issue upon the filing of the Washington case on May 4, 2023, is, by itself, insufficient to show that Defendants knew the case was removable to federal court as of that date. This is because Defendants premise this Court's removal jurisdiction on 28 U.S.C. § 1452 and the BMI bankruptcy case. *See* Dkt. No. 1 ¶¶ 12–13. But there is no record of the bankruptcy in the Washington state-court docket as of May 2023. *See* Dkt. No. 1-5 at 3–4. This is unsurprising, of course, given that Defendant BMI did not seek bankruptcy protection until October 2023.

**b. The BMI Bankruptcy**

Defendant BMI filed for bankruptcy protection on October 2, 2023. Plaintiff asserts that this served as an alternative trigger for the starting of the removal clock under 28 U.S.C. § 1446(b)(3). Dkt. No. 42 at 8–9. When Defendant BMI initiated bankruptcy proceedings, Plaintiff's claims against BMI were automatically stayed, pursuant to 11 U.S.C. § 362. *See id.* at 14. What matters here is that the automatic stay—and the reason therefor—was noted and recorded on the state-court docket on October 2, 2023. *See* Dkt. No. 1-5 at 22 (recording the submission of a Notice of Suggestion of Pendency of Bankruptcy and Automatic Stay of Proceedings)). The docketing of the Notice indicated the existence of federal-court jurisdiction over Plaintiff's claims against Defendant A-I-I, because it signaled that Plaintiff's claims were—through application of the *Pacor* test—"related to" Defendant BMI's bankruptcy. *See* 28 U.S.C. § 1334(b); *Pegasus Gold*, 394 F.3d at 1193. At that point, Defendant A-I-I was on notice that the exclusive supplier of talc for its Clubman product had filed for bankruptcy, in no small part due to the hundreds of asbestos lawsuits—like the instant case—that had been filed against it. Given Defendant A-I-I's assertions that: (1) "A-I-I and BMI share a direct relationship through A-I-I's exclusive purchase of BMI talc for incorporation into Clubman" (Dkt. No. 40 at 20), a relationship expressly endorsed by Defendant A-I-I in its Notice of Claim against Defendant

BMI; and (2) "every talc claim against A-I-I is, at its core, a claim that BMI's talc caused injury" (*id.*), it is unequivocally clear and certain that federal "related-to" jurisdiction attached to this case as soon as Defendant BMI filed for bankruptcy protection, especially in light of the significant role that "talc claims against [BMI]" played in Defendant BMI's bankruptcy. *See* Chapter 11 Petition at 14–17, *In re BMI Oldco Inc.*, No. BK23-90794 (Bankr. S.D. Tex. Oct. 2, 2023), Dkt. No. 1. Therefore, as of October 2, 2023, the case's removability under 28 U.S.C. § 1452 became unequivocally clear and certain.

For its part, Defendant A-I-I argues that it "had no ability to remove until it obtained standing as a party in the general causation proceeding." Dkt. No. 40 at 15. But as Plaintiff points out, "[n]owhere in A-I-I's opposition papers does A-I-I cited [*sic*] any authority for A-I-I's proposed rule whereby the 'related to' removal deadline is not triggered until a non-bankruptcy-debtor successfully intervenes into a bankruptcy case." Dkt. No. 42 at 10. And in any event, such a rule would seem to contravene the *Pacor* test, which holds that "[a]n action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate." *Pegasus Gold*, 394 F.3d at 1193. What could more clearly have the potential to "alter . . . [BMI's] . . . liabilities" than a tort action seeking to hold Defendant BMI liable for Jack LaSalle's wrongful death? Indeed, the *Pacor* test appears to caution against taking an overly narrow, party-based perspective on "related-to" jurisdiction, expressly providing that a "proceeding need not necessarily be against the debtor or against the debtor's property." *Id.*

* * *

In the end, what is good for the goose is good for the gander—or more appropriately, what is sauce for the goose is sauce for the gander. Defendant A-I-I asserts that "Plaintiff cannot

use the bankruptcy nexus as the premise for timing purposes while denying that same nexus for jurisdictional purposes." Dkt. No. 40 at 15. But Defendant A-I-I cannot invoke "related-to" jurisdiction for *jurisdictional* purposes while denying the same for *timing* purposes. It was unequivocally clear and certain that this case was removable long before Defendant A-I-I finally took action to remove it.

## IV. CONCLUSION

Accordingly, Plaintiff's motion to remand (Dkt. No. 13) is GRANTED. This case is REMANDED to King County Superior Court.

Further, Defendant PTI Union's request (Dkt. No. 37) that the Court clarify "if Union is currently a Defendant in this case" is DENIED AS MOOT.

Dated this 9th day of October 2026.

Tana Lin
United States District Judge